**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

| | |
|---|---|
| WILBUR-ELLIS COMPANY LLC,<br><br>                                  Plaintiff,<br><br>vs.<br><br>BRETT JENS and J.R. SIMPLOT<br>COMPANY,<br><br>                                  Defendants. | Court File No.: 4:23-cv-4104<br>                       _____<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Wilbur-Ellis Company LLC ("Wilbur-Ellis"), as and for its Complaint against Defendants Brett Jens ("Jens") and J.R. Simplot Company ("Simplot") (collectively, the "Defendants"), states and alleges as follows:

## PARTIES

1.      Wilbur-Ellis is a limited liability company formed under the laws of the State of California, and its principal place of business is located in San Francisco, California.

2.      Jens is a citizen and resident of the City of Tulare, South Dakota. Wilbur-Ellis employed Jens in South Dakota starting on or about March 16, 2007, until the termination of his employment on or about June 30, 2023.

3.      Simplot is a privately held company formed under the laws of the State of Idaho, and its principal place of business is located in Boise, Idaho. Simplot also maintains operations in the State of South Dakota.

4.      Jens is now employed by Simplot. Simplot is a direct competitor of Wilbur-Ellis.

## JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332.

6.      Wilbur-Ellis is a limited liability company formed under the laws of the State of California, and its principal place of business is located in San Francisco, California. Wilbur-Ellis's

sole member is Wilbur-Ellis Holdings II, LLC, a corporation formed under the laws of Delaware with a principal place of business located in San Francisco, California. Wilbur-Ellis Holdings II, LLC's sole member is Wilbur-Ellis Holdings, Inc., a corporation formed under the laws of the State of Delaware with its principal place of business located in San Francisco, California.

7.    Jens is a citizen and resident of the State of South Dakota.

8.    Simplot is a privately held company formed under the laws of the state of Idaho, and its principal place of business is located in Boise, Idaho.

9.    This is an action in which the amount in controversy exceeds $75,000.00.

10.    The case is properly venued in the United States District Court for the District of South Dakota under 28 U.S.C § 1391, as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTUAL BACKGROUND

### Wilbur-Ellis's Business

11.    Wilbur-Ellis is an international marketer, distributor and provider of agricultural chemicals, fertilizer, seed, and related agronomic products, services, and technologies.

12.    To serve its farm customers, Wilbur-Ellis sends experts to farms to sample and analyze soil, water, tissue, and other aspects of the farms' fields as part of an overall assessments of the needs of the farms, based in part on the crop and yield objectives of the individual farms. Wilbur-Ellis also services farms by innovating and selling proprietary products, including seeds, fertilizers, herbicides, and other applications, both directly to farmers and through Wilbur-Ellis's network of dealers. By leveraging its portfolio of branded technologies and biological solutions, its relationships and arrangements with customers, suppliers, licensors, and other business partners, and its commitment to service, Wilbur-Ellis helps its customers achieve significant financial returns.

13.     To achieve its mission of providing farmers with top quality products and professional agronomic recommendations to maximize yield for farmers and meet other strategic objectives, Wilbur-Ellis employs a team of Sales Agronomists to provide dedicated support to each of the farms with which Wilbur-Ellis has relationships. The Sales Agronomists are the farmers' direct point of contact for needed services, expert agronomy consulting, and the purchase of products, including some of Wilbur-Ellis' proprietary products, that the Sales Agronomist might recommend based on the robust and proprietary evaluation of the farm. Because of the depth of the agricultural experience provided by the Sales Agronomists, farmers across the country (including in South Dakota) are attracted by the services and products Wilbur-Ellis offers.

14.     Wilbur-Ellis's business model is dependent upon strategically developing partnerships and relationships with farmers across the United States (including in South Dakota, the geographic region in which Jens was employed by Wilbur-Ellis prior to the conclusion of his employment on or about June 30, 2023) to provide customized support and solutions with Wilbur-Ellis products based on the unique and individualized needs of the specific farm. Through its Sales Agronomists and Branch Managers, Wilbur-Ellis works with farmers to develop a customized regimen that optimizes yield and mitigates environmental risks to crops based upon, among other things, the location of the farm, the crop, the soil, and other factors that are analyzed by Wilbur-Ellis's Sales Agronomists' use of techniques and processes that were developed by and are proprietary to Wilbur-Ellis.

15.     Once a Sales Agronomist establishes a relationship on behalf of Wilbur-Ellis, the Sales Agronomist will work with the farmers to identify the mix of fertilizers, herbicides, fungicides, and other applications that is ideal for maximizing crop yield (and minimizing risk to crops) at the particular customer's farm. Wilbur-Ellis then sells the various agricultural products as

part of its services to the farmer. But the process of developing relationships with farmers and building the trust needed for a farmer to rely upon Wilbur-Ellis's agronomy expertise and purchase Wilbur-Ellis products is lengthy – which is why the role of the Sales Agronomist in identifying a potential customer, learning all aspects of the farmer's operations, and ultimately persuading the farmer to purchase Wilbur-Ellis products is crucial. Wilbur-Ellis seeks to develop longstanding relationships with the farmers based on the depth of its experience and quality of its products, no matter the identity of the Sales Agronomist or other Wilbur-Ellis employee that is responsible for calling on any particular farm or customer.

16.    The relationships between Wilbur-Ellis and its farm customers are a significant source of Wilbur-Ellis's competitive advantage in the marketplace. Wilbur-Ellis operates in a mature industry that relies on repeat business to achieve maximum success. As such, Wilbur-Ellis invests a substantial amount of time and money in developing its relationships with farmers and maintaining trade secrets and other confidential and proprietary information relating to Wilbur-Ellis's business relationships with the farm customers. The efforts by Wilbur-Ellis include, but are not limited to, identifying new farms for its sales teams; providing training to sales teams on how to arrange introductory meetings to determine the farm customer's needs and production goals; sending experts to conduct comprehensive assessments of the farms, farm conditions, soil and water conditions; the formation of unique solutions that can be provided by Wilbur-Ellis; and the creation of a confidential customer profile to track continuing customer needs. One of the most important factors and a primary source of Wilbur-Ellis's competitive advantage, therefore, is the relationships with its farm customers, facilitated by Sales Agronomists using Wilbur-Ellis's resources, including the information and training given to Sales Agronomists on Wilbur-Ellis's products and services, and the databases containing information compiled about the farms and customers. This

competitive advantage can quickly and permanently disappear if these relationships are damaged by the use of Wilbur-Ellis's trade secrets and other confidential and proprietary information to solicit those customers on behalf of a third-party such as Simplot.

17.    Wilbur-Ellis invests a substantial amount of its financial and other resources in developing and maintaining certain trade secrets and other confidential and proprietary information, including about Wilbur-Ellis's farm customers. This trade secret and confidential information includes, but is not limited to, the identities of farm customers with which Wilbur-Ellis partners; the contacts at each farm and ranch with which Wilbur-Ellis has built a relationship; identities of current and prospective farm customers; unique customer needs and requirements, preferences, businesses and habits; business relationships; products and services (including pricing, costs, sales, profitability, and scope of services); contents of product mixes and information relating to additives; crop health and needs, and the unique plans implemented for each farm customer based on the Sales Agronomist's evaluation of each particular farm or ranch and from information learned from third party data firms working directly with Wilbur-Ellis; financial information and measures relating to the products and services offered and sold by Wilbur-Ellis to its customers, including the financial information regarding gross sales volume, profitability metrics, and historic volumes; future business plans and Wilbur-Ellis's business strategy; information contained in Wilbur-Ellis's confidential and proprietary databases; Wilbur-Ellis's organization; customer's organizations; and other confidential information that assist the Wilbur-Ellis sales team in maintaining and growing sales of Wilbur-Ellis products to its farm customers.

18.    Wilbur-Ellis invests a substantial amount of time and money in developing its relationships with the farms and maintaining certain trade secrets and other confidential and proprietary information relating to Wilbur-Ellis's business relationships with them.

19.     Because of the specialized nature of the services offered by Wilbur-Ellis, the information it develops and acquires, including about the farm customers is extremely valuable, is unknown to the general public or Wilbur-Ellis's competitors, and is one of the primary sources of Wilbur-Ellis's competitive advantage in the industry.

20.     Wilbur-Ellis goes to great lengths to maintain the secrecy of its trade secrets and confidential business information. Such trade secret and confidential business information includes, without limitation, information regarding the Company's business and strategy, research and development (including highly confidential seed and other proprietary product formulations), products, technical product information, quality control methods, pricing and margins, customers, and agreements with suppliers, licensors, and other business partners, among other things. Wilbur-Ellis does not provide access to any of its trade secrets or other confidential business information to members of the general public, other competitors in its industry, or to non-employees, unless such disclosure is subject to a confidentiality agreement.

21.     Furthermore, not all Wilbur-Ellis employees have access to all categories of Wilbur-Ellis's confidential and proprietary information, such as customer-related confidential information, including, by way of example, customer-level profitability reports, historical sales data, credit lines and limits, and names and contact information for purchasing decision-makers. Wilbur-Ellis maintains applications and databases in which such information is compiled and provided to those employees (including Jens) who have a need to know such information for purposes of their job responsibilities and level in the organization for purposes of servicing and selling products to customers – on behalf of and for the benefit of Wilbur-Ellis. Such information is secured by individualized login credentials which are provided only to those employees who need access to such information to perform their legitimate job duties. Indeed, Wilbur-Ellis also employs full-time

IT personnel, and one of their primary responsibilities is to secure the company's confidential, proprietary, or technical information

22.     Wilbur-Ellis also employs and compensates Branch Managers to manage, lead, and direct sales teams of Sales Agronomists, develop both Wilbur-Ellis personnel and retail strategy, and oversee sales operations at a specific Wilbur-Ellis branch. The primary functions of the Branch Manager role are the effective management and development of talent, business plan development for sales and profit growth, oversight of key accounts and operation of a safe and productive work environment. Branch Managers spend about 20-30% of their time performing sales with key account customers, including all of the responsibilities of a Sales Agronomist for cultivating and growing relationships with Wilbur-Ellis customers. Thus, Branch Managers have the same access to and control of, and are paid to cultivate, the invaluable customer relationships and goodwill to much the same degree as Sales Agronomists that the Branch Managers supervise. Branch Managers also have virtually the same access to the valuable trade secrets to which Sales Agronomists have access, and Branch Managers routinely use this information to help Sales Agronomists successfully grow Wilbur-Ellis's business and also in the Branch Managers' own development and growth of customer relationships and business.

23.     Sales Managers are responsible for managing the territory sales and support teams, including, but not limited to, by supervising the Branch Managers. Sales Managers are expected to develop retail strategy development and implementation, direct management of Wilbur Ellis branch locations, oversee personnel development, maintain operational oversight, and drive financial results of the branches in the Sales Manager's assigned territory. In addition, Sales Managers are responsible for identifying key customers, understanding the customers' business, determining their needs, and develop plans and actions to build a complete "Wilbur Ellis" relationship that is deeper

than a buy-sell relationship. Utilizing the data collected by Sales Agronomist and Branch Managers, Sales Managers utilize protected client data and information to help develop sales plans and strategies for growing key customer relationships in the assigned territory and achieve financial targets for the territory.

24.    The compensation of Sales Agronomists, Branch Managers, and Sales Managers, all include a base salary and significant compensation based on sales performance.

25.    In addition, Wilbur-Ellis incurs great expense training and educating its sales teams in order to ensure the highest quality of service to clients. By way of example, Wilbur-Ellis offers more than 100 training modules on agronomy and advanced agronomy, which are available only to Wilbur-Ellis employees.

26.    There are additional training programs available to Wilbur-Ellis's managers, including Sales Managers. For example, select managers are nominated and selected to participate in a special management development program to assist the managers in their development as leaders in the sales organization. Managers that are selected to participate in this program receive specialized training that includes meeting agricultural lobbyists in Washington D.C., meeting with representatives of various tech companies in California, and additional management training classes at Purdue University. The management development program is a two-year program and Wilbur-Ellis only accepts about twenty applicants per cycle. Wilbur-Ellis provides the opportunity for this training program, at significant investment of time and money by Wilbur-Ellis, to ensure the continued development of its management team, who contribute substantially to the success of Wilbur-Ellis's business endeavors.

**Simplot's Business**

27.    Simplot is a direct competitor of Wilbur-Ellis; it is a food and agribusiness company that provides plant nutrition and food processing services, services farmers, and sells seeds and other services for crop growth and production.

**Jens's Employment with Wilbur-Ellis**

28.    Wilbur-Ellis employed Jens, commencing on or about March 16, 2007, until the termination of his employment on or about June 30, 2023.

29.    Jens's employment with Wilbur-Ellis arose as a result of Wilbur-Ellis's acquisition of Krech Dakota Airspray, Inc. ("Dakota Airspray"). On or about March 16, 2007, Wilbur-Ellis acquired Dakota Airspray. Dakota Airspray was Jens's employer prior to March 16, 2007, beginning in 1999. As part of the acquisition, a number of employees of Dakota Airspray, including Jens, were offered employment with Wilbur-Ellis after the close of its acquisition of Dakota Airspray. Jens accepted the offer of employment with Wilbur-Ellis and was initially hired as the Branch Manager for Wilbur-Ellis's Tulare, South Dakota, branch location. As of October 15, 2019, Jens was promoted to Sales Manager for Northwest South Dakota, overseeing numerous branches including Redfield, Tulare, Huron, and Wessington Springs. Jens gained even more access to Wilbur-Ellis's trade secrets and confidential information as the Sales Manager, as he was responsible for overseeing all sales and commercial activity in his assigned district (consisting of multiple branches). Jens had access to extensive protected client information, which he utilized to consider the District needs, assist in customer management, and forecast future needs and financial information.

30.    During his employment with Dakota Airspray, Jens was a key member of the ownership group and was responsible for, among other things, developing Dakota Airspray's business strategies, customer relationships, confidential customer information and customer

goodwill. Jens had access to virtually all of Dakota Airspray's valuable trade secrets, customer relationships, and customer goodwill developed by Dakota Airspray. Wilbur-Ellis acquired such trade secrets and other confidential information and the customer relationships and good will owned by Dakota Airspray, all of which (among other things) was taken into account when Wilbur-Ellis set a valuation of Dakota Airspray's business.

31.     Accordingly, it was important to Wilbur-Ellis to protect the trade secrets, confidential information, and customer goodwill that it acquired from Dakota Airspray after the acquisition, including from Jens's improper use or disclosure of any Dakota Airspray trade secrets and other confidential information (which was now owned by Wilbur-Ellis) and from Jens's improper conversion of customer relationships and other damage to customer goodwill that would occur if Jens took employment with a competitor of Wilbur-Ellis. Because of the work Jens performed for Wilbur-Ellis, his access to Wilbur-Ellis's customer relationships and goodwill, and the sensitivity of the information to which Wilbur-Ellis granted Jens access as a result of his employment, Wilbur-Ellis required Jens to agree to certain restrictive covenants at the inception of employment. As an express condition to his employment with Wilbur-Ellis, Jens executed an Employment Agreement, with an effective date of March 16, 2007. A true and correct copy of the Employment Agreement is attached to the Complaint as **Exhibit A** and incorporated herein by reference.

32.     As consideration for Jens signing the Employment Agreement, Wilbur-Ellis agreed to: (1) employ him full-time as Branch Manager for Wilbur-Ellis's Tulare, South Dakota facility; (2) pay him an initial salary of $80,290.00, which was subject to annual review and increased during his employment; (3) enroll him in the company's bonus program; (4) provide him with a company vehicle at no cost; (5) enroll him in the company's fringe benefits program; and (6) allow him

access to Wilbur-Ellis's highly confidential, proprietary, and technical information, as well as Wilbur-Ellis's customer relationships, so that he could successfully perform his job duties and support the Tulare branch. Wilbur-Ellis would not have provided Jens with any of the extremely lucrative compensation and benefits of employment except for his execution of the Employment Agreement and promises to abide by its terms. In other words, there can be little doubt that Jens was handsomely compensated by Wilbur-Ellis in exchange for his promises in the Employment Agreement.

33.     Under the Employment Agreement, Jens agreed (among other things) to certain post-employment restrictive covenants that controlled following his departure from Wilbur-Ellis. In particular, the restrictive covenants contained in the Employment Agreement to which Jens agreed restricted his ability to engage in any "Competitive Business" (defined below) or solicit Wilbur-Ellis's customers and prospective customers, and employees. Specifically, Section 5 of the Employment Agreement states:

> 5.     <u>Covenant Not to Compete</u>.
>
> . . .
>
> (ii) The Employee further covenants and agrees that he will not, at any time for a period of three (3) years following the date his employment is terminated, for whatever reason (the "Restriction Period"), **directly or indirectly, (A) engage in any business engaged in the marketing, distribution, sale or application ( or any segment thereof) of agricultural chemicals, fertilizer, seed and related products within one hundred (100) miles of the area served by business acquired from Dakota Airspray (the "Competitive Business")**, whether such engagement shall be as an owner, partner, employee, agent, consultant, or shareholder (except as the holder of not more than five percent (5%) of the outstanding shares of a corporation whose stock is listed on any national or regional securities exchange or any successor thereto) or in any other capacity; (B) **directly or indirectly solicit, divert or accept business from or otherwise take away or interfere with any customer of the Employer or its affiliates or subsidiaries engaged in any Competitive Business**, including without limitation, any person who was a customer of, or whose

business was being pursued by, the Employer in the conduct of its business prior to the date hereof; or (C) **solicit the employment of any person employed by the Employer or its affiliates or subsidiaries**.

*See* Exhibit A at § 5(ii) (emphasis added).

34.    Pursuant to the Employment Agreement, Jens agreed that the restrictions and limitations contained in the Employment Agreement were reasonable as to scope and duration and were necessary to protect Wilbur-Ellis's goodwill and proprietary interests. Specifically, Section 6 states:

> 6.    <u>Employee Acknowledgements.</u> Employee acknowledges that the Restriction Period, the geographical areas of restriction and the scope of restraints imposed by the provisions of Section 5 above are fair and reasonably required for the protection of the Employer. If any provision of the covenants and agreements set forth above shall be held invalid or unenforceable because of the scope of the territory or the actions thereby restricted, or the period of time within which such covenant or agreement is operative, or for any other reason, it is the intent of the parties hereto that such provision shall be construed by limiting and reducing it such that the covenants and agreements may be upheld and enforced, or, if necessary, eliminating it so that the provisions hereof be valid and enforceable to the extent compatible with applicable law as determined by a court of competent jurisdiction.

*See* Exhibit A at § 6.

35.    Jens also agreed under the Employment Agreement that if he breached a provision, Wilbur-Ellis is entitled to various remedies. Specifically, Section 14 states:

> 14.    <u>Remedies.</u> The Employee acknowledges that a violation of any of the provisions of this Agreement, including its restrictive covenants, will cause irreparable damage to the Employer, its successors and assigns. The Employee consents that any violation shall entitle the Employer or its successors and assigns, in addition to any other rights or remedies it, or they, may have, to an immediate injunction restraining Employee from committing or continuing any violation of this Agreement. Employee will not assert any claim or defense in any action or proceeding to enforce any provision hereof that the Employer has or had an adequate remedy at law.

*See* Exhibit A at § 14.

36.      The parties agreed that the Agreement shall be construed and enforced in accordance with the laws of the State of South Dakota, irrespective of conflicts of law principles.

37.      Jens commenced his employment with Wilbur-Ellis as a Branch Manager of the Tulare location on or about March 16, 2007. Throughout the duration of his employment, Wilbur-Ellis invested substantial efforts into Jens's growth and knowledge in the industry.

38.      From March 16, 2007, through June 30, 2023, Jens held various sales-focused positions including Branch Manager and Sales Manager. These positions utilized protected customer information compiled by Sales Agronomists to strategize and develop customer sales. During this time, Jens continued to develop relationships with customers in South Dakota.

39.      Wilbur-Ellis compensated Jens very well during his employment. Wilbur-Ellis valued Jens's customer and employee development and retention. In 2022, his last full year of employment, Jens was compensated $291,492.84.  Jens would never have had the opportunity to receive such substantial compensation from Wilbur-Ellis but for his signing the Employment Agreement that was a condition of his original offer of employment with Wilbur-Ellis.

### Jens's Abrupt Resignation of His Employment and Jens's Breach of the Employment Agreement

40.      On or about June 30, 2023, Jens gave notice of his resignation of employment with Wilbur-Ellis.

41.      Upon information and belief, almost immediately after his employment with Wilbur-Ellis ended, Jens commenced employment with Simplot in a role that was directly competitive with the roles he held with Wilbur-Ellis. As discussed above, Simplot is a direct competitor of Wilbur-Ellis and it is beyond dispute that Simplot engages in a Competitive Business, as defined in the Employment Agreement.

42.    Jens has continued his employment with Simplot working from and reporting to Simplot's office located at 38420 US Highway 12 West, Aberdeen, South Dakota, or his home office at 38663 182nd St, Tulare, South Dakota 57476. The Simplot office where Jens works is located within a 100-mile radius of Spink County, South Dakota, part of the territory in which, pursuant to the Employment Agreement, Jens's restrictive covenants applied as it was withing 100 miles of the area served by the business Wilbur-Ellis acquired from Dakota Airspray ("the geographical areas of restriction"). Notwithstanding his legal obligations to Wilbur-Ellis, Wilbur-Ellis has information and believes that Jens has repeatedly visited and worked from Simplot's offices in Aberdeen, South Dakota – meaning that he is engaging in competitive activities that are strictly prohibited by the Employment Agreement.

43.    To make matters worse, Jens has breached his other contractual promises to Wilbur-Ellis pursuant to the Employment Agreement. In plain violation of his contractual obligations to Wilbur-Ellis, Jens has solicited more than one Wilbur-Ellis employee to terminate their employment with Wilbur-Ellis and take employment with Simplot.

44.    Wilbur-Ellis has information and believes that Jens has engaged in such solicitation of employees utilizing the trade secrets and other confidential and proprietary information provided by Wilbur-Ellis and to which he had access during his employment with Wilbur-Ellis. Jens has done so with the knowledge, support and encouragement of Simplot, for Simplot's own financial gain and growth of its business in South Dakota.

45.    Information about the full scope and nature of Jens's solicitation of other Wilbur-Ellis's employees in not fully known.  The complete knowledge and information resides in the sole possession of Defendants.

46.     Upon information and belief, Simplot was aware and encouraging of Jens's behavior, including Jens's violation of the Employment Agreement and solicitation of Wilbur-Ellis employees to leave Wilbur-Ellis for Simplot. Simplot is aware of Jens's Employment Agreement and Jens's corresponding continuing obligations to Wilbur-Ellis. As a result, Simplot is likewise aware that Jens's employment and solicitation of employees in the geographical areas of restriction is contrary to the terms of the restrictive covenants contained in the Employment Agreement. Nonetheless, Simplot has condoned, ratified, encouraged, assisted in, and benefitted from Jens's misconduct in an effort to take advantage of Wilbur-Ellis's years of investment, and goodwill. Simplot has done so in order to gain market share and damage Wilbur-Ellis's competitive advantage in the marketplace without incurring the time and expense necessary to independently develop and train its own workforce, or independently develop its own customer relationships, thereby competing unfairly with Wilbur-Ellis in the marketplace.

47.     Upon information and belief, Jens continues to solicit Wilbur-Ellis's employees in the geographical areas of restriction on behalf of Simplot. This is precisely the type of unfair competition that the restrictive covenants in the Employment Agreement were designed to prevent. The proof supporting these allegations is within Jens's and/or Simplot's sole possession and control, and discovery in this case will show the nature and extent of how Jens has and continues to unlawfully solicit Wilbur-Ellis customers and employees.

48.     Jens's actions send a message that has been heard loud and clear by Wilbur-Ellis. Jens and Simplot have no intention of honoring Jens's—or other Wilbur-Ellis employees'—legal and contractual obligations to Wilbur-Ellis, which necessitates emergency injunctive relief.

49.     Except for Jens's competition and solicitation in violation of his Employment Agreement and Simplot's intentional and unjustified interference with the contract between Wilbur-Ellis and Jens, Wilbur-Ellis would not have suffered irrevocable and irreparable damage.

## COUNT I
## BREACH OF THE EMPLOYMENT AGREEMENT
*(Against Jens)*

50.     Wilbur-Ellis restates and incorporates the allegations contained in paragraphs 1-49 of the Complaint as though fully set forth herein.

51.     Jens and Wilbur-Ellis are parties to the Employment Agreement.

52.     All provisions in the Employment Agreement constitute enforceable promises, and so, the Employment Agreement is enforceable in its entirety.

53.     Wilbur-Ellis has satisfied all conditions precedent necessary to demand performance by Jens.

54.     The Employment Agreement is supported by adequate consideration.

55.     The Employment Agreement's restrictive covenants are reasonable and enforceable as to time and scope, and are necessary to protect Wilbur-Ellis's legitimate business interests, including but not limited to its goodwill, confidential, proprietary, or technical information, and relationships with its employees and its current or prospective customers.

56.     Jens breached the Employment Agreement's Covenant Not to Compete provision by beginning to work for Simplot shortly after his departure from Wilbur-Ellis. Jens currently reports to a Simplot location within the geographical areas of restriction, and, further, has solicited Wilbur-Ellis's employees within the geographical areas of restriction, on behalf of Simplot, in violation of the Employment Agreement.

57.     Jens breached the Employment Agreement's Non-Solicitation provision, because, upon information and belief, Jens has solicited other Wilbur-Ellis employees to join Simplot.

58.     Coupled with injunctive relief, Jens's unlawful conduct entitles Wilbur-Ellis to legal and equitable remedies, including monetary damages in an amount in excess of $75,000.00, to be determined after discovery or at trial.

### COUNT II
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
(*Against Jens*)

59.     Wilbur-Ellis restates and incorporates the allegations contained in paragraphs 1–58 of the Complaint as though fully set forth herein.

60.     Wilbur-Ellis has valid contractual relationships with all its employees.

61.     Jens intentionally and unjustifiably interfered with Wilbur-Ellis's valid contractual relationship with its employees by, among other things, soliciting employees to leave employment with Wilbur-Ellis and take employment with Simplot in violation of those employees' agreements with Wilbur-Ellis and, more specifically, the post-employment restrictive covenants contained therein.

62.     Jens's intentional and unjustifiable interference with Wilbur-Ellis's contractual relationships caused and exposed Wilbur-Ellis to immediate and irreparable harm for which there is no adequate remedy at law.

63.     Coupled with injunctive relief, Jens's intentional and unjustifiable interference with Wilbur-Ellis's contractual relationships caused it additional harm and entitles Wilbur-Ellis to other legal and equitable remedies, including monetary damages in an amount in excess of $75,000.00, to be determined after discovery or at trial.

### COUNT III
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
(*Against Simplot*)

64.     Wilbur-Ellis restates and incorporates the allegations contained in paragraphs 1–63 of the Complaint as though fully set forth herein.

65.    Simplot was and remains aware of Jens's continuing contractual obligations to Wilbur-Ellis.

66.    In spite of the above, Simplot intentionally interfered with Wilbur-Ellis's contractual relations with Jens, inducing him to breach those obligations for an improper purpose and by improper means.

67.    Simplot condoned, ratified, encouraged, assisted in and benefitted from Jens's misconduct.

68.    Simplot's misconduct in this regard was wanton, willful, intentional and in reckless disregard of Wilbur-Ellis's rights.

69.    Simplot's intentional and unjustifiable interference with Wilbur-Ellis's contractual relationships caused and exposed Wilbur-Ellis to immediate and irreparable harm for which there is no adequate remedy at law.

70.    Coupled with injunctive relief, Simplot's intentional and unjustifiable interference with Wilbur-Ellis's contractual relationships caused it additional harm and entitles Wilbur-Ellis to other legal and equitable remedies, including monetary damages in an amount in excess of $75,000.00, to be determined after discovery or at trial.

**COUNT IV**
**BREACH OF DUTY OF LOYALTY**
(*Against Jens*)

71.    Wilbur-Ellis restates and incorporates the allegations contained in paragraphs 1–70 of the Complaint as though fully set forth herein.

72.    Jens owed Wilbur-Ellis a duty of loyalty under South Dakota Law and a corresponding duty to ensure that his conduct did not breach the trust of Wilbur-Ellis, including, without limitation, his covenants to Wilbur-Ellis set forth in his Employment Agreement.

73.     Wilbur-Ellis placed special trust and confidence in Jens, investing substantial time and resources in him in the form of training, access to confidential information and trade secrets, and access to established customers. Jens accepted such trust and confidence.

74.     Upon information and belief, Jens has breached his duty of loyalty to Wilbur-Ellis by soliciting Wilbur-Ellis's employees, while still employed, to move with him to Simplot, and misappropriating, upon information and belief, Wilbur-Ellis's confidential information and trade secrets, all for the purpose of assisting Simplot, a direct competitor of Wilbur-Ellis, during his employment with Wilbur-Ellis as described hereinabove.  The information and evidence related to this allegation is in Defendants' possession and control.

75.     As a direct and proximate result of his breaches, Wilbur-Ellis has suffered and will continue to suffer monetary damages.

76.     Wilbur-Ellis is entitled to judgment against Jens for the amount of its actual, general, compensatory, incidental, special, and consequential damages, as well as punitive damages.

77.     Wilbur-Ellis is also entitled to recover from Jens all wages paid to him during any period of his employment in which he was engaged in acts disloyal to Wilbur-Ellis.

**COUNT V**
**AIDING AND ABETTING BREACH OF DUTY OF LOYALTY**
(*Against Jens and Simplot*)

78.     Wilbur-Ellis restates and incorporates the allegations contained in paragraphs 1–77 of the Complaint as though fully set forth herein.

79.     At all times pertinent hereto, Jens owed Wilbur-Ellis a fiduciary duty of loyalty to safeguard its confidential information, to protect the stability of its workforce and not to use Wilbur-Ellis funds and other documents and information to compete against it.

80.     By the conduct set forth herein, Jens performed wrongful acts that injured Wilbur-Ellis.

81.     Simplot was at all relevant times aware of Jens's duty of loyalty to Wilbur-Ellis and aware of their role in their fiduciary breaches at the time the fiduciary breaches occurred. Upon information and belief, Simplot did so by incentivizing this behavior by offering these Jens and other employees financial incentives (and upon information and belief) indemnification, among other things, all for the benefit of Simplot.

82.     Wilbur-Ellis was and continues to be damaged by Simplot's wrongful inducement of Jens to breach his fiduciary duties to Wilbur-Ellis.

83.     Further, Wilbur-Ellis suffered and will continue to suffer immediate irreparable harm until Simplot is enjoined, as Wilbur-Ellis continues to suffer from Simplot's aiding and abetting of the fiduciary breaches – the fruit of the poisonous tree. Injunctive relief is necessary as Wilbur-Ellis is without an adequate remedy at law to prevent these harms to Wilbur-Ellis.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Wilbur-Ellis respectfully requests the Court enter an Order granting the following relief:

1.     Entering an order temporarily and permanently enjoining:

   a.     Jens, and all those acting in concert with him, from (1) taking action of any character that results in violation of or interference with the non-competition provisions of the Employment Agreement, including, but not limited to, continuing employment with Simplot, or any of its subsidiaries, parents, or other related entities, within the geographical areas of restriction for the period of time defined in the Employment Agreement; (2) taking action of any character that results in violation of or interference with the non-solicitation provision of the Employment Agreement, including, but not limited to, soliciting Wilbur-Ellis employees or soliciting, diverting or accepting business from or otherwise taking away or interfering with any customer or prospective customer of Wilbur-Ellis, for the period of time defined in the Employment Agreement; (3) taking any action that results in the violation of the confidentiality provisions of the Employment Agreement;

and (4) tortiously interfering with Wilbur-Ellis's contractual relationships with its employees, customers, dealers, and business partners;

b.      Simplot, and all those acting in concert with them, from tortiously interfering with Wilbur-Ellis's contractual rights pursuant to Jens's Employment Agreement.

2.      Compelling expedited discovery pursuant to F.R.C.P. 26(d)(1).

3.      Awarding Wilbur-Ellis compensatory and exemplary damages in an amount to be proven at trial incurred due to Jens's breaches of the Employment Agreement, and any other damages the Court deems just and necessary.

4.      Awarding Wilbur-Ellis compensatory damages incurred due to Defendants' tortious interference with its contractual relationships, and any other damages the Court deems just and necessary.

5.      Awarding Wilbur-Ellis all reasonable attorneys' fees incurred in pursuing its claims in this matter, as the Court deems just and proper.

6.      Awarding Wilbur-Ellis its allowable interest, costs, disbursements, and penalties in this matter as the Court deems just and proper.

7.      Directing such other relief as the Court deems just and equitable.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Wilbur-Ellis demands a trial by jury on all issues so triable in the case.

Dated:  July 6, 2023

/s/ David J. Goldstein
David J. Goldstein, Bar No. SBSD #4281
dgoldstein@littler.com
Jeremy D. Sosna, MN Bar No. 290233
jsosna@littler.com
*(Pro Hac Vice Forthcoming)*
Lauren E. Clements, MN Bar No. 0399187
lclements@littler.com
*(Pro Hac Vice Forthcoming)*
Michelle A. Christy, MN Bar No. 0402038
mchristy@littler.com
*(Pro Hac Vice Forthcoming)*
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone:      612.630.1000

Attorneys for Plaintiff

4869-2681-1245.4 / 080113-1036

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a)  PLAINTIFFS**
Wilbur-Ellis Company LLC

**(b)**  County of Residence of First Listed Plaintiff  San Francisco
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
David J. Goldstein, Littler Mendelson, P.C., 1300 IDS Center
80 S. 8th Street, Minneapolis, MN 55402, 612-630-1000

**DEFENDANTS**
Brett Jens and J. R. Simplot Company

County of Residence of First Listed Defendant  Spink County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [x] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 365 Personal Injury - Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander / [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle / **PERSONAL PROPERTY** | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability / [ ] 370 Other Fraud | | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury / [ ] 371 Truth in Lending | | | [ ] 485 Telephone Consumer Protection Act |
| [x] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice / [ ] 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 385 Property Damage Product Liability | [ ] 720 Labor/Management Relations | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | [ ] 751 Family and Medical Leave Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | [ ] 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities- Employment / [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities- Other / **Other:** / [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education / [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation- Transfer
- [ ] 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C § 1332
Brief description of cause:
Unfair competition

**VII. REQUESTED IN COMPLAINT:**
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$75,000+ per count

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*
JUDGE  Lawrence L. Piersol
4:23-cv-04058
DOCKET NUMBER  4:23-cv-4097

DATE  July 6, 2023
SIGNATURE OF ATTORNEY OF RECORD  /s/ David J. Goldstein

**FOR OFFICE USE ONLY**

RECEIPT #  _____  AMOUNT  _____  APPLYING IFP  _____  JUDGE  _____  MAG. JUDGE  _____

American LegalNet, Inc.
www.FormsWorkFlow.com