# EXHIBIT B

# Declaration of Tracie Gogolin

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

| | |
|---|---|
| WILBUR-ELLIS COMPANY LLC, | Court File No.: <u>4:23-cv-4104</u> |
| Plaintiff, | |
| vs. | **DECLARATION OF TRACIE GOGOLIN** |
| BRETT JENS, SHANE FASTNACHT, PHYLICIA HOFFMAN, WES HOTCHKISS, and J.R. SIMPLOT COMPANY, | **IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Defendants. | |

Tracie Gogolin swears, affirms, and attests to the following:

1.      I, Tracie Gogolin, am over 18 years of age and make the statements contained in this Declaration based upon my own personal knowledge and in support of Wilbur-Ellis Company LLC's ("Wilbur-Ellis") Motion for Temporary Restraining Order.

2.      I am providing this Declaration voluntarily and am competent to testify to the matters included in it. I have not been promised or given anything in exchange for providing this Declaration.

3.      I am currently the Vice President of People & Culture ("VP of People & Culture"). I joined Wilbur-Ellis in February 2012.

4.      Wilbur-Ellis is a limited liability company founded in 1921 as an international marketer, distributor and provider of agricultural chemicals, fertilizer, seed, and related agronomic products, services, and technologies.

5.      Wilbur-Ellis's customer base is farmers. To serve its customers, Wilbur-Ellis sends experts to farms to sample and analyze soil, water, tissue, and other aspects of the farms' fields as part of an overall assessments of the needs of the farms, based in part on the crop and yield

objectives of the individual farms. Wilbur-Ellis also services farms by innovating and selling proprietary products, including seeds, fertilizers, herbicides, and other applications, both directly to farmers and through Wilbur-Ellis's network of dealers. By leveraging its vast portfolio of branded technologies and biological solutions, its relationships and arrangements with customers, suppliers, licensors, and other business partners, and its commitment to service, Wilbur-Ellis helps its customers achieve significant financial returns.

6.     To achieve its mission of providing farmers with top quality products and professional agronomic recommendations to maximize yield for farmers and meet other strategic objectives, Wilbur-Ellis employs a team of Sales Agronomists to provide dedicated support to each of the farms with which Wilbur-Ellis has relationships. The Sales Agronomists are the farmers' direct point of contact for needed services, expert agronomy consulting, and the purchase of Wilbur-Ellis products that the Sales Agronomist might recommend based on the robust and proprietary evaluation of the farm.  Because of the depth of the agricultural experience provided by the Sales Agronomists, farmers across the country (including in South Dakota) are attracted by the services and products Wilbur-Ellis offers.

7.     Wilbur-Ellis's business model involves strategically developing partnerships and relationships with farmers across the United States (including in South Dakota) to provide customized support and solutions with Wilbur-Ellis products based on the unique and individualized needs of the specific farm.  Through its Sales Agronomists and Branch Managers, Wilbur-Ellis works with farmers to develop a customized regimen that optimizes yield and mitigates environmental risks to crops based upon, among other things, the location of the farm, the crop, the soil, and other factors that are analyzed by Wilbur-Ellis's Sales Agronomists' use of techniques and processes that were developed by and are proprietary to Wilbur-Ellis.

8.      Wilbur-Ellis also employs and compensates Branch Managers to manage, lead, and direct sales teams of Sales Agronomists, develop both Wilbur-Ellis personnel and retail strategy, and oversee sales operations at a specific Wilbur-Ellis branch. The primary functions of the Branch Manager role are the effective management and development of talent, business plan development for sales and profit growth, oversight of key accounts and operation of a safe and productive work environment. Branch Managers spend about 20-30% of their time performing sales with key account customers, including all of the responsibilities of a Sales Agronomist for cultivating and growing relationships with such customers. Thus, Branch Managers have the same access to and control of, and are paid to cultivate, the invaluable customer relationships and goodwill to much the same degree as Sales Agronomists that the Branch Managers supervise. Branch Managers also have virtually the same access to the valuable trade secrets to which Sales Agronomists have access, and Branch Managers routinely use this information to help Sales Agronomists successfully grow Wilbur-Ellis's business and also in the Branch Managers' own development and growth of customer relationships and business.

9.      Territory Sales Managers are responsible for managing the territory sales and support teams, including, but not limited to, by supervising the Branch Managers. Territory Sales Managers are expected to develop retail strategy development and implementation, direct management of Wilbur-Ellis branch locations, oversee personnel development, maintain operational oversight, and drive financial results of the branches in the Territory Sales Manager's assigned territory. In addition, Territory Sales Managers are responsible for identifying key customers, understanding the customers' business, determining their needs, and develop plans and actions to build a complete "Wilbur-Ellis relationship" that is deeper than a buy-sell relationship. Utilizing the data collected by Sales Agronomist and Branch Managers, Territory Sales Managers

utilize protected client data and information to help develop sales plans and strategies for growing key customer relationships in the assigned territory and achieve financial targets for the territory.

10.     District Sales Managers are responsible for supervising the Territory Sales Managers and ensuring the success of the Territory Sales Manager's oversight of the territory. District Sales Managers (who report to the Director of Sales) and are responsible for managing, leading, and directing operations within their assigned district (which is made up of multiple territories). In this role, District Sales Managers have oversight of all sales and commercial activity in their assigned district, act as a mentor to all new sales personnel in the district, help the sales teams in each territory within the district develop their customer relationships and grow sales, and oversee all operational aspects of servicing and supporting the customers in the district for which they have responsibility. District Sales Managers also identify potential new customers, devise sales plans, and assist with executing the sales plans. District Sales Managers have access to extensive protected client information, which is utilized to strategize district needs, assist in customer management, and forecast future needs and financial information.

11.     Wilbur-Ellis also employs a variety of people, including the employees solicited by Brett Jens ("Jens"), Shane Fastnacht ("Fastnacht"), Phylicia Hoffman ("Hoffman"), and Wes Hotchkiss ("Hotchkiss") (collectively, the "Former Employees"), in an operations capacity, such as Operations Managers and Warehouse Leads. These individuals are responsible for managing the interaction of support groups within the branch, including the warehouse, production plants (fertilizer, manufacturing), dispatch, and purchasing. The Operations Manager is responsible for ensuring each group operates efficiently to achieve its goals and interacts effectively with the other operation groups within the facility. The Operations Manager's direct reports include plant, warehouse, purchasing and dispatch managers.

12.     The compensation of Sales Agronomists, Branch Managers, Territory Sales Managers, District Sales Managers, and Operations Managers all include a base salary and, for the sales roles, significant incentive compensation based on sales performance.

13.     In addition, Wilbur-Ellis incurs great expense training and educating its sales teams in order to ensure the highest quality of service to clients. By way of example, Wilbur-Ellis offers more than 100 training modules on agronomy and advanced agronomy, which are available only to Wilbur-Ellis employees.   There are additional training programs available to Wilbur-Ellis's managers, including District Sales Managers and Territory Sales Managers. For example, select managers are nominated and selected to participate in a special management development program to assist the managers in their development as leaders in the sales organization. Managers that are selected to participate in this program receive specialized training that includes meeting agricultural lobbyists in Washington D.C., meeting with representatives of various tech companies in California, and additional management training classes at Purdue University. The management development program is a two-year program and Wilbur-Ellis only accepts about twenty applicants per cycle. Wilbur-Ellis provides the opportunity for this training program, at significant investment of time and money by Wilbur-Ellis, to ensure the continued development of its management team, who contribute substantially to the success of Wilbur-Ellis's business endeavors.

14.     In sum, Wilbur-Ellis devotes significant time and expense in training its sales and operations employees and providing them with the confidential information and trade secrets they need to cultivate client relationships. To this end, some of the Former Employees, and the employees they recruited to resign from Wilbur-Ellis and move to Simplot (the "Recruited Employees"), devoted over a decade of their careers working for Wilbur-Ellis, learning the Wilbur-Ellis way, and developing goodwill with Wilbur-Ellis's customer base.

15.     The relationships between Wilbur-Ellis and its farm customers are a significant source of Wilbur-Ellis's competitive advantage in the marketplace. Wilbur-Ellis operates in a mature industry that relies on repeat business to achieve maximum success. As such, Wilbur-Ellis invests a substantial amount of time and money in developing its relationships with farmers and maintaining trade secrets and other confidential and proprietary information relating to Wilbur-Ellis's business relationships with the farm customers. The efforts by Wilbur-Ellis include, but are not limited to, identifying new farms for its sales teams; providing training to sales teams on how to arrange introductory meetings to determine the farm customer's needs and production goals; sending experts to conduct comprehensive assessments of the farms, farm conditions, soil and water conditions; the formation of unique solutions that can be provided by Wilbur-Ellis; and the creation of a confidential customer profile to track continuing customer needs. One of the most important factors and a primary source of Wilbur-Ellis's competitive advantage, therefore, is the relationships with its farm customers, facilitated by Wilbur-Ellis's resources, including the information and training described above on Wilbur-Ellis's products and services, and the databases containing information compiled about the farms and customers.  This competitive advantage can quickly and permanently disappear if these relationships are damaged by the use of Wilbur-Ellis's trade secrets and other confidential and proprietary information to solicit those customers on behalf of a third-party.

16.     Wilbur-Ellis invests a substantial amount of its financial and other resources in developing and maintaining certain trade secrets and other confidential and proprietary information, including information related to Wilbur-Ellis's farm customers.  This trade secret and confidential information includes, but is not limited to, the identities of farm customers with which Wilbur-Ellis partners; the contacts at each farm and ranch with which Wilbur-Ellis has built a relationship;

identities of current and prospective farm customers; unique customer needs and requirements, preferences, businesses and habits; business relationships; products and services (including pricing, costs, sales, profitability, and scope of services); contents of product mixes and information relating to additives; crop health and needs, and the unique plans implemented for each farm customer based on the Sales Agronomist's evaluation of each particular farm or ranch and from information learned from third-party data firms working directly with Wilbur-Ellis; financial information and measures relating to the products and services offered and sold by Wilbur-Ellis to its customers, including the financial information regarding gross sales volume, profitability metrics, and historic volumes; future business plans and Wilbur-Ellis's business strategy; information contained in Wilbur-Ellis's confidential and proprietary databases; Wilbur-Ellis's organization; customer's organizations; and other confidential information that assist the Wilbur-Ellis sales team in maintaining and growing sales of Wilbur-Ellis products to its farm customers.

17.    Likewise, Wilbur-Ellis invests a substantial amount of time and money in developing its relationships with the farms and maintaining certain trade secrets and other confidential and proprietary information relating to Wilbur-Ellis's business relationships with them. The efforts by Wilbur-Ellis include, but are not limited to, identifying new farms for its sales teams, providing training to Sales Agronomists on how to determine the farm customer's needs and production goals, conducting a comprehensive assessment of the farm, farm conditions, and soil to evaluate the needs and the right mix of products that can be provided by Wilbur-Ellis, creation of a confidential customer profile to track continuing customer needs, and creation of proprietary crop application mixes to address Wilbur-Ellis's farm customers' goals and needs.

18.    Because of the specialized nature of the products and services offered by Wilbur-Ellis, the information it develops and acquires, including about the farm customers is extremely

valuable, is unknown to the general public or Wilbur-Ellis's competitors, and is one of the primary sources of Wilbur-Ellis's competitive advantage in the industry.

19.     Wilbur-Ellis goes to great lengths to maintain the secrecy of its trade secrets and confidential business information. Such trade secret and confidential business information includes, but is not limited to, information regarding the company's business and strategy, research and development (including highly confidential seed and other proprietary product formulations), products, technical product information, quality control methods, pricing and margins, customers, and agreements with suppliers, licensors, and other business partners, among other things. Wilbur-Ellis does not provide access to any of its trade secrets or other confidential business information to members of the general public, other competitors in its industry, or to non-employees, unless such disclosure is subject to a confidentiality agreement.

20.     Further, not all Wilbur-Ellis employees have access to all categories of Wilbur-Ellis's confidential and proprietary information, such as customer-related confidential information, including, by way of example, customer-level profitability reports, historical sales data, credit lines and limits, and names and contact information for purchasing decision-makers. Wilbur-Ellis maintains applications and databases in which such information is compiled and provided to those employees who have a need to know such information for purposes of their job responsibilities and level in the organization for purposes of servicing and selling products to customers – on behalf of and for the benefit of Wilbur-Ellis.  Such information is secured by individualized login credentials which are provided only to those employees who need access to such information to perform their legitimate job duties.

21.     Wilbur-Ellis also employs full-time IT personnel, and one of their primary responsibilities is to secure the company's confidential, proprietary, or technical information.

22.     Wilbur-Ellis's efforts to maintain the confidentiality of its trade secrets and other confidential and proprietary information extends to its own employees. For example, Wilbur-Ellis requires all employees to agree to Wilbur-Ellis's Employee Handbook that, among other things, requires all employees to maintain the confidentiality of Wilbur-Ellis's trade secrets and confidential and proprietary information, prohibits employees from unauthorized use of Wilbur-Ellis's intellectual property, and provides that improper, careless, or destructive use of Wilbur-Ellis equipment, including, but not limited to, company-provided devices such as computers and smartphones, can result in discipline, up to and including discharge. The Employee Handbook further provides that when an employee's employment is terminated, whether or not voluntarily, the employee's supervisor, rather than the employee herself, will reset the employee's company-provided device(s) and delete any proprietary information residing on such device(s). Finally, as noted above, certain categories of confidential, proprietary, or trade secret information is accessible only to specific Wilbur-Ellis employees, and requires individualized login credentials.

23.     Wilbur-Ellis employed Jens, commencing on or about March 16, 2007, until he abruptly and voluntarily resigned his employment on or about June 30, 2023.

24.     Jens's employment with Wilbur-Ellis arose as a result of Wilbur-Ellis's acquisition of another company. Specifically, on or about March 16, 2007, Wilbur-Ellis acquired Krech Dakota Airspray, Inc. ("Dakota Airspray"), for whom Jens worked from about 1999 to March 16, 2007. As part of the acquisition, a number of employees of Dakota Airspray, including Jens, were offered employment with Wilbur-Ellis. Jens accepted the offer of employment with Wilbur-Ellis and was initially hired as the Branch Manager for Wilbur-Ellis's Tulare, South Dakota, branch location. As of October 15, 2019, Jens was promoted to Sales Manager for Northwest South Dakota, overseeing numerous branches including Redfield, Tulare, Huron, and Wessington Springs. Jens gained even

more access to Wilbur-Ellis's trade secrets and confidential information as the Sales Manager, because he was responsible for overseeing all sales and commercial activity in his assigned district (consisting of multiple territories). Jens had access to extensive protected client information, which he utilized to consider the district's needs, assist in customer management, and forecast future needs and financial information.

25.     During his employment with Dakota Airspray, Jens was a key member of the ownership group and was responsible for, among other things, developing Dakota Airspray's business strategies, customer relationships, confidential customer information and customer goodwill. Jens had access to virtually all of Dakota Airspray's valuable trade secrets, customer relationships, and customer goodwill developed by Dakota Airspray. Wilbur-Ellis acquired such trade secrets and other confidential information and the customer relationships and good will owned by Dakota Airspray, all of which (among other things) was taken into account when Wilbur-Ellis set a valuation of Dakota Airspray's business.

26.     Accordingly, it was important to Wilbur-Ellis to protect the trade secrets, confidential information, and customer goodwill that it acquired from Dakota Airspray after the acquisition, including from Jens's improper use or disclosure of any Dakota Airspray trade secrets and other confidential information (which was now owned by Wilbur-Ellis) and from Jens's improper conversion of customer relationships and other damage to customer goodwill that would occur if Jens took employment with a competitor of Wilbur-Ellis. Because of the work Jens performed for Wilbur-Ellis, his access to Wilbur-Ellis's customer relationships and goodwill, and the sensitivity of the information to which Wilbur-Ellis granted Jens access as a result of his employment, Wilbur-Ellis required Jens to agree to certain restrictive covenants at the inception of employment. As an express condition to his employment with Wilbur-Ellis, Jens executed an

employment agreement, with an effective date of March 16, 2007 (the "Employment Agreement").
A true and correct copy of the Employment Agreement is attached hereto as Attachment A.

27.     As consideration for Jens signing the Employment Agreement, Wilbur-Ellis agreed
to: (1) employ him full-time as Branch Manager for Wilbur-Ellis's Tulare, South Dakota facility;
(2) pay him an initial salary of $80,290.00, which was subject to annual review and increased during
his employment; (3) enroll him in the company's bonus program; (4) provide him with a company
vehicle at no cost to him; (5) enroll him in the company's fringe benefits program; and (6) allow
him access to Wilbur-Ellis's highly confidential, proprietary, and technical information, as well as
Wilbur-Ellis's customer relationships, so that he could successfully perform his job duties and
support the Tulare branch. In other words, Jens was handsomely compensated by Wilbur-Ellis in
exchange for his promises in the Employment Agreement. Wilbur-Ellis would not have provided
Jens with any of the extremely lucrative compensation and benefits of employment except for his
execution of the Employment Agreement and promises to abide by its terms.

28.     Under the Employment Agreement, Jens agreed (among other things) to certain
post-employment restrictive covenants that controlled following his departure from Wilbur-Ellis.
In particular, the restrictive covenants contained in the Employment Agreement to which Jens
agreed restricted his ability to engage in any "Competitive Business" (defined below) or solicit
Wilbur-Ellis's customers and prospective customers, and employees. Specifically, Section 5 of the
Employment Agreement states:

     5.     <u>Covenant Not to Compete</u>.

          . . .

          (ii)  The Employee further covenants and agrees that he will not, at any time
          for a period of three (3) years following the date his employment is
          terminated, for whatever reason (the "Restriction Period"), **directly or
          indirectly, (A) engage in any business engaged in the marketing,**

**distribution, sale or application ( or any segment thereof) of agricultural chemicals, fertilizer, seed and related products within one hundred (100) miles of the area served by business acquired from Dakota Airspray (the "Competitive Business")**, whether such engagement shall be as an owner, partner, employee, agent, consultant, or shareholder (except as the holder of not more than five percent (5%) of the outstanding shares of a corporation whose stock is listed on any national or regional securities exchange or any successor thereto) or in any other capacity; (B) **directly or indirectly solicit, divert or accept business from or otherwise take away or interfere with any customer of the Employer or its affiliates or subsidiaries engaged in any Competitive Business**, including without limitation, any person who was a customer of, or whose business was being pursued by, the Employer in the conduct of its business prior to the date hereof; or (C) **solicit the employment of any person employed by the Employer or its affiliates or subsidiaries**.

*See* Att. A at § 5(ii) (emphasis added).

29.     Pursuant to the Employment Agreement, Jens agreed that the restrictions and limitations contained in the Employment Agreement were reasonable as to scope and duration and were necessary to protect Wilbur-Ellis's goodwill and proprietary interests. Specifically, Section 6 states:

> 6.     <u>Employee Acknowledgements.</u> Employee acknowledges that the Restriction Period, the geographical areas of restriction and the scope of restraints imposed by the provisions of Section 5 above are fair and reasonably required for the protection of the Employer. If any provision of the covenants and agreements set forth above shall be held invalid or unenforceable because of the scope of the territory or the actions thereby restricted, or the period of time within which such covenant or agreement is operative, or for any other reason, it is the intent of the parties hereto that such provision shall be construed by limiting and reducing it such that the covenants and agreements may be upheld and enforced, or, if necessary, eliminating it so that the provisions hereof be valid and enforceable to the extent compatible with applicable law as determined by a court of competent jurisdiction.

*See* Att. A at § 6.

30.    Jens also agreed under the Employment Agreement that if he breached a provision, Wilbur-Ellis is entitled to various remedies. Specifically, Section 14 states:

>    14.    <u>Remedies</u>. The Employee acknowledges that a violation of any of the provisions of this Agreement, including its restrictive covenants, will cause irreparable damage to the Employer, its successors and assigns. The Employee consents that any violation shall entitle the Employer or its successors and assigns, in addition to any other rights or remedies it, or they, may have, to an immediate injunction restraining Employee from committing or continuing any violation of this Agreement. Employee will not assert any claim or defense in any action or proceeding to enforce any provision hereof that the Employer has or had an adequate remedy at law.

*See* Att. A at § 14.

31.    The parties agreed that the Agreement shall be construed and enforced in accordance with the laws of the State of South Dakota, irrespective of conflicts of law principles.

32.    Jens commenced his employment with Wilbur-Ellis as a Branch Manager of the Tulare location on or about March 16, 2007. Throughout the duration of his employment, Wilbur-Ellis invested substantial efforts into Jens's growth and knowledge in the industry and regarding Wilbur-Ellis's proprietary products to enable him to succeed in his various roles.

33.    From March 16, 2007, through June 30, 2023, Jens held various sales-focused positions including Branch Manager and Sales Manager. These positions utilized confidential customer information compiled by Sales Agronomists to strategize and develop customer sales. During this time, Jens continued to develop relationships with customers in South Dakota.

34.    In recognition of his important role in interfacing with customers, developing important customer relationships, and maintaining its confidential and trade-secret information, Wilbur-Ellis compensated Jens very well during his employment. Wilbur-Ellis valued Jens's customer and employee development and retention. In 2022, his last full year of employment, Jens was compensated $291,492.84. Jens would never have had the opportunity to receive such

substantial compensation from Wilbur-Ellis but for his signing the Employment Agreement that was a condition of his original offer of employment with Wilbur-Ellis.

35.     Wilbur-Ellis employed Fastnacht from on or about September 15, 2010, until he abruptly and voluntarily resigned his employment on or about June 29, 2023. Throughout the duration of his employment, Wilbur-Ellis invested substantial efforts into Fastnacht's growth and knowledge in the industry and regarding Wilbur-Ellis's proprietary products to enable him to succeed in his various roles.

36.     For the duration of his employment, Fastnacht held various sales-focused positions including Product Manager, Purchasing Manager, Plant Protection Product Manager, Crop Protection Strategy Lead, and District Sales Manager. In each of these positions, Fastnacht utilized confidential customer information compiled by Sales Agronomists to strategize and develop customer sales, as well as proprietary product information. Developing customer relationships in South Dakota was a core component of Fastnacht's roles.

37.     In recognition of his important role in interfacing with customers, developing important customer relationships, and maintaining its confidential and trade-secret information, Wilbur-Ellis compensated Fastnacht very well during his employment. Wilbur-Ellis valued Fastnacht's customer and employee development and retention. In 2022, his last full year of employment, Fastnacht was compensated $199,925.55.

38.     As the District Sales Manager, Fastnacht was one of the most senior Wilbur-Ellis employees in South Dakota and held a position of trust in which he was provided access to highly confidential information regarding Wilbur-Ellis's legal and business strategies for combatting Simplot's relentless efforts to raid Wilbur-Ellis's employees and steal its business.  After Simplot successfully acquired the employment of other Wilbur-Ellis employees—including Kevin Erikson

and Tait Lacey, who are the subject of separate unfair-competition litigation—Fastnacht, due to his senior position, was invited to attend calls with Wilbur-Ellis leadership (including the CEO, President of the Agricultural Division, and General Counsel) to discuss the business, operational, and legal strategies that Wilbur-Ellis would employ to combat the Simplot's unlawful attempt to steal Wilbur-Ellis's South Dakota operations. The information discussed during these calls was of the utmost secrecy given the high-stakes legal and business battles taking place in South Dakota with Simplot.

39.     Fastnacht continued to join these calls up to the time of his resignation on June 29, 2023, knowing that he also planned to resign from Wilbur-Ellis and join forces at Simplot. Fastnacht participated in these meetings and learned highly confidential information about Wilbur-Ellis's legal and business strategies as it related to the exact same actions Fastnacht and others were about to take, fully aware that he was leaving to move to Simplot and that the information to which he was privy would be beneficial to Simplot. Upon information and belief, Fastnacht disclosed the highly confidential information to which he was provided access to Simplot and the Former Employees, and is now utilizing this information in his employment with Simplot

40.     Wilbur-Ellis employed Hoffman, from about September 26, 2016, until she abruptly and voluntarily resigned her employment on or about July 10, 2023. Throughout the duration of her employment, Wilbur-Ellis invested substantial efforts into Hoffman's growth and knowledge in the industry and regarding Wilbur-Ellis's proprietary products to enable her to succeed in his various roles.

41.     Throughout her employment, Hoffman held various sales-focused positions including Agronomist, Sales Representative, and Sales Agronomist. These positions utilized protected customer information compiled by Sales Agronomists to strategize and develop customer

sales. During this time, Hoffman continued to develop relationships with customers in South Dakota.

42.     In recognition of her important role in interfacing with customers, developing important customer relationships, and maintaining its confidential and trade-secret information, Wilbur-Ellis compensated Hoffman very well during her employment. Wilbur-Ellis valued Hoffman's customer and employee development and retention. In 2022, her last full year of employment, Hoffman was compensated $152,843.36.

43.     Wilbur-Ellis employed Hotchkiss from about June 27, 2005, until he abruptly and voluntarily resigned his employment on or about June 29, 2023. Throughout the duration of his employment, Wilbur-Ellis invested substantial efforts into Hotchkiss's growth and knowledge in the industry and regarding Wilbur-Ellis's proprietary products to enable him to succeed in his various roles.

44.     From June 27, 2005, through June 29, 2023, Hotchkiss held various marketing- and sales-focused positions including Sales Representative, Branded Product Specialist, and Branded Territory Manager. These positions utilized protected customer information compiled by Sales Agronomists to strategize and develop customer sales. During this time, Hotchkiss continued to develop relationships with customers in South Dakota.

45.     In recognition of his important role in interfacing with customers, developing important customer relationships, and maintaining its confidential and trade-secret information, Wilbur-Ellis compensated Hotchkiss very well during his employment. Wilbur-Ellis valued Hotchkiss's product, customer, and employee development and retention. In 2022, his last full year of employment, Hotchkiss was compensated $138,426.61.

46.     The Former Employees, in coordination with J.R. Simplot Company ("Simplot"), orchestrated a scheme to unlawfully inflict maximum harm to Wilbur-Ellis and secure their success in their new roles at Simplot to the detriment of Wilbur-Ellis and for the benefit of Simplot. The Former Employees not only solicited other Wilbur-Ellis employees to resign their roles at Wilbur-Ellis in a synchronized fashion—the majority on the exact same day as the others—and go to work for Simplot, but also stole confidential information concerning Wilbur-Ellis's business and customers on their way out the door; destroyed the data to prevent Wilbur-Ellis from continuing its operations; and wiped their devices clean before their resignation in an attempt to cover their tracks. In sum, Simplot and the Former Employees (collectively, the "Defendants") set out to rob Wilbur-Ellis of its fairly earned market share by stealing the data, trade secrets, and talent team that Wilbur-Ellis has spent decades developing.

47.     Apparently dissatisfied with the prospect of unlawfully recruiting only a small handful of Wilbur-Ellis employees, Simplot endeavored to ensure Wilbur-Ellis would be left without virtually any employees to continue its business in various locations throughout South Dakota. As the Former Employees prepared for their resignations, they began harassing other Wilbur-Ellis employees to follow their lead – even misleading employees about their respective futures at Wilbur-Ellis. Defendants sought to ensure that the targeted Wilbur-Ellis employees believed that the only available option was to leave Wilbur-Ellis and instead accept employment with Simplot.

48.     The Defendants began orchestrating their scheme months before the Former Employees officially resigned from Wilbur-Ellis, and during that time they had access to extremely sensitive business information. For example, after Simplot successfully acquired the employment of other Wilbur-Ellis employees, including Kevin Erikson and Tait Lacey, Fastnacht was identified

as a "trusted" member of the Wilbur-Ellis team that was assembled to discuss the business, operational, and legal strategies that Wilbur-Ellis would employ to combat the Playbook and Simplot's unlawful attempt to steal Wilbur-Ellis's South Dakota operations lock, stock and barrel. Fastnacht was invited to join several calls with Wilbur-Ellis's leadership teams, including the Chief Executive Officer, General Counsel, and outside counsel, to discuss Wilbur-Ellis's commercial and legal strategies for responding to Simplot's actions.  Fastnacht was asked to join these business-critical meetings in which highly confidential information was discussed solely because of Wilbur-Ellis's belief that Fastnacht intended to remain with Wilbur-Ellis and assist in maintaining its business operations in South Dakota. Upon information and belief, Fastnacht continued to join these calls up to the time of his resignation knowing that he also planned to resign from Wilbur-Ellis in order to join forces at Simplot. Fastnacht participated in these meetings and learned highly confidential information about Wilbur-Ellis's legal and business strategies as it related to the exact same actions Fastnacht and others were about to take, fully aware that he was leaving to move to Simplot and that the information to which he was privy would be beneficial to Simplot. Upon information and belief, Fastnacht disclosed the information he learned during this meeting to Simplot, Erikson, Lacey, and the other Former Employees. Wilbur-Ellis is confident that discovery will further prove Fastnacht's malintent in attending this meeting with Wilbur-Ellis leadership and his conduct following the meeting, as such information lies solely in his possession.

49.     In conjunction with Fastnacht's assistance, Simplot appeared to target Jens as the business leader and Jens swiftly began advising the other Wilbur-Ellis team members of his plans to join Simplot. Upon information and belief, Jens held a meeting on Wilbur-Ellis's company property before he resigned and advised every single member of Wilbur-Ellis's sales team in Tulare of his plans and encouraged them to follow suit. In fact, upon information and belief, Jens told the

entirety of the sales team they "need to come with [him] to Simplot because no one else will be left at Wilbur-Ellis [in South Dakota]." Upon information and belief, Jens also falsely told many members of the sales team that the Wilbur-Ellis location in Tulare was going to close in a transparent effort to lead these Recruited Employees to conclude that their employment with Wilbur-Ellis was at risk (which was false) and that they had no choice but to leave Wilbur-Ellis and take employment with Simplot. During his employment with Wilbur-Ellis, Jens was compensated for mentoring and managing these employees; Jens abused his position in an attempt to capitalize on his relationships with the Recruited Employees to raid Wilbur-Ellis's sales and operation teams, all for the benefit of, and with the knowledge, support, and encouragement of, Simplot. Upon information and belief, Jens also contacted other Wilbur-Ellis sales employees in South Dakota beyond Tulare.  While the information is solely in her possession and control, it is believed that Hoffman solicited her brother, Josh Hoffman, to join the great resignation.  In sum, the latest chapter of Simplot's Playbook had officially begun.

50.     After the Former Employees spent months soliciting other Recruited Employees, the Former Employees and their followers were ready to initiate the great resignation from Wilbur-Ellis. The Former Employees coordinated their resignations, along with the Recruited Employees in the South Dakota branches, to incapacitate Wilbur-Ellis's operations.

51.     To begin, on June 29, 2023, Fastnacht and Hotchkiss gave notice of their resignations of employment with Wilbur-Ellis.  In conjunction with Fastnacht and Hotchkiss, Jens proceeded to give notice of his resignation of employment from Wilbur-Ellis the following day on June 30, 2023. Upon information and belief, Jens held a meeting with employees in the Tulare office building in which he told them that he was going to Simplot, that there was nothing left for them to do at Wilbur-Ellis, and that they would have to come with him.

52.     As planned, and with Jens' dire warning, at least 17 Recruited Employees followed suit and abruptly resigned on the same day. Within *less than two hours*, the entire Tulare sales and operations teams resigned and were gone. In some cases, certain Recruited Employees failed to even send an email or submit any resignation notice; they simply left as if they were going out to lunch, but never returned.

53.     Upon learning of the mass resignations, Wilbur-Ellis found the Tulare offices to be a ghost town– no employees present, their Wilbur-Ellis vehicles parked outside, and their company equipment left in the vehicles. It was evident, based on the state of the Tulare site, that Jens, Hotchkiss, and Fastnacht coordinated with the other Wilbur-Ellis Tulare Recruited Employees to synchronize their resignations and to leave Wilbur-Ellis's operations without any support.

54.     Soon after, Hoffman followed the others, providing notice of her resignation on July 10, 2023. Hoffman started the next wave of the great resignation, resulting in an additional six resignations in other South Dakota locations, including Wessington Springs, Huron, Miller, Blunt, and Highmore.

55.     Upon information and belief, almost immediately after their employment with Wilbur-Ellis ended, the Former Employees and those they had solicited commenced employment with Simplot in roles that were directly competitive with the roles they held with Wilbur-Ellis. Upon further information and belief, Simplot and the Former Employees intended to utilize confidential and trade secret information they gained access to by virtue of their employment with Wilbur-Ellis, including customer information and proprietary product information.

56.     Upon information and belief, the Former Employees have engaged in solicitation of Recruited Employees utilizing the trade secrets and other confidential and proprietary information provided by Wilbur-Ellis and to which they had access during their employment with Wilbur-Ellis.

The Former Employees have done so with the knowledge, support and encouragement of Simplot, for Simplot's own financial gain and growth of its business in South Dakota. Wilbur-Ellis fully expects discovery will further prove this fact, as such information regarding the solicitation of Wilbur-Ellis's employees resides in the sole possession of Defendants.

57.     Upon information and belief, Simplot was aware and encouraging of the Former Employees' behavior. Simplot has condoned, ratified, encouraged, assisted in, and benefitted from the Former Employees' misconduct in an effort to take advantage of Wilbur-Ellis's years of investment and goodwill. Simplot has done so in order to gain market share and damage Wilbur-Ellis's competitive advantage in the marketplace without incurring the time and expense necessary to independently develop and train its own workforce, or independently develop its own customer relationships, thereby competing unfairly with Wilbur-Ellis in the marketplace.

58.     In addition to the Former Employees' blatant disregard for fair competition and upholding their duties owed to Wilbur-Ellis, Jens undisputedly breached his contractual obligations owed to Wilbur-Ellis pursuant to his Employment Agreement. Even more, Hotchkiss, Fastnacht, and Simplot had clear knowledge of Jens's Employment Agreement and tortiously interfered with Wilbur-Ellis's contractual rights.

59.     Jens has continued his employment with Simplot, working from and reporting to Simplot's office located at 38420 US Highway 12 West, Aberdeen, South Dakota, or his home office at 38663 182nd St, Tulare, South Dakota 57476. The Simplot office where Jens works is located within a 100-mile radius of Spink County, South Dakota, the territory in which, pursuant to the Employment Agreement, Jens's restrictive covenants applied (the "Restricted Territory"). Notwithstanding his legal obligations to Wilbur-Ellis, Wilbur-Ellis has information and believes that Jens has repeatedly visited and worked from Simplot's offices in Aberdeen, South Dakota –

meaning that he is engaging in competitive activities that are strictly prohibited by the Employment Agreement. As discussed above, Simplot is a direct competitor of Wilbur-Ellis, as it is a food and agribusiness company that provides plant nutrition and food processing services, services farmers, and sells seeds and other services for crop growth and production. In other words, it is beyond dispute that Simplot engages in a Competitive Business, as defined in Jens's Employment Agreement.

60.     To make matters worse, Jens has openly and brazenly breached his other contractual promises to Wilbur-Ellis pursuant to the Employment Agreement. In plain violation and tortious interference with Jens's contractual obligations to Wilbur-Ellis, Jens, in conjunction with Fastnacht, Hotchkiss, and Hoffman, has solicited Wilbur-Ellis's employees to resign their employment with Wilbur-Ellis and take employment with Simplot.

61.     As leaders of Wilbur-Ellis, Fastnacht, Hotchkiss, and Hoffman, upon information and belief, had knowledge of Jens's Employment Agreement and his contractual obligations owed to Wilbur-Ellis. Fastnacht, for example, even took part in a strategy call with Wilbur-Ellis's leadership team and legal counsel to discuss the contractual obligations owed by other Wilbur-Ellis employees (such as Erikson – who Fastnacht knew Wilbur-Ellis had sued). Even more, Fastnacht stepped into the supervisory role as District Sales Manager in January 2023. As the District Sales Manager, Fastnacht had direct supervision over Jens and did not only have knowledge of Jens's Employment Agreement, but now held a duty to ensure Jens's compliance with his Employment Agreement.

62.     Simplot had clear awareness of Jens's Employment Agreement and his corresponding continuing obligations to Wilbur-Ellis. Not only did Simplot have knowledge based on the other ongoing litigation that pre-dated Jens's joining Simplot, but, upon information and

belief, Fastnacht reported Wilbur-Ellis's legal strategy and approach based on the meetings he had attended as a District Sales Manager to Simplot in coordination with their development of a mass scheme to take control of the South Dakota market.

63.   Upon information and belief, Simplot and the Former Employees coordinated with Jens to solicit the Recruited Employees, take Wilbur-Ellis's confidential information, and destroy customer and business information to prevent Wilbur-Ellis from continuing its operations in any fashion in South Dakota. Jens, upon information and belief, continues to solicit Wilbur-Ellis's employees in the Restricted Territory on behalf of Simplot. This is precisely the type of unfair competition that the restrictive covenants in the Employment Agreement were designed to prevent. The proof supporting these allegations is within Jens's, Simplot's, and/or the other Former Employees' sole possession and control, and discovery in this case will show the nature and extent of how Jens has and continues to unlawfully solicit Wilbur-Ellis customers and employees, and the other Former Employees and Simplot continue to tortiously interfere with such contractual obligations.

64.   Defendants' coordinated unlawful conduct has and will continue to cause Wilbur-Ellis irreparable harm, including loss of business, injury to customer goodwill, and disclosure of trade secrets and other confidential information, as well as incalculable economic damages.  The loss of Wilbur-Ellis's sales and operations teams in its Tulare branch, alone (all of whom resigned from Wilbur-Ellis to join Simplot at the inducement and encouragement of Defendants), will cost Wilbur-Ellis approximately $50 million in lost revenue.  This, however, is merely the tip of the iceberg to come.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Dated: August _3___, 2023

By: _____
       Tracie Gogolin