UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WILBUR-ELLIS COMPANY LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BRETT JENS, SHANE FASTNACHT, PHYLICIA HOFFMAN, WES HOTCHKISS, and J.R. SIMPLOT COMPANY,<br><br>Defendants. | 4:23-CV-04104-LLP<br><br>MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION |

Pending before the Court is Plaintiff Wilbur-Ellis Company LLC's ("Wilbur-Ellis" or "Plaintiff") Amended Motion for a Preliminary Injunction against Defendants Brett Jens ("Jens"), Wes Hotchkiss ("Hotchkiss"), and J.R. Simplot Company ("Simplot"). (Doc. 62.) Wilbur-Ellis alleges that Jens and Hotchkiss cooperated with Simplot (collectively referred to as "Defendants") to orchestrate a mass raid on Wilbur-Ellis's workforce and customers. According to Wilbur-Ellis, Defendants influenced all of Wilbur-Ellis's employees at the company's location in Tulare, South Dakota, to resign from their employment with Wilbur-Ellis on June 30, 2023, and to go to work for Simplot. For the following reasons, the Motion for a Preliminary Injunction is denied.

**BACKGROUND**

Wilbur-Ellis filed its initial Complaint on July 6, 2023, and its Amended Complaint on July 28, 2023. (Docs. 1, 22.) The Amended Complaint contains the following allegations:

 Count I: Breach of Employment Agreement (Jens)
 Count II: Tortious Interference with Contractual Relations (Fastnacht and Hotchkiss)
 Count III: Tortious Interference with Contractual Relations (Simplot)
 Count IV: Breach of Duty of Loyalty (Jens, Fastnacht, Hoffman, and Hotchkiss)
 Count V: Aiding and Abetting Breach of Duty of Loyalty (all Defendants)
 Count VI: Breach of Fiduciary Duties (Jens, Fastnacht, and Hotchkiss)
 Count VII: Aiding and Abetting Breach of Fiduciary Duties (Simplot)

| | |
|---|---|
| Count VIII: | Violation of Federal Defend Trade Secrets Act (all Defendants)\ |
| Count IX: | Violation of South Dakota Uniform Trade Secrets Act (all Defendants) |
| Count X: | Unfair Competition (all Defendants) |
| Count XI: | Civil Conspiracy (all Defendants) |
| Count XII: | Punitive Damages (all Defendants) |

After filing the Complaint, Wilbur-Ellis filed a motion requesting a temporary restraining order preventing Jens, Fastnacht, Hoffman, and Hotchkiss from continuing to work for Simplot. (Doc. 28). Subsequently, the parties agreed to proceed with expedited discovery and hold an evidentiary hearing on Wilbur-Ellis's request for a preliminary injunction. Following expedited discovery, Wilbur-Ellis limited its request for injunctive relief. (Doc. 67-1.) At the preliminary injunction hearing, counsel for Wilbur-Ellis explained that they are seeking injunctive relief for breach of contract based on Jens's alleged violation of the restrictive covenants in the Agreement. (Doc. 77, Transcript, p. 7.) In addition, Wilbur-Ellis alleges that Jens and Hotchkiss breached their duty of loyalty to Wilbur-Ellis by soliciting Wilbur-Ellis employees to go to work for Simplot. (*Id.*) Wilbur-Ellis asks the Court to enjoin Hotchkiss and Jens from working for Simplot for a period of time in certain geographic areas.

All Defendants filed briefs opposing Wilbur-Ellis's motion for a preliminary injunction. (Docs. 59, 66, 67.) The Court held a hearing on Plaintiff's motion on October 31, 2023 to November 1, 2023. The parties stipulated to the admission of a number of exhibits, and Wilbur-Ellis presented testimony from eight witnesses. Supplemental briefs were filed on November 8, 2023. (Docs. 79, 81, 82.)

## BACKGROUND

Jens was a five-percent owner and employee of a company called Krech Dakota Airspray, Inc. ("Dakota Airspray"). In 2007, Wilbur-Ellis Air, LLC purchased Dakota Air Spray. In conjunction with the sale, Jens signed an employment agreement ("Agreement") on March 16, 2007. The first paragraph of the Agreement identifies the parties:

> THIS AGREEMENT is made as of March 16, 2007 (the "Effective Date") between Wilbur-Ellis Air, LLC, a South Dakota limited liability company ("the Employer") and Brett A. Jens ("the Employee").

(Exhibit 1, p. 1.)

Recital A of the Agreement provides:

Concurrently herewith, Employer, a wholly-owned subsidiary of Wilbur-Ellis Company, a California Corporation ("Wilbur-Ellis"), and Krech Dakota Airspray, Inc., a South Dakota corporation ("Dakota Airpsray"), have entered into that certain Asset Purchase Agreement ("APA"), pursuant to which Employer has purchased from Dakota Airspray assets relating to the business of the marketing, sale, application and distribution of agricultural chemicals, fertilizers, seeds and related products (the "Business").

(Exhibit 1, p. 1.)

Section 2 of the Agreement defines its term:

Term. The employment term shall commence on the Effective Date and, unless otherwise terminated, shall continue through February 28, 2010. Thereafter, the employment of the Employee by the Employer shall continue at will and shall terminate upon written notice of such termination given by either party, or upon the death or physical or mental disability of the Employee which prevents such Employee from performing his or her duties hereunder.

(Exhibit 1, p. 1.)

The restrictive covenants are set forth in section 5:

(ii) The Employee further covenants and agrees that he will not, at any time for a period of three (3) years following the date his employment is terminated, for whatever reason (the "Restriction Period"), directly or indirectly, (A) engage in any business engaged in the marketing, distribution, sale or application (or any segment thereof) of agricultural chemicals, fertilizer, seed and related products within one hundred (100) miles of the area served by business acquired from Dakota Airspray (the "Competitive Business"), whether such engagement shall be as an owner, partner, employee, agent, consultant, or shareholder (except as the holder of not more than five percent (5%) of the outstanding shares of a corporation whose stock is listed on any national or regional securities exchange or any successor thereto) or in any other capacity; (B) directly or indirectly solicit, divert or accept business from or otherwise take away or interfere with any customer of the Employer or its affiliates or subsidiaries engaged in any Competitive Business, including without limitation, any person who was a customer of, or whose business was being pursued by, the Employer in the conduct of its business prior to the date hereof; or (C) solicit the employment of any person employed by the Employer or its affiliates or subsidiaries.

(Exhibit 1, p. 2, ¶ 5.)

Section 14 of the Agreement states:

Remedies. The Employee acknowledges that a violation of any of the provisions of this Agreement, including its restrictive covenants, will cause irreparable damage to the Employer, its successors and assigns. The Employee consents that any violation shall

3

   entitle the Employer or its successors and assigns, in addition to any other rights or remedies it, or they, may have, to an immediate injunction restraining Employee from committing or continuing any violation of this Agreement. Employee will not assert any claim or defense in any action or proceeding to enforce any provision hereof that the Employer has or had an adequate remedy at law.

((Exhibit 1, p. 4, ¶ 14.)

  Jens started work with Wilbur-Ellis Air, LLC in 2007. Jens's 2007 and 2008 W-2s list his employer's name as "Wilbur Ellis Air LLC." (Exhibit 122, pp. 1–2.) The employer's name changed to Wilbur-Ellis Company on Jens's 2015 W-2, and then to Wilbur-Ellis Company LLC on Jens's 2016 W-2. (*Id.* at pp. 2–3.) The addresses for the companies is identical on all W-2s submitted into evidence. Jens testified that the only changes he observed, other than the name of the employer on his W-2 forms, were some differences in advertising, including the decals on the company vehicles.

  Three exhibits were introduced at the preliminary injunction hearing regarding the businesses listed on Jens's W-2 forms. One exhibit is a 2023 annual report filed with the Secretary of State of South Dakota by Wilbur-Ellis Air LLC. (Exhibit 123.) The second exhibit is a Certificate of Withdrawal of Foreign Business for Wilbur-Ellis Company indicating that the company withdrew from business in the State of South Dakota on January 29, 2016. (Exhibit 124.) Third, there is an annual report filed with the Secretary of State of South Dakota by Wilbur-Ellis Company LLC for the year 2023. (Exhibit 125.) The corporate managers listed on the Wilbur-Ellis Air, LLC annual report are the same corporate managers listed on the annual report for Wilbur-Ellis Company LLC. (Exhibit 123; Exhibit 125.) The offices for their principal executive office and in-state mailing addresses for the two corporations on their annual reports are the same. *Id.*

  In its post-hearing brief, Wilbur Ellis asks the Court to take judicial notice of a document filed with the California Secretary of State on January 4, 2016, titled "Limited Liability Company Articles of Organization – Conversion." The document, attached as Exhibit A to Wilbur-Ellis's post-hearing brief, lists the name of the converting company as Wilbur-Ellis Company and the name of the limited liability company as Wilbur-Ellis Company LLC. (Doc. 82-1.) Wilbur-Ellis argues that this corporate filing shows Wilbur-Ellis Company did not cease to exist in 2016, but

4

rather was converted to an LLC on January 4, 2016, and has continued to operate in that capacity as Wilbur-Ellis Company LLC.[1]

Jens continued to work at Wilbur-Ellis until he resigned on June 29, 2023. Jens then went to work for Simplot, a direct competitor of Wilbur-Ellis. Wilbur-Ellis asks the Court to enforce the non-compete provision in the Agreement and to prohibit Jens from working for Simplot. Defendants argue that the non-compete provision expired and is unenforceable. Defendants also argue that the named Plaintiff in this case, Wilbur-Ellis Company, LLC, is not a party to the Agreement and therefore it cannot enforce the restrictive covenants in the Agreement.

Hotchkiss also resigned from his employment with Wilbur-Ellis on June 29, 2023. Hotchkiss started work with Simplot on June 30, 2023. Wilbur-Ellis seeks injunctive relief against Hotchkiss and Jens for allegedly breaching their duty of loyalty. Wilbur-Ellis claims that Hotchkiss and Jens, while employed at Wilbur-Ellis, solicited other Wilbur-Ellis employees to work for Simplot.

---

[1] Simplot has moved to strike Exhibit A. (Doc. 83.) Simplot argues that Exhibit A, submitted after the hearing, should not be considered because this Court stated that the evidence was closed at the conclusion of the preliminary injunction hearing. Federal Rule of Evidence 201 specifically provides that "[t]he court may take judicial notice at *any* stage of the proceeding." Fed.R.Evid. 201(d) (emphasis added). This includes taking judicial notice after the close of evidence. *See e.g., Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1306 (Fed. Cir. 2005) (rejecting argument that the district court could not take judicial notice of a patent's reinstatement because it occurred after the close of evidence because Rule 201 "clearly states that '[j]udicial notice may be taken at any stage of the proceeding' "). Facts proper for judicial notice are those not subject to reasonable dispute because they are either "generally known" in the community or "can be accurately and readily determined" by reference to sources whose accuracy cannot be reasonably questioned. Fed.R.Evid. 201. The printout from the California Secretary of State's website is subject to judicial notice as a public record and as containing facts the accuracy of which cannot reasonably be disputed. *See United States v. Eagleboy*, 200 F.3d 1137, 1140 (8th Cir. 1999) (court may take judicial notice of public records and agency documents). The Court will take judicial notice of Exhibit A. *See, e.g., Powers v. Stanley Black & Decker, Inc.*, 137 F.Supp.3d 358, 362 n.3 (S.D.N.Y. 2015) (taking judicial notice of facts regarding the parties' businesses "purely for purposes of background").

## LEGAL STANDARD

Wilbur-Ellis seeks a preliminary injunction under Federal Rule of Civil Procedure 65. (Doc. 62, p. 5.) The Court must consider four factors in deciding whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between this harm and the injury that granting the injunction will inflict on the other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Ultimately, a court "has broad discretion when ruling on requests for preliminary injunctions." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. As the party seeking injunctive relief, Wilbur-Ellis bears the burden of showing that these factors support the issuance of a preliminary injunction. *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006).

## DISCUSSION

### I. Likelihood of Success on the Merits

The likelihood of success on the merits is the most important *Dataphase* factor. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation omitted). When assessing the likelihood of Wilbur-Ellis's success on the merits, the Court need not determine whether Wilbur-Ellis will ultimately succeed, but rather it must decide whether Wilbur-Ellis has a "fair chance of prevailing." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (noting that where an injunction is sought to stop anything other than "government action based on presumptively reasoned democratic processes," the familiar "fair chance of prevailing" test will still apply). To show it has a "fair chance of prevailing," Wilbur-Ellis need not show that it is more likely than not to prevail on the merits. *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044–45 (8th Cir. 2020) (citing *Dataphase*, 640 F.2d at 113). Wilbur-Ellis only needs to establish that it has a fair chance of prevailing on one of its claims. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (citation omitted).

### A. Breach of Employment Agreement

#### 1. Expiration of Restrictive Covenants

Jens is the only defendant who signed an employment contract with Wilbur-Ellis. Defendants Jens and Simplot argue that Wilbur-Ellis is not likely to succeed on the merits of the breach of contract claim against Jens because the restrictive covenants in Jens's employment agreement did not survive past the termination of the Agreement on February 28, 2010.[2]

Wilbur-Ellis admits that Jens's employment agreement does not contain a survival provision which would have ensured that the non-compete and non-solicitation provisions survived the termination of Jens's Agreement. (Doc. 29, p. 17, n.3.) Wilbur-Ellis argues, however, that Jens's restrictive covenants survive the three-year term of the Agreement because the parties agreed that the restrictive covenants begin to run at the end of Jens's employment and not at the end of the three-year term of the Agreement. This argument is based on the language of the Agreement stating that the restrictive covenants are "for a period of three (3) years following the date [Jens's] employment is terminated." (Exhibit 1, p. 2, ¶ 5.)

The Agreement states that it shall be governed by South Dakota law. (Doc. 1-1, ¶ 18.) Under South Dakota law, interpretation of a contract is a question of law for the court. *See Ziegler Furniture and Funeral Home, Inc. v. Cicmanec*, 709 N.W.2d 350, 354 (S.D. 2006) (citations omitted). Parties are bound by the plain terms of their contract. *See Coffey v. Coffey*, 888 N.W.2d 805, 809 (S.D. 2016). Courts possess no authority to rewrite a contract or add to its language. *Culhane v. W. Nat. Mut. Ins. Co.*, 704 N.W.2d 287, 297 (S.D. 2005) (quoting *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 160–62 (Tex. 2003)). "The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties." *Johnson v. Johnson*, 291 N.W.2d 776, 778 (S.D. 1980) (quoting *Huffman v. Shevlin*, 72 N.W.2d 852, 855 (S.D. 1955)). "When the meaning of contractual language is plain and unambiguous, construction is not necessary. If a contract is found to be ambiguous the rules of construction apply. Whether the language of a contract is ambiguous is . . . a question of law." *Ziegler Furniture*, 709 N.W.2d at 354. The mere fact that the parties differ on their interpretations

---

[2] Defendants argue in the alternative that the restrictive covenants expired at the latest in 2012, two years after expiration of the Agreement. SDCL § 53-9-11 restricts covenants not to compete to two years.

of a contract does not create an ambiguity. *See Dowling Family P'ship v. Midland Farms*, 865 N.W.2d 854, 860 (S.D. 2015) (quoting *Pesicka v. Pesicka*, 618 N.W.2d 725, 727 (S.D. 2000)). After careful consideration, the Court concludes that the language of the employment agreement between Jens and Wilbur-Ellis is plain and unambiguous.

The Eighth Circuit's decision in *Miller v. Honkamp Krueger Financial Services, Inc.*, 9 F.4th 1011 (8th Cir. 2021), is on point. In *Miller*, an employee's employment agreement included restrictive covenants stating in part: "Employee further covenants that for a period of one year following the termination of Employee's employment for whatever reason" the employee would not compete with the employer or solicit anyone doing business with the employer. *Id.* at 1014. The language in the agreement also allowed either party to terminate the employment agreement in writing. Years later, the employee quit her job and, three days later, terminated her employment agreement in writing. Reversing a preliminary injunction enforcing the non-compete agreement, the Eighth Circuit held that the clause did not survive the employee's termination of her employment agreement: "By its terms, the non-compete provision survived the termination of Miller's 'employment.' But there is nothing in the non-compete provision to suggest the parties intended it to survive the termination of the Employment Agreement." *Id.* at 1015. The Eighth Circuit ruled that the non-compete provision "became inoperable" when the employee terminated the employment agreement in writing. *Id.*

In the present case, the Agreement states that Jens's "employment term" continues through February 28, 2010, and that Jens's employment "shall continue at will" following February 28, 2010. The non-compete and non-solicitation covenants are "for a period of three (3) years following the date [Jens's] employment is terminated." Jens's Agreement expired by its own terms on February 28, 2010. The Agreement does not specify that the restrictive covenants would survive after the Agreement expired. Under *Miller*, expiration of the Agreement on February 28, 2010, rendered the restrictive covenants unenforceable after February 28, 2013 at the latest.[3]

---

[3] This case is distinguishable from *Wilbur-Ellis Co. LLC v. Erikson and Simplot*, CIV 23-4058. Erikson's employment agreement with Wilbur-Ellis contains a survival provision permitting his obligations under the restrictive covenants to continue after termination of the agreement. Because of the survival provision, this Court granted injunctive relief to Wilbur-Ellis and enjoined Erikson from violating the restrictive covenant in his employment agreement. (*Id.* at Doc. 44.)

8

Because the restrictive covenants are no longer enforceable, Wilbur-Ellis is not entitled to injunctive relief based on its breach of contract claim against Jens.

### 2. Corporate Change

Jens and Simplot dispute whether Plaintiff can enforce the Agreement because it was between Jens and Wilbur-Ellis Air; Wilbur-Ellis Company LLC was not a signatory.[4] Thus, according to Defendants, as a non-party to the Agreement, Wilbur-Ellis is unlikely to succeed on its breach of contract claim against Jens. Wilbur-Ellis responds that the change in the corporation's name from Wilbur-Ellis Air to Wilbur-Ellis Company was simply administrative and has no effect on Wilbur-Ellis's contractual rights in the Agreement with Jens.

Jens was originally employed by Wilbur-Ellis Air and the Agreement identifies Wilbur-Ellis Air as his "Employer." The Agreement does not include parent companies, subsidiaries or affiliates of Wilbur-Ellis Air within the definition of Employer. However, in the "Remedies" section of the Agreement, Jens acknowledged that a violation of any provision of the Agreement, "including its restrictive covenants, will cause irreparable damage to the Employer, *its successors and assigns*." (Exhibit 1, p. 4, ¶ 14) (emphasis added). Jens also consented that any violation of the Agreement will "entitle the Employer *or its successors and assigns*, in addition to any other rights or remedies it, or they, may have, to an immediate injunction restraining Employee from committing or continuing any violation of this Agreement." (*Id.*) (emphasis added).

---

[4] This is not an issue of standing as argued by Jens. "Article III standing must be decided first by the court and presents a question of justiciability; if it is lacking, a federal court has no subject-matter jurisdiction over the claim." *Schumacher v. SC Data Ctr., Inc.*, 912 F.3d 1104, 1105 (8th Cir. 2019) (internal quotation marks omitted). Standing must exist "throughout the case because to qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Id.* "At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). Standing has three requirements: (1) an injury in fact (2) the injury is traceable to the defendant, and (3) the likelihood of redressability. *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017). All three elements of constitutional standing are satisfied for Wilbur-Ellis Company, LLC because it lost numerous employees, including key employees, to Simplot. There is evidence that its business was injured by the loss of employees going to work for Simplot, Plaintiff argues that Defendants caused this injury, and damages would provide redress for the injury.

Jens became an employee of Plaintiff Wilbur-Ellis Company LLC following a corporate change in 2016.[5] Wilbur-Ellis describes the change in the corporate name as "administrative" and argues that Wilbur-Ellis Company LLC can enforce the restrictive covenants in the Agreement with Jens.

The limited record at this stage of the proceedings does not reveal the circumstances of the change from Wilbur-Ellis Air, LLC to Wilbur-Ellis Company LLC. There is no evidence that Wilbur-Ellis Air, LLC and Wilbur-Ellis Company LLC merged or assigned assets to one another. Tracie Gogolin, Wilbur-Ellis's Vice President of People & Culture, testified that "there was no change to anything," other than a "change in which company was paying [the employees]." (Doc. 77, Transcript, p. 92.) Ms. Gogolin described the change as "very administrative" and happening at "the corporate level." (*Id.* at p. 90.) In its post-hearing brief, Wilbur-Ellis describes the change as an "internal administrative transfer." (Doc. 82, p. 4.) Jens testified that all of the terms and conditions of his employment remained the same after Wilbur-Ellis Company LLC became his employer.

None of the parties cite any decisions that directly address the question whether Wilbur-Ellis Company LLC can enforce Jens's restrictive covenants even though it was not a signatory or the "Employer" named in the Agreement.[6] There is no South Dakota case addressing this issue. Thus, the Court will look to other jurisdictions to find similar cases for guidance. *See Gilliam v. Roche Biomedical Labs., Inc.*, 989 F.2d 278, 280 n.3 (8th Cir. 1993) (holding that federal court may turn to the decisions of other jurisdictions for guidance on questions of first impression under the law of a particular state).

*Symphony Diagnostic Services No. 1 Inc. v. Greenbaum*, 828 F.3d 643 (8th Cir. 2016), is instructive. In *Greenbaum*, two employees signed non-compete and confidentiality agreements

---

[5] Wilbur-Ellis Company was Jens's employer in 2015, until the company converted to an LLC with the name Wilbur-Ellis Company LLC in 2016. (Exhibit 22, pp. 2–4.)

[6] Wilbur-Ellis notes that "[t]his appears to be a case of first impression – Wilbur-Ellis has not uncovered any cases in which a court has expressly held that an intracompany transfer of an employee from one entity in a family of companies to another entity within the same family constituted a 'termination' of the employment relationship such that a contract containing a restrictive covenant was either (a) unenforceable by the entity to which the employee was transferred or (b) triggered the running of the restricted period." (Doc. 82, pp. 10–11.)

with Ozark. *Id.* at 644–45. After Ozark was acquired by Mobilex through an asset purchase, the employees went to work for a Mobilex competitor. *Id.* at 645. A federal district court in Missouri held that the restrictive covenants were not assignable to Mobilex because the employees did not consent to the assignment. *Id.* The Eighth Circuit reversed, applying what it deemed to be the "majority rule" that non-compete covenants can be assigned to a successor under an asset purchase, even if the employee did not consent to the assignment. *Id.* at 646 (citing 6 *Williston on Contracts* § 13:13 (4th ed. 1990)).

Because the *Greenbaum* case was brought under Missouri state law, the Eighth Circuit said that it was bound by any relevant decisions of the Missouri Supreme court or Missouri's intermediate courts. *See id.* at 646. However, no Missouri court had "squarely addressed the question" at issue in *Greenbaum*. *Id.* The Eighth Circuit predicted that "the Missouri Supreme Court would permit assignment of covenants not to compete without contemporaneous consent [of the employee]." *Id.*

The Eighth Circuit observed that, in the case of a corporate merger, employment agreements are assigned to a successor. *Id.* at 647. The Court then concluded that when the assignment of restrictive covenants is at issue, the precise manner in which the successor company gains control of the predecessor company - whether through a merger, stock purchase, or asset purchase - should not determine whether covenants are assigned to the successor. *Id.* The Court held: "We see no reason why the non-compete and confidentiality agreements here should be unenforceable simply because Mobilex's acquisition of Ozark was effected through an asset purchase rather than a transfer of stock." *Id.* (citing 9 John E. Murray, Jr., *Corbin on Contracts* § 49.5, at 204-05 (rev. ed 2007) ("The underlying issue of whether an employee should be subject to a noncompetition covenant should not depend on matters of form.")). The Eighth Circuit noted that if the assignment would materially change the obligations of the employee, it might make sense to preclude assignment of the non-compete without the employees' consent. *Greenbaum*, 828 F.3d at 647. However, the employees' obligations under the non-compete did not change upon transfer to Mobilex. "The non-compete agreements here precluded only working in the field of medical diagnostics or soliciting business from certain clients within a specified geographical area. That obligation is no different whether enforced by Ozark or by Mobilex." *Id.* at 648. The Court added that "when a person contracts with a corporation, it must be assumed that person

11

contemplated the almost certain likelihood of change in the corporation and its personnel." *Id.* (citing *Alexander & Alexander, Inc. v. Koetz*, 722 S.W.2d 311, 313 (Mo.Ct.App. 1986)).

In the present case, the Agreement states in Recital A that the Wilbur-Ellis Air, is a wholly-owned subsidiary of Wilbur-Ellis Company. (Exhibit 1, p. 1.) Jens testified that he knew when he signed the Agreement that Wilbur-Ellis Corporation owned Wilbur-Ellis Air. (Doc. 78, Transcript, p. 299–300). By signing the Agreement, Jens acknowledged in the "Remedies" section that any violation of the restrictive covenants would damage Wilbur-Ellis Air's successors and assigns, and would entitle those successors and assigns to remedies, including an injunction restraining Jens from violating any provision of the Agreement.

Just as in *Greenbaum*, Jens's obligations under the restrictive covenants are no different whether enforced by Wilbur-Ellis Air or by Wilbur-Ellis Company. Jens was aware that there was a relationship between the Wilbur-Ellis companies when he signed the Agreement. The precise manner Wilbur-Ellis Company took control of Wilbur-Ellis Air should not determine whether the restrictive covenants in the Agreement are enforceable. *Greenbaum*, 828 F.3d at 647. Applying the language of the Agreement, and the reasoning of the Eighth Circuit in *Greenbaum*, the Court concludes that the corporate transition from Wilbur-Ellis Air, LLC to Wilbur-Ellis Company LLC did not render the restrictive covenants in Jen's employment agreement unenforceable. Defendants' arguments that the restrictive covenants are unenforceable because Wilbur-Ellis Company LLC is not the employer named in Recital A are rejected. However, as set forth in the preceding section of this Memorandum Opinion, Wilbur-Ellis Company, LLC cannot enforce the restrictive covenants in the Agreement because they expired by February 28, 2013 at the latest.

### B. Duty of Loyalty

Hotchkiss does not have an employment agreement with Wilbur-Ellis. Wilbur-Ellis contends Hotchkiss, along with Jens, breached his duty of loyalty to Wilbur-Ellis by recruiting other employees to work for Simplot.

In South Dakota, employees have a statutory duty of loyalty to their employer.[7] *Setliff v. Akins*, 616 N.W.2d 878, 886 (S.D. 2000). "[T]he employee must not, while employed, act contrary to the employer's interests." *Id.* This duty comes with a caveat: employees are "entitled to make 'arrangements' for some new employment by a competitor and should be given some latitude in this regard." *Id.* (citing Restatement (Second) of Agency § 393 cmt. e (1957)). In *Setliff*, the South Dakota Supreme Court held that, "while employees may lay plans and take limited steps to begin competing with their employers, employees who go too far risk violating their duty of loyalty." *Id.* An employee may go "too far" by soliciting customers or employees of his employer for a rival business before the end of his employment. *See Carda v. E.H. Oftedal & Sons, Inc.*, 2005 WL 2086280, at *6 (D.S.D. Aug. 26, 2005) (citing *Setliff*, 616 N.W.2d at 886). Whether an employee "went too far" in preparing to compete with his employer is a question of fact. *Setliff*, 616 N.W.2d at 887.

Wilbur-Ellis has not presented sufficient evidence for this Court to hold that Jens and Hotchkiss went too far by soliciting employees during their employment with Wilbur-Ellis. The record shows that Jens and Hotchkiss expressed their dissatisfaction with Wilbur-Ellis to other Wilbur-Ellis employees, told several co-workers that they themselves were going to resign from Wilbur-Ellis and go to work for Simplot, and mentioned to a few people that the pay and benefits were better at Simplot. Hotchkiss gave Simplot's website address to some Wilbur-Ellis employees, but he denied encouraging anyone to take a position at Simplot. (Doc. 78, Transcript, pp. 455–59; 486–88.) Before deciding to quit, Jens and Hotchkiss shared their frustrations with upper management for Wilbur-Ellis.

At the preliminary injunction hearing, Phillip Gilbert ("Gilbert") testified that he met with Hotchkiss at a bar in Watertown on June 29, 2023, when both men were still Wilbur-Ellis employees. Gilbert said Hotchkiss encouraged Gilbert to leave Wilbur-Ellis and go to work for Simplot, telling Gilbert that there was a position available for him at Simplot if he wanted it, that Hotchkiss could get a "number" for him, and that the entire staff in Tulare was leaving to go to work at Simplot. (Doc. 77, Transcript, pp. 236–38). Hotchkiss admitted that he had looked at the

---

[7] "An employee who has any business to transact on the employee's own account, similar to that entrusted to the employee by the employer, shall always give the employer the preference." SDCL § 60-2-13.

Simplot website before meeting with Gilbert, and that he gave Gilbert the name of a position that was open. (*Id.* at 460–63.) Hotchkiss adamantly denied most of Gilbert's allegations.[8] Gilbert did not apply for employment with Simplot. (Doc. 77, p. 238.)

Jens was questioned extensively at the hearing about getting together with several Wilbur-Ellis employees at various times during the evening of June 28, 2023, prior to Jens's resignation from Wilbur-Ellis the next morning. Jens admitted he told other employees that he had an opportunity to go to Simplot and he was considering it, but he denied encouraging anyone to leave Wilbur-Ellis or to apply for a job at Simplot. (Doc. 78, pp. 319–330; 345.)

In light of the conflicting testimony, the Court cannot find that Wilbur-Ellis is likely to succeed on the merits of the breach of loyalty claim. As in *Setliff*, whether Jens or Hotchkiss breached the duty of loyalty to Wilbur-Ellis is a question of fact to be determined at trial.

## II. Irreparable Harm

The second preliminary injunction factor is whether the moving party will suffer irreparable harm if the injunction is not issued. There has been no showing that an injunction based on the duty of loyalty will prevent any further harm to Wilbur-Ellis.[9] The duty of loyalty existed while Jens and Hotchkiss worked for Wilbur-Ellis, but it does not continue into the future. *See Setliff*, 616 N.W2d at 886 (stating that "the employee must not, *while employed*, act contrary to the employer's interests") (emphasis added).

Counsel for Wilbur-Ellis argued that Jens and Hotchkiss should be enjoined from working at Simplot in certain geographical areas because Wilbur-Ellis needs time to rebuild without interference by Jens and Hotchkiss. (Doc. 78, Transcript, p. 501.) However, that will not cure any harm that Wilbur-Ellis suffered if Jens or Hotchkiss breached their duty of loyalty while they worked for Wilbur-Ellis. In other words, any harm to Wilbur-Ellis resulting from a breach of duty of loyalty has already occurred, and it can be addressed through an award of damages if Wilbur-

---

[8] Jens admitted that he told Gilbert he could get him a salary number from Tait Lacey who worked at Simplot. (Doc. 78, Transcript, p. 330.)

[9] Because the restrictive covenants are no longer enforceable, the Court will address the last three preliminary injunction factors only as they relate to the breach of loyalty claim and not with regard to the breach of contract claim.

Ellis prevails on this claim at trial. *See, e.g., CDI Energy Services v. West River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009). In *CDI Energy*, the Eighth Circuit reviewed a North Dakota case which applied the *Dataphase* factors to a request for preliminary injunction based on a duty of loyalty. The Court indicated that the claims for breach of duty of loyalty "rest on the possibly wrongful appropriation of [plaintiff's] clients, an act the defendants have already carried out. As such, it is not entirely clear how injunctive relief would actually assist [plaintiff] in any matter. . . . [t]he harm that had already occurred could be remedied through damages." *Id.* at 403 (citing *Adam-Mellang v. Apartment Search, Inc.* 96 F.3d 297, 300 (8th Cir. 1996)). This factor weighs against injunctive relief for Wilbur-Ellis.

### III. Balancing Harms

On balancing the relative harms, an injunction would put Jens and Hotchkiss out of work within their areas of expertise, and in the geographic areas where they have always performed their work. Without a valid non-compete agreement in place for Jens or Hotchkiss, and based on the fact that they no longer have a duty of loyalty to Wilbur-Ellis, this factor weighs against granting a preliminary injunction.

### IV. Public Interest

With respect to the fourth *Dataphase* factor, the public interest, the Court concludes that, particularly without a contractual obligation, it is not in the public interest to restrain individuals from working and earning a living. This factor also weighs against granting a preliminary injunction.

For all of these reasons,

IT **IS ORDERED:**

1. That Plaintiff's Motion for a Temporary Restraining Order and Motion for Preliminary Injunction are denied. (Docs. 28 and 62);
2. That Simplot's Motion to Strike Exhibit A attached to Wilbur-Ellis's post-hearing brief is denied. (Doc. 83.)

3. That, in accordance with this Court ruling at the conclusion of the preliminary injunction hearing, the trial in this case will commence on Monday, October 21, 2024 and last, as necessary, through Friday, November 1, 2024.

4. That an Order for Discovery Report and Scheduling Information will be issued.

Dated this 27th day of November, 2023.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK