## UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH DAKOTA
### SOUTHERN DIVISION

WILBUR-ELLIS COMPANY LLC,

                                    Plaintiff,

    vs.

BRETT JENS, SHANE FASTNACHT,
PHYLICIA HOFFMAN, WES
HOTCHKISS, and J.R. SIMPLOT
COMPANY,

                                    Defendants.

Court File No.: 4:23-cv-4104-LLP


**MEMORANDUM IN SUPPORT OF
MOTION FOR INJUNCTION
PENDING APPEAL**

On November 27, 2023, the Court denied Plaintiff Wilbur-Ellis Company LLC's ("Wilbur-Ellis") request for a preliminary injunction which, if granted, would have prohibited Defendant Brett Jens from continuing to breach the terms of his Employment Agreement (the "Agreement") with Wilbur-Ellis and prohibited Defendant J.R. Simplot Company from ("Simplot") continuing to tortiously and unlawfully interfere with the Agreement. *See* Doc. 85. On November 28, 2023, Wilbur-Ellis appealed the Court's Order to the Eight Circuit Court of Appeals. Doc. 89. Pursuant to Rule 8(a)(1) of the Federal Rules of Appellate Procedure, Wilbur-Ellis now requests that the Court issue an injunction prohibiting Jens from working for Simplot, or soliciting customers and employees of Wilbur-Ellis, pursuant to the terms of the Agreement pending the resolution of Wilbur-Ellis's appeal.

The requested injunction pending appeal is warranted because the Court committed clear error in its interpretation of the plain language of the Agreement. The Court's denial of the preliminary injunction was based on its finding that the post-

employment restrictive covenants contained in the Agreement did not survive the expiration of the initial term of the Agreement due to the lack of a survival clause. *See* Doc. 85 at 8-9. The fundamental flaw with this finding is that the Agreement never actually expired such that survival is even an issue to be resolved – the plain language of the Agreement neither provides for a specific term upon the expiration of which the Agreement was terminated, nor is there any provision that allows Jens to terminate the Agreement prior to the end of his employment (something that, in any event, it is undisputed he did not do).

Rather, the "term" that expired (and on which this Court based its decision) was simply the period during which Jens's employment could only be terminated by Wilbur-Ellis for Cause, after which Jens's employment would convert to employment at-will. The Agreement does not, however, contain a specific term for the Agreement itself after which the Agreement automatically terminated, as the Court's Order denying the motion for a preliminary injunction erroneously assumes. In other words, the concept of survival does not even come into play, because the Agreement never lapsed in the first instance. Thus, the Agreement (and the Restrictive Covenants contained therein) never expired or was terminated, and instead remained fully in force and effective through the end of Jens's employment, the triggering event of the Restrictive Covenants at issue in this case.

Given that the Court's decision was based on this misreading of the Agreement, Wilbur-Ellis is highly likely to succeed on the merits of its appeal and is entitled to the requested preliminary injunction pending resolution of the appeal.

## I.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

Brett Jens entered into the Agreement on March 16, 2007, when Wilbur-Ellis acquired Dakota Airspray. *Ex. 1, Jens's Employment Agreement*, p.1[2]; *Tr. 1, 89:17-19, 102:11-19.* Section 2 of the Agreement provided for an "employment term" beginning on March 16, 2007, and "continu[ing] through February 28, 2010," during which Jens could only be terminated by Wilbur-Ellis for Cause.  *See* Exhibit 1 at ¶ 2. The parties also agreed in Section 2 that Jens's employment would automatically continue after the initial defined employment term by stating, "[t]hereafter, the employment of Employee by the Employer **shall** continue at will." *Id.* (emphasis added). It is undisputed that this is exactly what happened – after the expiration of the specific term of employment during which Jens enjoyed protection from termination for reasons other than Cause (as defined in the Agreement), Jens's employment with Wilbur-Ellis continued for another 13 years on an at-will basis.  Importantly, however, and contrary to the Court's findings in its Order denying the motion for a preliminary injunction, neither Section 2 nor any other provision in the Agreement established a specified term of the *Agreement* itself after which the Agreement expired or permitted Jens to terminate the Agreement prior to the end of his employment – meaning the Agreement governing the terms of Jens's employment continued in effect, therefore, until the employment ended.  *Id.*

---

[1] Wilbur-Ellis incorporates by reference the Statement of Relevant Facts in its Post-Hearing Brief. *See* Doc. 82 at 2-8.

[2] Unless otherwise stated, all cited exhibits are from the October 31, 2023- November 1, 2023, Hearing on Plaintiff's Motion for a Preliminary Injunction ("Hearing").

The Agreement includes post-employment restrictive covenants limiting Jens's competitive activities for a certain period of time and within certain defined geographical areas. Ex. 1 at ¶ 5(ii) (setting forth the "Restrictive Covenants"). The Restrictive Covenants explicitly prohibit Jens both from taking employment with a Wilbur-Ellis competitor or soliciting Wilbur-Ellis's customers or employees within the restricted territory. *Id.* These post-employment Restrictive Covenants are triggered when Jens's "employment is terminated, for whatever reason."[3] *Id.* at p. 2.

There is no dispute that if the Restrictive Covenants remained in effect after the expiration of the initial term of employment set forth in Section 2, Jens is in breach. It is undisputed that Jens remain continuously employed until his voluntary resignation in June 2023. *See* Doc. 85 at 4-5 (describing the history of Jens's employment insofar as an internal transfer was concerned, concluding, in relevant part, "Jens continued to work at Wilbur-Ellis until he resigned on June 29, 2023."). It is also undisputed that Jens has taken employment with a direct competitor (Simplot) in the restricted geographic

---

[3] Importantly, Jens acknowledged in his testimony at the hearing that he believed his employment with Wilbur-Ellis was continuous and that he was still subject to the Agreement after his transfer from Wilbur-Ellis Air to Wilbur-Ellis Company. When describing his employment with Wilbur-Ellis to Simplot in a meeting that occurred in February 2023, Jens represented that he had been employed with "Wilbur Ellis March 2007-Present." Ex. 11, February 2023 Simplot PowerPoint, p. 3. Further, in March 2023, well after the transfer he now claims resulted in a termination of employment that triggered the Restrictive Covenants, Jens contacted his attorney to discuss the enforceability of the non-compete agreement contained in the Restrictive Covenants (a clear sign that he believed it still had effect). Tr. 1, 309:14-19. At the hearing, Jens testified that he also had conversations with Simplot (including Sam Caton) in mid-2023 about his concerns about employment with Simplot due to his non-compete agreement with Wilbur-Ellis, which demonstrates that he believed the non-compete was still in effect. Tr. 1, 309:20-23.

territory and that he has solicited both Wilbur-Ellis customers and employees in violation of the Restrictive Covenants. *See* Tr. 2 at 293:2-6; 329:14-330:7; 331:2-23; 332:6-15; 338:1-389:5; 411:9-412:2; 443:4-7. Thus, the only question the Court needed to resolve for purposes of determining Wilbur-Ellis's likelihood of success on the merits for its breach of contract and tortious interference claims (against Jens and Simplot, respectively) is whether the Restrictive Covenants remained in effect through the date of Jens's resignation, the event that otherwise triggered the post-employment Restrictive Covenants.[4] They did and, in denying Wilbur-Ellis's requested preliminary injunction, the Court erred in finding otherwise.

On November 27, 2023, the Court entered its Memorandum Opinion and Order Denying Motion for Preliminary Injunction (the "Order") in which it denied Wilbur-Ellis's motion for a preliminary injunction against Jens (for breaching the Agreement) and Simplot (for tortiously interfering with the Agreement). *See* Doc. 85. In its Order, the Court correctly noted that "the Agreement states that Jens's 'employment term' continues through February 28, 2010, and that Jens's employment 'shall continue at will' following February 28, 2010." *Id*. at 8. The Court further held, erroneously and contrary to the plain language of the Agreement, that "Jens's Agreement expired by its own terms on February 8, 2010," and that the lack of a provision specifying the Restrictive Covenants survive

---

[4] Wilbur-Ellis also sought a preliminary injunction against Jens and Defendant Wes Hotchkiss based on their undisputed breach of their duties of loyalty. *See* Tr. 2 at 492:18-495:14. Wilbur-Ellis's instant request for an injunction pending appeal, however, is based solely on Jens's breach of contract and Simplot's tortious interference. *See* Proposed Order filed contemporaneously herewith.

after the expiration of the Agreement "rendered the restrictive covenants unenforceable after February 28, 2013, at the latest." *Id.* at 8-9. As set forth in detail below, the Court's finding in this respect is in error because it is contrary to the plain language of the Agreement – there is no language in Section 2 (or anywhere else in the Agreement) pursuant to which the Agreement terminated on February 28, 2010.[5] Therefore, Wilbur-Ellis is highly likely to succeed on the merits of its claims against Jens and Simplot and, accordingly, Wilbur-Ellis respectfully requests that the Court enter an order enjoining Jens from continuing to breach the Agreement and Simplot from interfering with the terms of the Agreement pending the resolution of the appeal.

## II.    LEGAL ARGUMENT

Rule 8(a)(1) of the Federal Rules of Appellate Procedure enables a party to seek an order granting an injunction while an appeal is pending. FED. R. APP. P. 8(a)(1). A party must ordinarily move first in the district court for such relief. *Id.* The standard for granting an injunction pending appeal is: (1) whether the applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent an injunction pending appeal; (3) whether issuance of the injunction pending appeal will substantially injure the other interested parties; and (4)

---

[5] Notably, at the conclusion of the hearing, the parties submitted legal arguments about the enforceability of Jens's Agreement, focusing on the continuity of Jens's employment with Wilbur-Ellis due to an internal company transfer and language in the Agreement regarding who Jens's "employer" was. Tr. 2, 509:16-522:4. Upon the Court's request, the parties submitted supplemental briefing on these limited issues alone. *See* Tr. 2, 524:11-527:1. Given that the issues did not relate to the lack of a "survival clause" in the Agreement, the parties did not provide post-Hearing briefing on the issue of a survival clause and how it would impact the enforceability of Jens's Agreement, if at all. *See generally* Docs. 79, 81, 82

where the public interest lies. *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987). These factors are essentially the same as those considered in determining whether preliminary injunctive relief is appropriate. *See Dataphase Sys. Inc. v. C.L. Sys.,* Inc., 640 F.2d 109, 114 (8th Cir. 1981).[6]  As set forth below, each of these factors weigh heavily in favor of Wilbur-Ellis and, accordingly, the Court should enter the requested injunction pending the outcome of the appeal.

> A.    **Wilbur-Ellis Has Made a Strong Showing That It Is Likely to Succeed on the Merits of Its Breach of Contract Claim Against Jens and Tortious Interference Claim Against Simplot.**

Wilbur-Ellis is likely to succeed on the merits of its breach of contract claim against Jens, because the issue of a survival clause—or lack thereof—turns in Wilbur-Ellis's favor when reviewing the plain language of the Agreement in light of the appropriate legal precedent. A strong showing is not required to satisfy this first element:

> [I]t is error for a district judge to attempt to predetermine the merits of a case on only a preliminary showing. For this reason the requirement of probability of success should not turn on a mathematical likelihood of success.

*N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 n.3 (8th Cir. 1984). The Eighth Circuit has further clarified, "the question is not whether the movant has proved a greater than fifty percent likelihood that it will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a fair ground for litigation." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "In considering the

---

[6] Because the Court determined Jens's Restrictive Covenants are no longer enforceable, the Court did not address the last three *Dataphase* factors with regard to Wilbur-Ellis's breach of contract claim. *See generally* Doc. 85.

likelihood of the movant prevailing on the merits, a court does not decide wither the movant will ultimately win." *PCTV Gold*, 508 F.3d at 1143.

      **1.**      **This Court erred in holding that the Agreement expired in February 2010 such that the Restrictive Covenants were no longer in effect when Jens voluntarily resigned his employment in 2023.**

Wilbur-Ellis is very likely to succeed on the merits of its claims of its breach of contract claim against Jens because, contrary to the Court's conclusion, the Agreement remained alive and in effect until the Jens's voluntary resignation in 2023. The Court's determination that the Agreement lapsed in 2010 (and that the Restrictive Covenants were thus no longer in effect at the time of Jens's resignation due to the absence of an express survival clause) is not remotely supported by the plain language of the Agreement.   The Court's clear misinterpretation of Section 2 led to the erroneous conclusion that the Agreement expired in February 2010 and is alone a basis for reversal on appeal.

Under South Dakota law, courts interpret contracts as a matter of law. *See Johnson v. Johnson*, 291 N.W.2d 776, 778 (S.D. 1980). "The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties." *Id*. The requires "examin[ing] the contract as a whole and giv[ing] words their plain and ordinary meaning." *Gloe v. Union Ins. Co.*, 694 N.W.2d 252, 260 (S.D. 2005). Courts do not "interpret particular words and phrases in isolation nor do courts interpret language in a manner that renders a portion of the contract meaningless." *See Tri-City Assocs., L.P. v. Belmont, Inc.*, 845 N.W.2d 911, 915 (S.D.

2014) (cleaned up). An interpretation of the plain and unambiguous language compels a finding that the Restrictive Covenants contained in the Agreement remained in effect at the time Jens resigned his employment with Wilbur-Ellis and commenced employment with Simplot (an undisputed direct competitor of Wilbur-Ellis) in the restricted territory.

The starting point of the analysis is the language of the Agreement itself and whether the Agreement contains a specific term after which it would expire (it does not) or whether Jens had the right to terminate the Agreement prior to his resignation (he did not). The Agreement defined the "employment term" as beginning March 16, 2007, and "continu[ing] through February 28, 2010." *See* Exhibit 1 at ¶ 2. The parties affirmatively contemplated and established that Jens's employment would automatically continue after the initial defined employment term by stating, "[t]hereafter, the employment of Employee by the Employer **shall** continue at will." *Id*. (emphasis added). The purpose of defining the initial employment term was to give Jens a nearly three-year term during which he could not be fired except for Cause (as that term is defined in Section 3) after Wilbur-Ellis acquired the company in which Jens had an equity interest. *Id*. at ¶ 3. However, the language in Section 2 shows that the parties expressly contemplated a period of employment that extended *beyond* the initial term – albeit converting to an at-will employment relationship under which Jens would not have the same protections from termination. *Id*. at ¶ 2. In other words, there can be no dispute that the parties' intention was for Jens's employment to continue beyond the expiration of the employment term (something that it is undisputed occurred through his resignation in 2023).

9

But importantly, Section 2 does *not* (contrary to Defendants' arguments at hearing and the Court's conclusion in its Order) provide for the expiration of the *Agreement* at the conclusion of the employment term. The plain and unambiguous language of Section 2 provides for the term of *employment*, not the term of the *Agreement*. In fact, there is not a single provision in the Agreement that provides for either the expiration or a termination of the *Agreement* (unlike the employment agreement at issue in the Eighth Circuit's decision in *Miller v. Honkamp Krueger Fin. Services, Inc*., 9 F.4th 1011 (8th Cir. 2021), as discussed in more detail below). In other words, the Agreement did not expire at the end of the initial term of employment, nor is there any mechanism pursuant to which Jens was entitled to terminate the Agreement prior to his voluntary resignation. The "term" referred to in Section 2 is simply the term of initial employment during which Jens could not be fired without Cause, *not* the term of the Agreement itself. The net effect of a plain language reading of Section 2 is that the Agreement did not expire or terminate at the end of the term set forth in Section 2.

The only legal import of the "term" referred to in Section 2 of the Agreement is that beginning February 28, 2010, Jens's employment seamlessly converted to at-will employment. *See, e.g., Arthur J. Gallagher & Co. v. Roi*, No. 1-14-0786, 2015 Il App (1st) 140786-U, 2015 WL 114167, at *10 (Ill. Ct. App. Mar. 12, 2015) (finding similar language in a contract "contemplated and included continued employment"). This is where the Order misses the mark – Section 2 only refers to the term of Jens's employment, not the term of the Agreement, and cannot be interpreted to call for the Agreement to expire or lapse at the end of that term. Exhibit 1 at ¶ 2. Because it did not

terminate at the expiration of the employment term, and because there is no provision that allows Jens to terminate it, the Agreement continued to govern Jens and Wilbur-Ellis after that date and throughout his employment, including Jens's obligations under the Restrictive Covenants contained in Section 5 of the Agreement. *Id*. at ¶ 5(ii) As a result, the Restrictive Covenants were wholly in effect and enforceable at the time Jens voluntarily resigned his employment on June 29, 2023, the event that triggered the Restrictive Covenants. This is the result that is compelled by the plain language of the Agreement and the only reasonable interpretation that can be applied.

As a result, the Restrictive Covenants were alive and applicable to Jens when he resigned his employment, and the lack of a survival clause is completely irrelevant to the analysis of the enforceability of the Restrictive Covenants – there is no need to evaluate whether the Restrictive Covenants survived termination of the Agreement *when the Agreement never actually terminated*. This is a fundamental flaw in the Court's interpretation of the Agreement and demonstrates that the Court's finding that the Restrictive Covenants did not survive expiration of the initial term of the Agreement (and that, therefore, Wilbur-Ellis was unlikely to succeed on the merits of its breach of contract and tortious interference claims) is clear error.[7]

---

[7] Lest there be any misapprehension, the Agreement between Wilbur-Ellis and Jens is *not* identical to the contract between Wilbur-Ellis and another former employee (Kevin Erikson) in another pending lawsuit before this Court. *See Wilbur-Ellis Co., LLC v. Erikson*, No. 4:23-CV-04058-LLP, 2023 WL 3980330 (D.S.D. June 13, 2023). The definition of the "employment term" in the Agreement in the instant litigation is in stark contrast to the agreement at issue in the litigation involving Erikson (not to mention the agreement interpreted by the Court of Appeals in *Miller*, as discussed below). Unlike the Agreement here, Section 2 of Erikson's employment agreement provided that the

Once it is established that the Restrictive Covenants were in effect at the time of Jens's resignation, they were triggered upon the date of his resignation. The plain language of the Agreement makes clear that the triggering event for the Restrictive Covenants is the date on which Jens's employment with Wilbur-Ellis ended. Section 5 plainly states that the Restrictive Covenants begin on the "date his employment is terminated." *Id*. It is undisputed Wilbur-Ellis continuously employed Jens until his resignation on June 29, 2023, i.e., the "date his employment [wa]s terminated." Therefore, Jens is restricted from the competitive activities identified within the Agreement for three years from his resignation date, not from the date on which the initial term of employment expired in February 2010. *See Gloe*, 694 N.E.2d at 260 (explaining courts must "give effect to the mutual intention of the parties").

> ### 2. The Court's reliance on *Miller* is misplaced due to the material differences between the poorly drafted agreement there and the Agreement in this case.

---

***agreement*** terminated at the end of the term of the ***agreement*** (as opposed to the term of employment), which was prior to the date on which Erikson's employment ended. Thus, the Court in Erikson's case deemed it necessary to interpret whether the restrictive covenants survived the expiration of the specific term of that agreement pursuant to the survival provision in that agreement. Unlike Erikson's agreement, here, the "term" in Section 2 refers only to the initial period of employment during which Jens could not be terminated without Cause, and *not* the period of time in which the Agreement was in effect. The Order does not appear to appreciate these material differences between the Erikson agreement and Jens's Agreement. While unnecessary, *see* Section (B)(3), *infra*, it makes perfect sense that the parties would include a survival provision in Erikson's agreement because the agreement itself allegedly expired at the end of the Term (as defined in Section 2 of that contract). On the other hand, there is no need for a survival provision here, and any analysis of survival is a red herring, because **the Agreement's plain language shows that the parties did not intend for the Agreement to expire or terminate at any time during Jens's employment.**

The Court's reliance on *Miller* in the Order as dispositive of the issue is misplaced, as *Miller* is factually distinguishable on critical points. *See* Doc. 85 at 8-9; 9 F.4th 1011. The *Miller* holding is limited to the specific terms of the agreement the Court of Appeals analyzed, which the Court commented was "no exemplar of precision." *Miller*, 9 F.4th at 1015. The decision in *Miller* was driven by the specific language of that particular agreement, not some general principle that must be universally applied. Therefore, there is no binding legal proposition in *Miller* that the Court can or should apply here to support its conclusion that the Agreement here terminated in February 2010 (which is factually inaccurate, in any case) and that the Restrictive Covenants did not survive as a matter of law.

In *Miller*, the court analyzed the term and non-compete provisions in an employment agreement, which provided as follows:

> **Term.** Employment is at will; however, the parties agree that either party may terminate the Agreement on written notice.
>
> **Covenant Not To Compete.** Employee further covenants that for a period of one year following the termination of Employee's employment for whatever reason, Employee will not, within the Company's market area, directly or indirectly, either as a sole proprietor, partner, stockholder, director, officer, employee, consultant or in any other capacity, conduct or engage in, or be interested in or associated with, any person or entity which engages in the "Business" (as defined above), working with CPA firms. For purposes of this Paragraph, the "Company's market area" includes, but is not limited to, any state in which HKFS has conducted business at any time in the preceding twelve months.

*Id*. at 1014-15 (emphasis in original); *see also* Exhibit 2.[8]

The Court of Appeals in *Miller* first held that the plain language of appellant's non-compete agreement survived the termination of her employment. *Id*.[9]  Despite this plain language reading of the employment agreement, the Court there was unable to locate anything in the agreement to suggest the parties intended the non-compete provision to survive the termination of the *agreement itself*. *Id*. at 1015. Instead, the court determined that "the contract treats the term of employment and the term of the Employment Agreement as two distinct concepts." *Id.* Specifically, the court focused on the "term" provision, which it determined had two distinct clauses with different subjects: "employment at will," referring to appellant's employment, and—separately—the ability for either party to the agreement to "terminate the Agreement on written notice." *Id*.

This "critical" distinction between the two concepts (employment versus the agreement) was important because the non-compete provision only survived the termination of appellant's employment, but there was no language in that agreement suggesting that it survived the termination of the *employment agreement* itself. As such, when the appellant in *Miller* resigned her at-will employment, the Court of Appeals held that the non-compete provision remained in effect only until she terminated the

---

[8] A copy of the *Miller* agreement is attached hereto as Exhibit 2 (also available at No. 5:20-cv-5056-JLV, Doc. 10-1), and the Court may also take judicial notice of this agreement. *See Burroughs v. Emberton*, No. 1:19-cv-100-DPM, 2019 U.S. Dist. LEXIS 196770, at *2 (E.D. Ark. Oct. 15, 2019) (explaining "a court 'may take judicial notice of proceedings in other courts of record'") (quoting *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980); *Hood v. United States*, 152 F.2d 431 (8th Cir. 1946))

[9] Like Jens's covenant not to compete, the non-compete provision in *Miller* started "following the termination of [appellant's] employment for whatever reason." *Id*.

agreement in writing several days after resigning (after which the non-compete no longer had effect because it did not survive the termination of the underlying agreement). *Id*.

Here, the same analysis does not apply, because the Agreement is completely unlike the employment agreement interpreted by the Court of Appeals in *Miller*. Unlike in *Miller*, the "term" identified in Section 2 of the Agreement is only the term of employment (not the term of the Agreement), but Section 2 does not distinguish between the term of employment and the term of the Agreement (as was the key deciding factor in *Miller*). *See* Exhibit 1 at ¶ 2. Whereas the *Miller* agreement expressly allowed the termination of the agreement at any time—whether during or after appellant's employment—the Agreement here neither contains a term of or an expiration date for the Agreement, *see id.*, nor an express mechanism pursuant to which Jens could terminate his Agreement prior to resigning.

The practical effect of this structure is that the Agreement did not expire upon the expiration of the employment term defined in Section 2, and Jens could not (and did not) terminate the Agreement prior to his employment ending. The unambiguous language in Section 2 (and the absence of language permitting Jens to terminate the Agreement), therefore, is that Jens's employment was coextensive with the Restrictive Covenants obligations—the exact opposite of the *Miller* agreement, where the employee was permitted to terminate the Agreement without terminating the employment. Thus, the Agreement continued fully in force until the day on which Jens resigned, and Jens's post-employment Restrictive Covenants began on June 29, 2023, not February 28, 2010.

These critical differences between the terms of *Miller*'s agreement and those in Jens's Agreement explain why the legal holding in *Miller* cannot be transposed to this case to support the Court's findings in the Order. Unlike here, the *Miller* agreement not only contemplated but expressly allowed for termination of the agreement separate from appellant's employment.   Thus, the Court of Appeals held that in absence of language indicating the parties intended the restrictive covenants there to survive termination of the underlying agreement, the employee's termination of the agreement meant that the restrictive covenants terminated immediately. In this case, on the other hand, the Agreement does not need a survival clause because the Agreement never terminated - either on its own terms or by virtue of some right by Jens to do so. Instead, the term of Jens's Agreement was synonymous with his overall employment with Wilbur-Ellis. Consequently, the termination Jens's employment was the only event that could trigger the running of the Restrictive Covenants in Section 5.

> **3.     An express "survival" clause is not necessary for Jens's Restrictive Covenants to remain alive after the seamless transition from "for cause" to "at will" employment.**

The Agreement remains in effect and Jens had (and has) no right to terminate it – the plain language of the Agreement makes this abundantly clear, meaning the Restrictive Covenants continue to apply to Jens and must be enforced.   But even assuming, *arguendo*, the Agreement lapsed in 2010 or Jens had the right to terminate the Agreement (which he has not to date), the Court's finding that the Restrictive Covenants do not survive such termination in the absence of survival language is in error. While this argument may have surface appeal, the law does not require a perfectly written contract.

Contracts are interpreted based on their plain language and while giving "effect to the mutual intention of the parties." *Id*. To this end, the absence of a "survival" clause does not defeat the clear intent of the parties for Jens to be subject to the Restrictive Covenants beginning upon his resignation. Judicially creating such an obligation disregards the practical understanding of contract law that "[n]on-competition and non-solicitation covenants are classic surviving obligations after termination of an employment contract." *Wilbur-Ellis Co. LLC v. Erikson*, No. 4:23-cv-4058-LLP, 2023 WL 3980330, at *5 (D.S.D. June 13, 2023).[10]

As an initial matter, the Court's finding that the Restrictive Covenants do not survive termination of the Agreement violate general principles of contract interpretation by rendering Section 5(ii)'s post-employment covenants entirely meaningless. *See Tri-City Assocs.,* 845 N.W.2d at 915. Stated differently, interpreted consistent with the Court's Order, Section 5(ii) becomes an unnecessary contract term for the situation in which Jens seamlessly remains employed following his initial employment term—which is what was contemplated by the parties and is precisely what happened here. To give full effect to Section 5(ii) and the obvious intent of the parties, the Court must determine that the Restrictive Covenants survived any purported termination of the Agreement (which did not occur, as discussed above) and were triggered when Jens resigned his

---

[10] *See also Automed Technologies v. Eller*, 160 F. Supp. 2d 915, 924 (N.D. Ill. 2001) (allowing a restrictive covenant agreement silent on an assignability to be assigned to a successor company, explaining, in part, that "covenants typically take effect upon the termination of employment, at which point the employer has no further obligations to the employee"); *Healthcare Servs. v. Copeland*, 198 S.W.3d 604, 610 n.3 (Mo. 2006) ("Generally non-compete agreements are focused upon post-employment activities.").

employment with Wilbur-Ellis. *Id*. (discussing efforts to harmonize separate provisions so as not to "render a portion of the contract meaningless'").

Consistent with these plain-language interpretations, many courts have specifically held that survival clauses are not necessary in the restrictive covenant context. *See, e.g.,* *Monumental Life Ins. Co. v. Ill. Mut. Life Ins. Co.*, No. 1:11-cv-8909, 2012 U.S. Dist. LEXIS 164521, at *9-10 (N.D. Ill. Nov. 19, 2012) ("To require the degree of explicitness in a savings clause that [defendant] demands would render the entire post-employment restrictions section meaningless."); *Roi*, 2015 WL 1143167, at *10 (holding that an agreement that contained a for-cause period followed by a transition to at-will employment contemplated continued employment, and, therefore, the restrictive covenants continued "for as long as [defendant's] employment continued," even without a survival clause).

For example, in *H.B.G. Corp. v. Houbolt*, the court analyzed a similar employment agreement and relationship. 367 N.E.2d 432 (Ill. Ct. App. 1977). In *Houbolt*, the individual signed a sales agreement, requiring him to work for at least five years with plaintiffs' company. *Id*. at 957-58. He also signed an employment agreement that had a five-year term of employment and a restrictive covenant clause that applied "for a period of five years following the termination of [his] employment." *Id*. The parties did not renew the employment agreement after it expired. *Id*. at 958. Eleven years after initially signing his employment agreement, and well after the agreement had lapsed, the individual resigned to work for a competitor. *Id*. The trial court granted an injunction requested by his former employer based on the restrictive covenants, finding the

restricted period started when he resigned, and *not* when his initial agreement expired. *Id.*

at 958-59. On appeal, the court affirmed, explaining:

> [T]he employment contract contain[s] the parties agreement that Houbolt
> would not compete for a period of five years from the termination of his
> employment. We agree with the trial court that the language of both
> documents[11] which form the basic agreement, when read together, is plain
> and unambiguous. . . . ***We cannot ignore the obvious meaning which must
> be attached to the term "termination of employment"*** used in both
> documents. As we stated earlier the employment contract and sale
> agreement must and should be read together. To concede to defendant's
> argument that defendant's employment was terminated in 1968, with the
> end of his five-year minimum period of employment, is totally inconsistent
> with the sale agreement, which contemplated the purpose of the
> employment contract and actually mandated the ultimate written contract.

*Id.* at 961-62 (emphasis added).

Another instructive case is *Arthur J. Gallagher & Co. v. Youngdahl*, 412 F. Supp.

2d 1013 (D. Minn. 2006). In *Youngdahl*, plaintiff purchased defendant's company and the

parties executed multiple agreements, including an employment agreement. *Id.* at 1015.

The employment agreement had "a three-year term of employment, after which

[defendant's] employment would be at-will." *Id.*[12] The agreement also contained

restrictive covenants, beginning "following the termination of [defendant's] employment

---

[11] Similar to the sales agreement in *Houbolt*, Jens's Agreement contemplated that he
would continue working beyond the initial "employment term" by stating his
employment continued thereafter until his termination by written notice.

[12] The exact language stated: "Employment of [defendant] shall 'not necessarily cease as
of the expiration of the Term of Employment; however, employment thereafter shall be
on an at will basis.'" *Id.* at 1018.

for any reason." *Id*. The employment agreement did not have a "survival clause." *Id*.[13]

After defendant's three-year term of employment expired, he continued working for two

more years as an at-will employee until plaintiff terminated his employment. *Id*. After his

termination, defendant started working for one of plaintiff's competitors. *Id*.

First, the court in *Youngdahl* recognized that the agreement provided for a three-

year term and then stated defendant's employment "thereafter shall be on an at will

basis," and that the non-compete clause "generally refer[ed] to the termination of [his]

employment for any reason whatsoever." *Id*. at 1018. This "show[ed] the parties intended

to distinguish between [defendant's] three-year Term of Employment and his overall

'employment' with [plaintiff] both before and after the expiration of his three-year term."

*Id*. "Because the restrictive covenants refer only to [defendant's] 'employment' and apply

for a period of years following the termination 'for any reason whatsoever,' the covenants

d[id] not expire at the end of his three-year term." *Id*. Rather, the court held that "the

reasonable construction of the non-compete . . . clause[] is that [it is] enforceable for

three years . . . [after] the day [plaintiff] terminated [defendant's] employment" in 2005.

*Id*.

Likewise, in *Monumental Life Ins.*, the court enforced restrictive covenants by

giving meaning and effect to all parts of the contract at issue. *See Monumental Life Ins.*,

2012 U.S. Dist. LEXIS 164521. There, defendant signed an agreement with a two-year

restrictive covenant period beginning "from the date of the termination of [his]

---

[13] No such provision is mentioned in the opinion. Moreover, the Court may take judicial notice of the *Youngdahl* employment agreement, *see* No. 05-cv-1890-DSD, Doc. 5-4 at 12-17, and its lack of a survival clause. *See* Footnote 9, *supra*.

employment." *Id*. at *1-2. He briefly retired, and then returned to work for plaintiff, before being terminated months later. *Id*. at *2. Defendant argued the restrictive covenants in his agreement did not survive his retirement without a survival clause. *Id*. at *4. The court disagreed, stating that, despite the lack of a survival clause, contract law "disfavors interpretations that would render provisions with them as having no effect." *Id*. at *9. The court reasoned that the non-compete clause's phrase "[f]or a period of two (2) years from the date of termination of [defendant's] employment" had "a certain level of explicitness" as used in a savings clause, and to require an explicit savings clause would render the restrictive covenants section meaningless. *Id*. at *10. Therefore, the court held that the parties unambiguously "intended the post-employment restrictions to continue for two years past the general termination of the contract." *Id*.

Thus, the weight of authority supports a finding that the Restrictive Covenants would survive any alleged termination of the Agreement (notwithstanding that the Agreement here was never terminated), notwithstanding the absence of express survival language. The Court of Appeals' decision in *Miller* likewise does not support the general proposition that an employment agreement must contain a survival clause for post-employment restrictive covenants to have effect after the underlying employment agreement lapses or is terminated. Importantly, *Miller* does not hold that, as a matter of law, the lack of a survival clause invalidates any and all restrictive covenants upon the expiration of the underlying contract. Rather, the *Miller* court based its decision on the fact that the employment agreement was poorly drafted, including by separately allowing for the termination of appellant's employment and the agreement itself, and did not have

*any* language indicating that the parties intended the restrictive covenants to survive (whether in a survival clause or otherwise). The decision turned on the specific language of the contract—not on a general tenet of contract interpretation that compelled a finding that the restrictive covenants automatically failed to survive because there was no express survival provision.[14] And Defendants in this litigation are unable to point to any South Dakota authority that would support such a legal proposition.

In any event, had Wilbur-Ellis and Jens intended the Restrictive Covenants to end at the same time as the Agreement (again assuming, *arguendo,* that the Agreement actually has terminated), they would have said so. They could have distinguished between terminating employment and terminating the overall agreement, like in *Miller.* They could have defined the "term" as ending at the term of the agreement, as in *Erikson.* Differing from both of those cases, instead, the parties drafted the Agreement with the plain intent for Jens to have continuous employment and Restrictive Covenants connected to the "the date [his] employment is terminated."

The plain and generally accepted meaning of the term "employment" as used in the "Term" and "Covenant Not to Compete" clauses is "the state of being employed." *See* Dictionary by Merriam-Webster (employment), *available at* https://www.merriam-webster.com/dictionary/employment; *see also, e.g., Houbolt*, 367 N.E.2d at 437 (finding a noncompete extended until the termination of defendant's employment, even though the

---

[14] Of course, all of the discussion of survivability in this case is a complete red herring because survivability is a legal concept that only becomes relevant when a contract has been terminated. There is no reasonable interpretation of the Agreement that supports a finding that the Agreement lapsed or was terminated (whether in 2010 or now), as set forth in detail above.

initial five-year term of his employment contract had expired). To hold the term ended and Restrictive Covenants began on February 28, 2010, reads into the Agreement language that simply does not exist. For each of these reasons, the *Miller* case is not on-point. The more applicable cases are *Youngdahl* and *Monumental Life Ins.* because those agreements similarly had an "employment term" that contemplated an employee remaining continuously employed and restrictive covenants tied to the end employment. *See, e.g., Youngdahl*, 412 F. Supp. 2d at 1018.

Unlike the agreement in *Miller*, the two non-compete provisions in the Agreement themselves provide further evidence of the intent of the Agreement to have the Restrictive Covenants to remain in effect until Jens's employment terminated. The post-employment non-compete runs for three years "following the date [Jens's] employment is terminated, for whatever reason." *See* Exhibit 1 at ¶ 5(ii). There would be no need for different clauses "during" Jens's employment and "following" his termination if the parties did not intend the covenants to survive any purported termination of the Agreement. Indeed, under the Court's current interpretation, the entire post-employment non-compete is rendered meaningless in the situation where Jens stays employed following the completion of his initial, for-cause term for more than three years (which he did).

Moreover, the plain language of the Agreement shows that Jens's post-employment Restrictive Covenants were tied to the end of his employment—not any alleged lapsing of the Agreement. *Id.* ("following the date his employment is terminated"). Section 5(ii) did not need "survival language," as the obligations referred to

within this section inherently survived the duration of Jens's entire employment with Wilbur-Ellis. *See, e.g., Houbolt*, 367 N.E.2d at 961-62 (holding that restrictive covenants survived the termination of an employment agreement because of the unambiguous language stating they started following "the termination of [defendant's] employment"); *Monumental Life Ins.*, 2012 U.S. Dist. LEXIS 164521, at \*9-10 (declining to require an explicit savings clause because that "would render the entire post-employment restrictions section meaningless" in an employment agreement ). At bottom, even if the Agreement had somehow lapsed or been terminated prior to the end of Jens's resignation, the absence of explicit survival language is not required by South Dakota law for the Restrictive Covenants to continue in effect until the date he resigned.

For the above reasons, including the plain language and intent of the parties, the Court should determine that the Agreement and its post-employment Restrictive Covenants are enforceable against Jens and started to run on June 29, 2023. *See Tri-City Assocs.,* 845 N.W.2d at 915; *Youngdahl*, 412 F. Supp. 2d at 1018.

### 4.    Jens breached the Restrictive Covenants within the Agreement.

As explained above, the Restrictive Covenants are fully enforceable under South Dakota law. Specifically, Jens agreed that he would not engage in any "Competitive Business" within one 100 miles of the area served by Dakota Airspray (the "Restricted Territory") for a period of three years following the end of his employment with Wilbur-Ellis. *See* Exhibit 1 at ¶ 5(ii). Jens further agreed, for the same period of time and within the same Restricted Territory, that he would not "solicit, divert or accept business from or otherwise take away or interfere with any customer of [Wilbur-Ellis]." *Id.* Finally, Jens

agreed, for the same period of time and within the same Restricted Territory, that he would not "solicit the employment of any person employed by [Wilbur-Ellis]." *Id.* Restrictive covenants such as this, which are narrow in scope and limited in time and geographic reach, have been routinely upheld as enforceable. *See*, *e.g., Hot Stuff Foods, LLC v. Mean Gene's Enters.*, 468 F. Supp.2d 1078, 1102 (D.S.D. 2006); *FIMCO v. Funk*, 2017 WL 4798137 (N.D. Iowa 2017).

There is no dispute that Jens is in violation of the Restrictive Covenants in his Agreement. Shortly after abruptly and voluntarily resigning his employment with Wilbur-Ellis without notice, Jens went to work for Simplot—a direct competitor—to compete against Wilbur-Ellis in the agricultural services industry for precisely the same customers he serviced on behalf of Wilbur-Ellis. Tr. 2 at 293:2-6. Jens is doing so less than 50 miles from where he worked with Wilbur-Ellis, where he is soliciting an identical customer base. *See* Tr. 2 at 411:9-412:2; 443:4-7. And Jens spoke with several Wilbur-Ellis employees before he resigned and advised them of his plans to go work for Simplot, which had the effect of encouraging them to follow suit. *See* Tr. 2 at 329:14-330:7; 331:2-23; 332:6-15; 338:1-389:5. Jens breached the plain terms of his Agreement by commencing employment with Simplot, Wilbur-Ellis's direct competitor, soliciting at least one Wilbur-Ellis employee for Defendants' benefit, and, upon information and belief, soliciting Wilbur-Ellis's customers for Simplot's business, all within the geographical areas of restriction. Consequently, Wilbur-Ellis is likely to succeed on the merits of its breach of contract claim against Jens and, therefore, this factor weighs heavily in favor of injunctive relief.

### B.    Wilbur-Ellis Will Suffer Irreparable Injury Absent an Injunction Pending Appeal.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). It is undeniable that Wilbur-Ellis will suffer significant and irreparable harm without an immediate restraining order that prohibits Defendants Jens and Simplot from continuing to violate and interfere with the plain terms of Jens's valid and enforceable Agreement with Wilbur-Ellis.

Courts in the Eighth Circuit routinely hold that irreparable harm results where a company faces loss of intangible assets such as reputation and goodwill due to former employees' breaching their fiduciary duties and duties of loyalty, with their new employer aiding and abetting the same *(see United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."); (*General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987) (finding irreparable harm where "intangible assets such as reputation and goodwill" are at risk)); where a company faces the loss of goodwill among customers due to defendants unfairly competing (*Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 789-90 (8th Cir. 2010) ("We have previously held that a district court did not err when finding that a loss of goodwill among customers was sufficient to establish a threat of irreparable harm."); where a company faces the unlawful use of its confidential information by defendants (*Sterling Computers Corp. v. Fling*, No. 4:19-CV-04137-KES,

2019 WL 5104013, at *6 (D.S.D. Oct. 11, 2019) ("[A] breach of confidentiality, like that alleged here, is likely to shake customer confidence in [plaintiff] and permanently damage its reputation and goodwill. Such damage is sufficient to constitute irreparable harm.")); where a former employee breaches their employment agreement's restrictive covenants and works with a competitor to steal trade secrets and employees (*see Medtronic, Inc. v. Gibbons,* 527 F. Supp. 1085, 1091 (D. Minn. 1981), *aff'd*, 684 F.2d 565 (8th Cir. 1982); *Marco, Inc. v. Advanced Systems, Inc.*, No. CIV 11-4072-KES, 2011 WL 2748691, at *10 (D.S.D. July 13, 2011); *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) ("In a proper case irreparable harm to the employer may be inferred if it can be shown that the employee breached an enforceable restrictive covenant."); *Erikson*, 4:23-cv-04058-LLP, 2023 WL, at *5 ("The mere violation of non-compete and non-solicitation covenants suffices to show irreparable harm."))[15]; and where, as here, an employer employs former employees of a company despite the substantial likelihood that the former employees have already or will use and disclose the company's trade secrets (*see Poet Plant Mgmt., LLC v. Simpson*, No. CIV 07-4116, 2007 WL 2493514, at *1 (D.S.D. Aug. 29, 2007) (finding defendant's employment with plaintiff's competitor created a threat of irreparable harm to plaintiff because of the substantial likelihood that defendant would either unintentionally or intentionally use and disclose plaintiff's confidential information and trade secrets to the competitor if he was

---

[15] Even in the event the Court were to somehow find that Wilbur-Ellis has not presented sufficient evidence of irreparable harm (and Wilbur-Ellis submits that there is ample evidence), Wilbur-Ellis can meet its burden of proving irreparable harm simply by virtue of Jens's specific agreement that his breach has caused irreparable harm. *See* Exhibit 1 at ¶ 14.

allowed to continue his employment); *Raven Indus., Inc. v. Lee*, 2010 S.D. 49, ¶ 24, 783 N.W.2d 844, 852 (affirming issuance of injunction in light of continued irreparable harm where defendants were using plaintiff's secret, confidential, or proprietary information)). Given Jen's open and ongoing breaches of the Agreement, with Simplot's knowledge, support and encouragement, there can be little question that Wilbur-Ellis is suffering irreparable harm that warrants injunctive relief.

### C. Issuance of the Injunction Pending Appeal Will Not Substantially Injure the Other Interested Parties.

The balance of harms weighs heavily in favor of Wilbur-Ellis and favors issuance of an injunction pending appeal. Because an injunction will only prohibit Jens and Simplot from engaging in illegal conduct in which they have no legal right to engage, issuance of an injunction will not result in any significant harm to other interested parties. *See Erikson*, 4:23-cv-04058-LLP, 2023 WL, at *6. Courts have routinely found the balance of harms weighs in favor of plaintiffs in situations similar to this. *See e.g. N.I.S.*, 724 F.2d at 710 (holding that the balance of equities weighs in favor the plaintiff where restrictive covenants are at issue); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1437 (N.D. Iowa 1996) (finding the balance tipped in favor of injunction where plaintiff would suffer significant injury, economic and non-economic, if disclosure of its confidential information and trade secrets were not enjoined); *Reg Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 861 (S.D. Iowa 2013) (holding that the balance of harms favors an employer where the employer took great care to protect its confidential information and significant investments with restrictive covenants).

The only potential harm to Jens and Simplot is that they will not be able to benefit from Jens's unlawful competition and solicitation of Wilbur-Ellis's employees and customers. Jens and Simplot would not be able to unlawfully compete with Wilbur-Ellis but for their numerous breaches of straightforward legal duties. There is no cognizable harm under those circumstances. For each of these reasons, the balancing of the potential harms weighs decidedly in favor of the relief sought. The effect on non-parties is minimal because customers may continue to have their farms serviced by Wilbur-Ellis or any other company in the market that has not engaged in unfair competition for the restricted period, and Wilbur-Ellis employees can remain employed by Wilbur-Ellis.

### D.      The Public Interest Weighs Heavily in Favor of Granting An Injunction.

The public interest weighs in favor of this Court issuing an injunction pending appeal. In particular, the public interest is served by upholding the sanctity of contracts, protecting intellectual property, and preventing Jens and Simplot from executing their documented scheme of flouting the same. *See N.I.S*, 724 F.2d at 710 (holding that if restrictive covenants are valid the public interest calls for their enforcement). In the instant case, there is simply no identifiable public interest that is paramount to Wilbur-Ellis's interests in having its valid contracts upheld, or its employees and customers protected from unlawful theft by a former employee and a direct competitor.

## III.    CONCLUSION

For the above reasons, Wilbur-Ellis respectfully requests that the Court grant its motion and enter an order enjoining Brett Jens from violating and Simplot from

interfering with the Restrictive Covenants, including by Jens working for Simplot, or soliciting customers and employees of Wilbur-Ellis in the restricted territory, pending the resolution of the appeal to the Eighth Circuit Court of Appeals.

Dated: December 22, 2023

/s/ David J. Goldstein
David J. Goldstein, Bar No. SBSD #4281
dgoldstein@littler.com
Jeremy D. Sosna, MN Bar No. 290233
jsosna@littler.com
(Admitted Pro Hac Vice)
Lauren E. Clements, MN Bar No. 0399187
lclements@littler.com
(Admitted Pro Hac Vice)
Michelle A. Christy, MN Bar No. 0402038
mchristy@littler.com
(Admitted Pro Hac Vice)
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone:     612.630.1000

Kelli Fuqua (TX Bar No. 24097713)
kfuqua@littler.com
(Admitted Pro Hac Vice)
LITTLER MENDELSON, P.C.
100 Congress Avenue
Suite 1400
Austin, TX 78701
Telephone:  512.982.7250

Donald W. Myers (PA Bar No. 92704)
dwmyers@littler.com
*(Admitted Pro Hac Vice)*
LITTLER MENDELSON, P.C.
1601 Cherry Street
Suite 1400
Philadelphia, PA 19102-1321
Telephone:  267.402.3000

Attorneys for Plaintiff