UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WILBUR-ELLIS COMPANY LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BRETT JENS,  J.R. SIMPLOT COMPANY, SHANE FASTNACHT, PHYLICIA HOFFMAN, WES HOTCHKISS,<br><br>Defendants. | 4:23-CV-04104-LLP<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL<br><br>DOCKET NO. 155 |

## INTRODUCTION

This matter is before the court on plaintiff Wilbur-Ellis Company LLC's ("W-E") amended complaint against former employees defendants Brett Jens, Shane Fastnacht, Phylicia Hoffman, Wes Hotchkiss, and their new employer, defendant J.R. Simplot.[1]  See Docket No. 22.  W-E alleges the individual defendants left their employment with W-E between June 29 and July 10, 2023, to go to work for J.R. Simplot, a competitor of W-E.  Id.  W-E alleges 12

---

[1] W-E is a Delaware corporation with its principal place of business in California.  Docket No. 22 at p. 2.  All of the individual defendants are citizens of South Dakota.  Id.  J.R. Simplot is an Idaho corporation.  Id. at p. 3.  Jurisdiction is premised on the diverse citizenship of the parties.  See 28 U.S.C. § 1332.

separate claims against defendants including breach of contract, tortious interference with contractual relations, breach of duty of loyalty, breach of fiduciary duty, violation of state and federal trade secrets laws, unfair competition, and civil conspiracy.  Id.

Now pending is a motion to compel discovery by defendants.  Docket No. 155.  W-E resists the motion.  Docket No. 160.  The motion was referred to this magistrate judge for decision by the district judge.  Docket No. 159.

## FACTS

### A.    Identities of the Parties

Mr. Jens became an employee of W-E in 2007 under an agreement that, by its terms, ended February 28, 2010, and thereafter reverted to an employment at will relationship.  The district court found (after a two-day evidentiary hearing on W-E's motions for a TRO and for a preliminary injunction) that the restrictive covenants of that employment contract were no longer in effect as of the date that Mr. Jens left W-E's employment on June 30, 2023.  The other three individual defendants were never parties to an employment contract with W-E, but were employees at will at all times. Mr. Fastnacht began employment with W-E in 2010 and left June 29, 2023. Ms. Hoffman began working for W-E in 2016 and left July 10, 2023.  And Mr. Hotchkiss began working for W-E in 2005 and left June 29, 2023.

At the time of his departure from W-E, Mr. Fastnacht was a district sales manager.  Docket No. 92 at p. 13:17-21 (October 31, 2023, Hearing Transcript ("HT")).  Mr. Jens was one of three sales managers who reported to

2

Mr. Fastnacht.  Id. at p. 14:2-21.  Mr. Jens was in charge of the areas of
Tulare, Huron, and Wessington Springs, South Dakota.  Id. at p. 30:25;
p. 31:1.  Informally, Mr. Jens also had responsibility or influenced the areas of
Miller, Highmore, and Blunt, South Dakota.  Id. at p. 31:2-6.

Mr. Hotchkiss was the branded manager for South Dakota at W-E.  Id. at
p. 35:9-12.  His duties were to manage the W-E "branded portfolio."  Id. at
p. 35:25; p. 36:1.  He worked closely with the district sales managers and the
sales managers as well as with sales agronomists and with customers.  Id. at
p. 36:1-6.  The "branded portfolio" refers to products W-E actually
manufactures itself with W-E's name on the box, jug, or bag.  Id. at p. 36:9-15.

W-E is an agricultural business that sells seeds, chemicals, fertilizer, and
crop scouting to farmers.  Docket No. 92 at p. 13:6-7 (Oct. 31, 2023, Hearing
Transcript ("HT")).  J.R. Simplot competes with W-E in retail agricultural
business in South Dakota.  Id. at p. 34:9-15.

**B.    Allegations in W-E's Amended Complaint**

W-E alleges in its amended complaint that J.R. Simplot began plotting a
raid of W-E's employees, customers, confidential information, and trade secrets
in 2021, resulting in the "theft" of 24 employees in South Dakota.  Docket No.
22 at p. 3.  W-E alleges that in the days leading up to their resignations,
defendants Mr. Fastnacht, Ms. Hoffman, and Mr. Hotchkiss inserted external
drives or USB devices into their W-E computers and accessed W-E documents,
including documents containing confidential and trade secret information.  Id.
at p. 4.  W-E also alleges Ms. Hoffman deleted customer seed orders the day

prior to her resignation.  Id.   W-E alleges on June 20, 2023, Mr. Fastnacht bought 50 GB of iCloud storage and then, on June 27, purchased another 200 GB of iCloud Storage.  Id. at p. 23.

W-E alleges that months before the individual defendants terminated their employment with W-E, they began "harassing other Wilbur-Ellis employees to follow their lead" and leave W-E's employment.  Id. at p. 26. Other than the four named individual defendants, W-E lists 20 employees who it alleges left its employ between June 29 and July 18, 2023.  Id. at pp. 31-32. Some of those employees constituted W-E's entire work force from its office in Tulare, South Dakota. [2]  Docket No. 92, Oct. 31. 2023, HT, at p. 39:2-23.

## C.    Testimony from the Hearing on W-E's Request for Injunctive Relief

At the evidentiary hearing on W-E's request for injunctive relief events other than actions of the defendants were established as contributing to employee dissatisfaction at W-E in the first half of 2023.  There was a reduction in force in January 2023 and a second one in February 2023 that had negatively impacted morale at W-E.  Mr. Jens testified that two of the employees who were let go, Tait Lacey and Troy Johnson, were very successful

---

[2] The testimony of a W-E witness and employee established the number of ten as the total of the employees at the Tulare office.  Another W-E witness and employee said there were 25 such employees.  Mr. Jens testified there were 14-15 employees.  Docket No. 93 at p. 352:15-17.  The court notes that if there were really 25 employees at the Tulare office and all of them walked out on the same date, the amended complaint would probably list more employees than the 20 employees it lists.  Resolution of the exact number of employees at W-E's Tulare office is not necessary for purposes of addressing defendants' instant motion.

at their jobs at W-E and it caused Mr. Jens to fear whether he might be next. Docket No. 93, HT Nov. 1, 2023 at p. 360:8-20.

Mr. Jens made W-E aware in March 2023 that he had received an offer of employment from J.R. Simplot that would pay him 3.8 times his current W-E salary. Although 2022 had been a record year for sales, Mr. Jens' bonus—paid in March 2023 and based on sales for 2022—was lower than in previous years when the sales had not been as high.

Also, W-E increased sales goals for 2023 by 130 percent, a figure the sales employees felt was unrealistic. And, although W-E had just experienced a record sales year, W-E demanded that discretionary spending for meals, entertainment, travel, and sponsorships be reduced.

Mr. Jens communicated a number of other grievances to W-E in March about the corporate micro-management of his job, the fact that corporate forecasts were not reflecting the data he submitted (specifically as to inventory), that the calibration of payments for bonuses needed to be recalculated because it would result in too low of a payment in bad years, that the corporate policies for rewarding sales agronomists needed to be recalibrated, and that the fleet was "a mess." Docket No. 74 at p. 7 (Ex. 104). W-E made efforts to improve Mr. Jens' compensation, but did not address any of his other complaints.

Mark Ripato, a member of upper management from W-E, came to the Tulare office sometime in the first two weeks of March 2023 to speak to Mr. Jens and all his direct reports (that is, employees directly under Mr. Jens' supervision). Docket No. 93, HT Nov. 1, 2023 at p. 371:13-19. All of the

Tulare employees who met with Mr. Ripato had the opportunity to express their discontent with circumstances at W-E.  Id.  The meeting with Mr. Ripato lasted many hours.  Id.  In the aftermath of this meeting, there was "zero response from upper management" to the concerns expressed by Mr. Jens and his direct reports.  Id. at 374:13-13.

Mr. Jens testified that he felt like a valued employee at W-E until the last five years of his employment there when leadership of W-E changed from John Thacher to John Buckley.  Docket No. 93, HT Nov. 1, 2023 at p. 368:12-23. After the change in leadership, Mr. Jens testified he felt W-E viewed him as "just a number."  Id.

Wes Hotchiss echoed Mr. Jens' assessment.  Id. at pp. 476-77.  He remarked that the last five years at W-E were disappointing as W-E changed its direction.  Id.  Instead of focusing on the customer, they were all about checking a box.  Id.  W-E was exiting the aerial business and had already done so in Texas.  Id.  Mr. Hotchkiss felt W-E broke its word to him and to fertilizer suppliers and a very negative culture arose within the company.  Id.  Morale was low due to reductions in force and forced layoffs of Tait Lacey, Troy Johnson, and others Mr. Hotchkiss had long worked with.  Id.

Mr. Hotchkiss stated he began to look for other job opportunities in the winter of 2021 and spring of 2022.  Id. at p. 477.  He applied for a job with Helena, a competitor of W-E and Simplot's.  Id.  Eventually, in May 2023 Mr. Hotchkiss had dinner with Tait Lacey and the subject of applying for a job with Simplot came up.  Id. at p. 478.  Mr. Hotchkiss was not interested in a job

6

at Simplot at the time, but he followed up with Mr. Lacey on June 15 or 16, 2023.  Id.

Between the May dinner and June 15 or 16, a superior at W-E told Mr. Hotchkiss that he would no longer be provided with cost information for branded products that Mr. Hotchkiss was responsible for pricing because the executive believed Mr. Hotchkiss and other similarly-situated employees were not "capable of managing that information."  Id. at pp. 479-80.  Mr. Hotchkiss found this decision very disrespectful and highly frustrating.  Id.  It motivated him to reach back out to Mr. Lacey and explore further the idea of working for Simplot.  Id.

As early as January 2022 Mr. Hotchkiss' supervisor had expressed concerns to W-E that Mr. Hotchkiss was being underpaid compared to other similarly performing employees.  At some point W-E engaged in a market analysis regarding employee compensation and determined that at least some of its employees were being paid below the market compensation rates.  W-E determined to offer retention agreements to those employees it felt were at risk of leaving, but it never offered any such agreements to any of the individual defendants in this case and it did not offer any such agreements to any other W-E employees until after June 30, 2023.

Phillip Gilbert, W-E's district operations manager in South Dakota, also testified.  Docket No. 92, HT Oct. 31, 2023, pp. 218 et seq.  Mr. Gilbert met with Mr. Hotchkiss on the afternoon of June 29, 2023, at which time

Mr. Hotchkiss announced he and the entire Tulare office were leaving W-E.[3]
Id. at pp. 233:10-22.  Mr. Hotchkiss told Mr. Gilbert he had "a seat on his bus"
for Mr. Gilbert and slid a note across the table.  Id. at p. 236:2-4.  The note had
the title of a position on it, the [J.R. Simplot] website to go to look at the job
description, and gave details about the role, who it would report to [Tait Lacey]
and the geography it would cover.  Id. at p. 236:8-13.  Mr. Hotchkiss indicated
to Mr. Gilbert that the position listed on the note was his if he wanted it.  Id. at
p. 237:21-24.  Mr. Gilbert indicated he would not be leaving W-E's employ.  Id.
at p. 236:13-16.

After the meeting, Mr. Fastnacht called Mr. Gilbert on the phone that
same day to explain why he was leaving W-E and expressing the hope that,
with Mr. Gilbert, they would put "the team of the good old boys . . . back
together at Simplot."  Id. at p. 242:12-15.  Mr. Fastnacht said he was upset
with the sales bonus for the year 2022 and upset that the sales goals for 2023
were "unreachable."  Id. at p. 242:18-22.  The two also discussed that the
"wheels, fleet management" was "a mess."  Id. at p. 242:22-24.  In the end,
Mr. Gilbert told Mr. Fastnacht that he felt he could not leave W-E at that time.
Id. at p. 244:9-12.

Mr. Jens also called Mr. Gilbert that same evening.  Id. at p. 244:15-16.
Mr. Jens wanted to explain why he was leaving W-E.  Id. at p. 244:22-24.

---

[3] Mr. Hotchkiss and Mr. Jens disputed this. Both testified that, at the time
they spoke to Mr. Gilbert and, indeed, up to the time each of them resigned
their positions at W-E, neither had any knowledge of what the other employees
at the Tulare office planned to do vis a vis their employment with W-E.

Mr. Gilbert told Mr. Jens he had made promises to his employees that he would not leave W-E and felt he had to keep those promises.  <u>Id.</u> at p. 245:9-12.  Mr. Gilbert had been friends with Mr. Jens, Mr. Fastnacht, and Mr. Hotchkiss for decades, predating his employment with W-E in all but one case.

Brett Jens testified he approached J.R. Simplot, not vice versa, in February or March 2023 to explore possible employment with Simplot.  Docket No. 93, HT Nov. 1, 2023, at p. 307:16-25.  Mr. Jens had several conversations with other W-E employees before he resigned.  One of the employees was his own son, and three other employees were persons he also considered family, that he had known since they were little kids, and who were no longer Mr. Jens' direct reports.  <u>Id.</u> at pp. 379-81.  Mr. Jens testified he did not request any of these employees to leave W-E.  <u>Id.</u> at p. 381:18-20.  According to Mr. Jens, he simply told the employees he was leaving, explained his reasons, and told them they could explore the possibility of employment at J.R. Simplot if they wished.  He maintained he never encouraged or asked any employee to leave W-E.

Mr. Fastnacht and Mr. Hotchkiss told Mr. Jens on June 28 or 29 that they were leaving W-E to go to work for J.R. Simplot.  <u>Id.</u> at pp. 384-85.  Neither of these defendants asked Mr. Jens to come with them.  <u>Id.</u>  When Mr. Jens accepted employment with J.R. Simplot he had to file a declaration that he was not bringing any of W-E's confidential or trade secret information to his new employment with Simplot.  <u>Id.</u> at 402:6-17.  Mr. Jens testified he did

9

not bring any of W-E's confidential or trade secret information to his new job.  Id.

Bryan Lenocker testified that a fellow W-E employee, Clay Jens,[4] called him on June 28 and asked him to come out to his shop at his home. Mr. Lenocker went there and learned that Clay and another fellow W-E employee, Dustin Otto, were leaving W-E to go to work for Simplot.  Id. at p. 415.  The two told Mr. Lenocker if he was interested in joining them he could speak to Chris Kolda, another W-E employee who was also leaving.  Id. at p. 416.  Mr. Lenocker left Mr. Jens' home and called Mr. Kolda who conveyed a job offer to him including figures for his salary and bonus.  Id. at pp. 415, 419. Mr. Kolda told Mr. Lenocker there was a job opportunity for him at J.R. Simplot doing the same job duties as he currently performed at W-E.  Id. at pp. 416-17.  After Mr. Lenocker spoke to Mr. Kolda, Mr. Jens called him on the phone and invited Mr. Lenocker to come to his house to discuss the compensation package at Simplot.  Id. at p. 418.

Sully Masat also testified.  Id. at p. 433.  Mr. Masat resigned from his position at W-E June 30, 2023.  Id. at p. 434.  He now works for J.R. Simplot at a temporary office in Tulare that was first set up around the first week of July 2023.  Id.  Mr. Masat testified that at the moment he resigned from W-E, he was not aware that other employees at the W-E Tulare office had also resigned, though he learned of this information after the fact.  Id. at p. 435.

---

[4] Clay Jens is the son of defendant Brett Jens.

Mr. Masat testified he did not have a job offer from Simplot at the time he resigned his job at W-E.  Id. at p. 436.

Two days before he quit W-E, Mr. Masat had a conversation with Clay Jens and Dustin Otto in which he was told he could apply for a position with Simplot.  Id. at pp. 436-38.  After this conversation, Mr. Masat also had a conversation with Brett Jens at Mr. Jens' shop. Id. at p. 438.  Mr. Jens did not describe the benefits at Simplot in any detail, but did say they would be good benefits.  Id. at p. 439.  Mr. Masat did not learn what compensation Simplot was willing to offer him until he received an offer letter from Simplot later on. Id.  Mr. Masat testified he did not know Brett Jens or Wes Hotchkiss were going to resign until after the fact.  Id. at p. 442.  If Simplot had not offered Mr. Masat a job, he would have just worked on his family's farm, a job he performed on the side at all times anyway.  Id. at p. 445.

Mr. Masat testified no one pressured him or even encouraged him to go to work for Simplot.  Id.   Mr. Masat referred two other employees, Caton Eton and Berrett Nelson, to work at Simplot because he enjoyed working with these men.  Id. at p. 448.

Wesley Hotchkiss testified he left W-E's employ on June 29, 2023.  Id. at p. 449.  His first date of employment with J.R. Simplot was June 30, 2023.  Id. at p. 450.  Prior to these events, Mr. Hotchkiss applied for a job with Simplot on June 15 and was interviewed by former W-E employee Tait Lacey.  Id. at p. 451.  Mr. Hotchkiss accepted the Simplot job offer on June 23.  Id. at p. 453.

11

Between June 23 and 30, 2023, Mr. Hotchkiss met with W-E employes Blaise Baxter and Wyatt Brunson and told them he was leaving W-E to go to work for Simplot.  Id. at p. 455.  He told these individuals if they were interested in applying for a job at Simplot they could look on the Simplot website.  Id. at p. 456.  Mr. Hotchkiss recalled having told Mr. Brunson that the health insurance Simplot offered was better for Mr. Hotchkiss' family than what he currently had at W-E.  Id. at p. 458.

Mr. Hotchkiss also met with Brett Jens before leaving W-E to tell Mr. Jens he was planning to go to work for Simplot.  Id. at p. 459.  He also met with Phil Gilbert to tell him that Mr. Hotchkiss was going to leave W-E.  Id. at p. 460.  Mr. Hotchkiss told Mr. Gilbert he could look at Simplot's website to see what positions were available and mentioned a specific job title.  Id. at pp. 460-61.  Mr. Hotchkiss disputed that he suggested to Mr. Gilbert a particular salary or that he told Mr. Gilbert the entire Tulare office was going to leave W-E.  Id. at p. 463.

**D.     The Disputed Discovery**

On March 26, 2024, defendants served W-E with interrogatories and requests for the production of documents (RFP).  Docket No. 158-1.  W-E filed responses that included objections and incomplete information.  Docket Nos. 158-2 & 158-3.  The parties met and conferred both in writing and by telephone, but were ultimately unable to resolve all of their differences.  This motion ensued on November 26, 2024.  Docket No. 155.

## DISCUSSION

### A.    Good Faith Meet and Confer Requirement

Both the Federal Rules of Civil Procedure and this court's local rules require as a precondition to filing a discovery motion that the parties confer in good faith in an effort to resolve the discovery dispute.  See Fed. R. Civ. P. 37(a)(1) and DSD LR 37.1.  Defendants filed a certification and supporting documentation indicating they had met this requirement.  Docket Nos. 157, & 158-4 through 158-10.

In its brief in opposition, W-E asserts that "some" of the issues raised in defendants' motion were not previously the subject of any conferral between the parties.  Docket No. 160 at 10.  W-E asserts that defendants did not meet and confer regarding RFP 4, 5 and 8(a) – (d). Id. at 19, 20, & 21.

Reviewing the documentation of the parties' conferral, the court notes that in the very first correspondence defendants sent W-E regarding perceived discovery deficiencies, defendants asked W-E to confirm whether it was going to produce electronically stored information (ESI) and other documents responsive to RFP 4 & 5 and 8(a) - (d).  Docket No. 158-4 at 3-4.  Defendants asked W-E to clarify whether it was withholding any documents pursuant to objection with regard to RFP 4, 5, & 8(a) – (d).  Id.

When W-E responded in writing to defendants' inquiry, it chose to simply ignore the inquires about RFP 4, 5, & 8(a) – (d), saying nothing about these discovery requests.  Docket No. 158-5.  Following this exchange, the parties held a phone conference at the end of June and discussed the issues, though

there is no document showing the court specifically what was discussed in that phone call.

A subsequent email months later from defendants to W-E pointed out that W-E promised to provide documents responsive to RFP 4 & 5 and that W-E had not done so and had not indicated if it planned to do so, or when. Docket No. 158-9. Defendants filed their motion to compel four days after this email was sent.

The court finds that defendants did satisfy the meet and confer requirement as to RFP 4, 5, & 8(a) – (d). The defendants raised these topics in their initial letter and W-E ignored the issues when it responded in writing. Defendants raised the issues again in an email and W-E sent no response. These communications took place over a period of nearly six months, and included a phone conference, so defendants certainly cannot be accused of rushing to file their motion. The court will consider defendants' motion on its merits as to all issues raised.

## B.    Standards Applicable

Federal Rule of Civil Procedure 26(b)(1) sets forth the scope of discovery in civil cases pending in federal court:

> *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within

14

this scope of discovery need not be admissible in evidence to be discoverable.

See FED. R. CIV. P. 26(b)(1).

"An interrogatory may relate to any matter that may be inquired into under Rule 26(b)." FED. R. CIV. P. 33(a)(2). Interrogatories must be answered unless the opposing party objects stating specific grounds for the objection. Cf. id. at (b)(4). Interrogatories must be proportional to the needs of the case, as must all discovery requests under Rule 26(b)(1). FED. R. CIV. P. 33 advisory committee's note to 2015 Amendment. Interrogatories must be signed under oath by the party itself. FED. R. CIV. P. 33(b)(3).

A party requesting the production of documents "must describe with reasonable particularity each item or category of items to be inspected." FED. R. CIV. P. 34(b)(1)(A). The responding party must allow inspection, produce copies, or object and provide a basis for that objection. Id. at (b)(2)(B)-(C). "A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request." Id. at (b)(2)(E)(i). "The production must then be completed no later than the time for inspection specified in the request or another reasonable time specified in the response." Id. at (b)(2)(B).

When a party fails to answer an interrogatory or produce materials responsive to a request for production, the party seeking discovery may move the court "for an order compelling disclosure or discovery." FED. R. CIV. P.

15

37(a)(1), (a)(3)(B)(iii)–(iv).  The moving party "must make a threshold showing that the requested information falls within the scope of discovery under Rule 26(b)(1)."  Sprint Commc'ns Co. L.P. v. Crow Creek Sioux Tribal Ct., 316 F.R.D. 254, 263-64 (D.S.D. 2016) (citing Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992)).  It then becomes the burden of the party resisting discovery to convince the court that "the discovery is irrelevant or disproportional."  Id. (citations omitted).  If the court determines the requests to be outside the scope allowed by Rule 26(b)(1), it must fashion appropriate limits.  FED. R. CIV. P. 26(b)(2)(C)(iii).

## C.    W-E's Damages:  Initial Disclosures, Interrogatories 1-8 & RFP 1

### 1.    Initial Disclosures

W-E is claiming damages of in excess of $100 million in this lawsuit.  Docket No. 158-2 at 3.  In federal court, it is incumbent upon each party to make certain initial disclosures without awaiting a discovery request from opposing parties.  See FED. R. CIV. P. 26(a)(1)(A).

Rule 26 specifies that one type of initial disclosure that is required is "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered."  Id. at 26(a)(1)(A)(iii).

Rule 26 also provides that these initial disclosures must be made "based on the information then reasonably available" to the party.  Id. at 26(a)(1)(E).

16

"A party is not excused from making its disclosures because it has not fully investigated the case." Id.

Rule 26 requires initial disclosures be made within 14 days of the date on which the parties hold their joint conference as required by Rule 26(f). Id. at 26(a)(1)(C). The parties also stipulated that they would make their mutual disclosures 14 days after their conference. See Docket No. 106 at 2, ¶ 2. The parties held their Rule 26(f) conference on December 12, 2023. Id. at 1, ¶ 1.

Defendants state that W-E did not comply with the requirement regarding making initial disclosures of its computation of each category of damages claimed by W-E. W-E does not address this assertion in its brief, choosing instead to address only the written interrogatories regarding damages. Docket No. 160 at 11-15. The court orders W-E to comply with the letter and spirit of Rule 26(a)(1)(A)(iii) immediately, including not only providing an explanation in writing of how W-E calculates each category of its claimed damages, but also making available each source document on which that computation is based, including materials bearing on the nature and extent of injuries W-E claims to have suffered.

### 2.    Interrogatories 1 – 8

Defendants' interrogatories 1-4 request W-E to "identify any damages from lost profits (including the specific dollar amount and the identity of the customer associated with the claimed loss) that you allege to be proximately caused by" each of the individual defendants in connection with W-E's breach of duty of loyalty claims. Docket No. 158-1 at 8. Interrogatories 5-8 request

W-E to identify damages *other than* lost profits which W-E claims to have been proximately caused by each of the individual defendants.  Id. at 8-9.

W-E responded to these interrogatories with a page and half preface containing boilerplate objections, disclaimers, and reservations of the right to make other objections not articulated.  Docket No. 158-2 at 1-2.  These boilerplate objections are overruled.

In response to each individual interrogatory, W-E objected on the grounds that the interrogatory was premature.  Id. at 2.  This objection is overruled.  As indicted above, this information was required by the Federal Rules of Civil Procedure to be disclosed by W-E at the inception of the case— here, no later than December 26, 2023, over a year ago.  Clearly, a request that seeks the same information nine months after the complaint was filed in this matter is not premature.

W-E argues that it needs to rely on expert testimony for its calculation of damages and the deadline for disclosing W-E's expert opinions has not yet passed.  Docket No. 160 at 12.  But this argument, too, is refuted by the language pertaining to the initial disclosures:  W-E was required to explain how it came up with a damages figure in excess of $100 million no later than December 26, 2023.  See FED. R. CIV. P. 26(a)(1)(A)(iii).  That early calculation must be based upon the information then available to W-E.  Id. at (E).  The fact that W-E has not fully investigated the case—i.e. W-E does not yet have in hand it's expert's opinion on damages—is not a valid reason to refuse to produce the information.  Id.

Initial disclosures, as well as responses to written discovery requests, must be supplemented in a timely fashion when newly obtained information shows that the party's prior discovery response is materially incomplete or incorrect.  Id. at (e)(1).  Thus, W-E is required to respond fully to defendants' interrogatories 1-8 now.  If W-E later learns, after receiving its expert report, that the responses it gave are now materially incorrect or incomplete, W-E can (must) amend those responses.

W-E also argues that defendants are jointly and severally liable for the damages W-E claims because W-E has alleged a civil conspiracy.  Docket No. 160 at 13.  Therefore, it claims it would be "nonsensical" to try to state individual damages attributable to individual defendants.  Id. at 13-14.  But the facts alleged by W-E as to each defendant are different.  For example, only Jens had a written employment agreement that restricted post-employment actions.  Only three of the four individual defendants are alleged to have downloaded documents from W-E's computers.  Each defendant left at different times.  Some of the defendants had direct contact with W-E customers while others did not.  Recognizing that some of W-E's damages for a particular defendant may overlap with damages for other defendants or even all defendants, W-E must still articulate how it calculates its damages and what it attributes to each defendant based on the differing facts alleged by W-E.

The court notes that some of W-E's claims are not asserted against all defendants.  For example, in its tortious interference with contractual relations claim, W-E asserts that only defendants Mr. Fastnacht and Mr. Hotchkiss

19

interfered with W-E's contractual relations with defendant Mr. Jens by inducing Jens to breach his employment contract with W-E.  Docket No. 22 at 37.  This claim does not involve defendant Ms. Hoffmann nor is it alleged that defendant Simplot was involved in this tort.  Id.  W-E must explain what its damages are for this claim against Fastnacht and Hotchkiss and provide documents supporting its calculation of damages.

Likewise, the breach of fiduciary duty claim is asserted only against Mr. Jens, Mr. Fastnacht, and Mr. Hotchkiss, but not against Simplot or Ms. Hoffmann.  Id. at 41.  W-E must explain its what its damages are against these three defendants and provide supporting documentation.

Finally, W-E claims it has responded sufficiently by providing a chart showing five years' worth of sales at W-E locations at issue in this litigation. Docket No. 160 at 14.  First, of all, the court notes that what is at issue here are interrogatories, not RFPs.  An interrogatory requires a written answer signed under oath by the party itself.  Fed. R. Civ. P. 33(b)(3).  Providing an unsigned chart of numbers is not an appropriate response to an interrogatory.

Also, this chart begs the question:  how does **W-E** calculate its damages? The chart may provide, buried within it, the building blocks used to calculate W-E's damages, but it does not explain to defendants ***how*** that data is used to calculate damages.  As Rule 26 makes clear, the burden is on the party claiming damages—here, W-E—to explain its calculation of damages.  Fed. R. Civ. P. 26(a)(1)(A)(iii).  Supporting documents must also be produced, but that does not obviate the obligation to explain how the calculation is done.  W-E is

20

ordered to immediately provide full and complete written responses under oath to interrogatories 1-8.

In its responses to defendants' interrogatories 1-8, W-E asserted a number of other objections that were not argued and supported in its brief in response to the motion to compel. For example, in the written response, W-E objected to the interrogatories on the grounds that they are vague and ambiguous, overly broad and unduly burdensome. Docket No. 158-2 at 2. Any and all such objections not specifically mentioned by W-E in its brief (Docket No. 160) are overruled. It is W-E's burden to demonstrate that there are grounds to resist this admittedly relevant discovery. By not mentioning these objections in its brief and supporting them with facts and law, W-E has waived the objections.

### 3.    RFP 1

W-E was served with RFP 1, which requested W-E to provide every document and ESI on which W-E relies or to which W-E referred in answering the damages interrogatories 1-8 discussed above. Docket No. 158-3 at 2. In its brief in opposition to defendants' motion to compel, W-E relies on the same arguments discussed above in connection with interrogatories 1-8 to resist RFP 1. For the same reasons discussed above, W-E's objections are overruled. W-E is ordered to immediately provide all documents that support its calculation of damages as was required of it by Fed. R. Civ. P. 26(a)(1)(A)(iii) and interrogatories 1-8.

**D.    RFP 2, 4 & 5**

These three RFPs are all discovery requests in which W-E stated it would produce documents, but then either did not produce any documents or limited what it would produce.

**1.    RFP 2**

This RFP request seeks documents showing W-E's marketing efforts, media buys, media campaigns, solicitations, or other outreach efforts to reach existing customers or new customers in South Dakota from January 1, 2021, to the present.  Docket No. 158-3 at 3.  In a letter dated November 19, 2024, W-E agreed to produce post-resignation (i.e. after June 2023) documents relating to W-E's efforts to retain customers it believed defendants solicited or reasonably might have solicited.  Docket No. 158-7 at 2.  W-E promised to provide that discovery "in waves" within the next 30 days.  Id.  As of the filing of their reply brief on the motion to compel, defendants assert that W-E did not produce even this limited category of documents.  Docket No. 169 at 12.

Defendants argue this discovery is relevant to W-E's claims of damages. Defendants seek to understand what W-E's marketing efforts were before defendants left W-E's employ and compare that to what W-E's marketing efforts were after they left.  A basic tenet of damages is that a party seeking damages has a duty to mitigate those damages through reasonable efforts.  See Restatement (Second) of Torts § 918 (1979) (one injured by another's tort is not entitled to recover damages for harm that he could have avoided by the use of reasonable effort or expenditure after the tort); Restatement (Second) Contracts

22

§ 350 (2024) (party cannot recover damages for breach of contract that the party could have avoided without undue risk, burden or humiliation).  If W-E's marketing of South Dakota customers and potential customers differed markedly during the period after defendants resigned as compared with those efforts made prior to the defendants' resignation, it could shed light on whether W-E has taken reasonable efforts to mitigate its losses.  Hence, the court finds defendants have satisfied their burden to show that the discovery sought is relevant.

Although defendants acknowledge that W-E has provided some responsive documents, defendants point out they have received no text messages or email correspondence with new or existing customers from its Tulare office that post-date June of 2023.  Furthermore, no pre-June 2023 documents have been produced.

W-E claims that it offered to produce all the documents claimed by defendants, but that does not seem to be true.  Defendants' RFP 2 asks for all documents from January 2021 to the present, whereas defendants have produced only documents generated after June 2023.

W-E objects that defendants' request is "grossly overbroad."  Docket No. 160 at 17.  W-E claims it is only requesting damages related to three of its South Dakota locations (Huron-Wessington Sprints, Tulare, and Blunt-Miller-Highmore) while defendants' request for documents covers all of W-E's South Dakota locations.  Id.  Of course, because W-E refused to answer interrogatories 1-8 and refused to produce documents related to damages,

23

defendants could be excused from knowing that W-E's damages were limited to customers at these three locations.

The court, however, agrees that if W-E's damages are indeed limited to these three locations, its discovery response to RFP 2 should be similarly limited. However, the court does not agree with W-E's position that it need only produce documents that were generated post-resignation. As explained above, a reasonable amount of data about marketing efforts prior to June 2023 is necessary in order to assess whether W-E mitigated its damages. The court finds that the period from January 1, 2021, to the present is a reasonable data set. As such, the court orders W-E to produce all documents responsive to RFP 2 that relate to marketing efforts aimed at customers or potential customers at W-E's three stated locations for the period from January 2021 to the present.

### 2. RFP 4

RFP 4 seeks documents related to sales projections, revenue targets, key performance initiatives, or other sales-related goals for the Agribusiness Division for a five-year period from 2019-2024. Docket No. 158-3 at 4. W-E responded to this document request with a litany of objections, after which it stated it would produce any non-privileged responsive documents that were in its custody, possession or control "subject to and without waiving any objection." Id. at 4-5. W-E's written response to RFP 4 is problematic because the "subject to and without waiving" language leaves defendants wondering if

all responsive documents are being produced.  In any case, defendants assert that W-E never produced any responsive documents to RFP 4.

W-E provides documentation that it provided, on November 15, 2024, sales incentive documents from 2022 for Mr. Hotchkiss and Mr. Jens.  Docket No. 167-14 and 167-15.  This is incomplete even as to defendants' individual goals.  It does not include any information about defendants Ms. Hoffmann or Mr. Fastnacht.  Nor does it cover the period from 2019-2024.  It does not include national sales goals or incentives.

Now, in responding to defendants' motion to compel, W-E argues that it should not have to produce "nationwide business goals for a division that has been restructured."  Docket No. 160 at 19.  In addition, W-E asserts it has provided sales related goals for individual defendants.  Id.  It also asserts that its response should be limited to the three South Dakota locations mentioned above in connection with RFP 2.

The testimony at the hearing on preliminary injunctive relief in this case was that 2022 was a record-breaking year in terms of sales at W-E.  W-E responded to this by increasing the sales goals for 2023 by 130 percent, which Mr. Jens and others in the sales portion of W-E's workforce felt was unrealistic. According to Mr. Jens, this action by W-E—along with a concomitant reduction in the marketing budget used by the salesforce to attract new customers—was one of the reasons employees like him were dissatisfied with continued employment at W-E. The testimony at the hearing was not specific as to

25

whether the new sales goal for 2023 was a nationwide goal, a goal only for South Dakota, or a goal only for an individual location in South Dakota.

The discovery bears on causation: were defendant motivated by a desire to harm W-E when they left W-E's employment, or were defendants' resignations brought about by W-E's own actions in regard to compensation of its employees? W-E argues that its Agribusiness Division has been restructured, but provides no details or facts from which the court can ascertain (1) whether this did actually occur and (2) what impact, if any, that would have on the documents requested under RFP 4. The court concludes that defendants have shown the requested discovery to be relevant and that W E has failed to carry its burden to demonstrate why relevant discovery should not be had. Accordingly, the court orders W-E to immediately comply with RFP 4.

### 3.    RFP 5

This discovery request seeks documents related to any reduction in force (RIF) at W-E from January 1, 2020, to the present. Docket No. 158-3 at 5. As with RFP 4, W-E stated a litany of objections to RFP 5, but then stated that "subject to and without waiving" these objections, W-E would produce any nonprivileged responsive documents in its possession, custody or control. Id. at 5-6.

W-E produced only its employee handbook, which discusses RIFs and suggests this is sufficient. Docket No. 160 at 20. It is not.

26

As with the sales goals, Mr. Jens testified that two prior RIFs in which highly successful and well-liked W-E employees were let go was one of the reasons employees at W-E were primed to resign.  Not only were the employees who were let go missed, but the remaining employees worried whether they might be the next ones to be let go in a subsequent RIF.  This affected W-E employee morale.  This, along with the sales goals information requested in RFP 4, is relevant as it relates to causation of W-E's losses (if any).  Were W-E's losses attributable to defendants' resignations and other asserted actions or were those losses caused by W-E's own management of its workforce?

W-E suggests RFP 5 should be limited in scope to South Dakota.  Docket No. 160 at 20.  This objection was stated generally in W-E's response to RFP 5 (see Docket No. 158-3 at 5), but then W-E stated it would provide all responsive documents that were not privileged (see id at 6).

Although W-E's response leaves much to be desired in terms of clarity, the court will limit the geographic—but not the temporal—scope of RFP 5.  W-E must provide information about RIFs from January 1, 2020, to the present in any of the following locations:  South Dakota, Minnesota, Iowa, Nebraska, and North Dakota.  The court includes these states in addition to South Dakota because (1) they are states in which crops are commonly grown (not so commonly in Wyoming and Montana), and they are near enough to South Dakota that W-E's South Dakota employees could be expected to learn of RIFs in those locations and be affected by them.

27

**E.     RFP 3**

This discovery request seeks W-E's marketing budget for the Agribusiness Division for the period 2019 to 2024.  Docket No. 158-3 at 4. W-E objected to this RFP and produced no documents.  Id.

As discussed above, Mr. Jens previously testified that there were a number of factors that led to low morale among W-E employees, among those were the fact that W-E allegedly cut the funds available to sales staff for marketing purposes.  This is relevant to the issue of the causation of W-E's damages:  were the damages caused by defendants or by W-E's own management of its business?

Also, as discussed above, efforts W-E has made to keep current customers and attract new ones is relevant to the issue of mitigation of damages.  If W-E's marketing budget has been reduced materially from what it was before defendants left W-E's employ, that change in where W-E spends its money might indicate a failure to mitigate its damages.

W-E argues that defendants have failed to demonstrate that this request is relevant.  The court disagrees.  Therefore, the burden is now on W-E to demonstrate adequate grounds to resist the discovery.

W-E argues that defendants are not entitled to "the marketing budget for an entire [W-E] nationwide business without established relevance."  Docket No. 160 at 17.  But defendants do not seek the marketing budget for *all* of W-E's business divisions, only the Agribusiness Division.  W-E again asserts that its Agribusiness Division was restructured in November 2023, but fails to

28

explain how this fact defeats the relevance of the information sought or provides grounds to resist the discovery.  Id. at 17-18.

The court finds that defendants have established the relevance of the documents requested and that W-E has failed to establish grounds to resist the discovery.  Accordingly, W-E is ordered to immediately provide to defendants all documents which are responsive to RFP 3.

## F.    RFP 6 & 7

These RFPs request W-E to produce all documents related to retention payments, bonuses, or restructured terms of employment with any South Dakota W-E Agribusiness employee from June 28, 2023, to the present as well as all communications within W-E about which employees to offer such payments to.  Docket No. 158-3 at 6.

W-E produced a chart showing guarantee and loyalty payments provided to South Dakota W-E employees after the date of defendants' resignations. Docket No. 160, 158-15.  W-E claims it explained the reasons for the payments in its chart (Docket No. 160 at 21), but in reality it did not; the chart merely contains a label—either "loyalty" or "guarantee"—for each line item, not the reason for W-E's decision to give the loyalty or guarantee payment to that employee.  See Docket No. 158-15.

Defendants assert the chart is not fully responsive to the requests.  It does not include the actual signed contracts with the employees, it does not include the original spreadsheet circulated among upper management at W-E identifying which employees should be offered retention payments, and it does

29

not include any communications among the decision-makers as to how the individuals who received these payments or the amount of the payment was selected.  Docket No. 169 at 19.  The court agrees.

First, the information is relevant.  There was testimony at the preliminary injunction hearing that some employees, including defendant Mr. Hotchkiss, were identified by W-E as early as January 2022 (18 months before defendants resigned) as being substantially underpaid according to a market survey W-E had requested.  However, even though W-E had this information in their possession, prior to defendants' resignations, W-E did not act on this information by offering Mr. Hotchkiss or other employees increased remuneration.  Again, this information is relevant as it goes to causation of W-E's damages.  It may also bear on mitigation of damages to the extent it can be shown that W-E could have prevented employees from leaving.

Defendants have shown the relevance of the requested information and W-E has not established grounds for resisting the discovery.  Accordingly, the court will order W-E to immediately produce all documents responsive to RFP 6 and 7.

## G.    RFP 8

This discovery request contains six subparts as follows:

(a) documents relating to resignations from employees in the Agribusiness Division in June and July 2023.

(b) documents related to efforts to retain employees in the Agribusiness Division from June 28, 2023 to the present.

(c) documents related to efforts to hire new employees to replace employees or resigned or separated from employment, including

application materials and any offers of employment made to such individuals.

(d) documents related to W-E's efforts to retain existing customers in regions previously serviced by an employee who resigned in June or July 2023 from the date of resignation to the present.

(e) documents related to W-E's efforts to attract new customers in the service areas in the regions previously serviced by any employee who resigned in June or July 2023 from the date of resignation to the present.

(f) documents relating to meetings, videoconferences, calls, and other calendared events relating to any of the topics listed in (a) – (e) above.

Docket No. 158-3 at 6-7.  The court notes that subparts (d) – (e) are limited to those regions where employees resigned from in June and July 2023, but (a) – (c) do not contain similar limitations.  The court will limit the scope of (a) – (c) to those regions of W-E's South Dakota Agribusiness Division where employees resigned in June and July 2023.  Resignations by employees in California or New Jersey in that same time frame would shed little light on W-E's claims or damages in this case.

Regarding RFP 8, W-E's written response to the discovery request again contains a litany of objections, most of which are not stated and supported with facts and law in its brief in opposition to the motion to compel.  Compare Docket No. 158-3 at 7-8, with Docket No. 160 at 21-23.  These objections are overruled.

In its brief, W-E claims RFP 8(e) is "not proportionate to the needs of this case" and "not proportionate to this matter," but W-E gives no details or facts to support this assertion.  Docket No. 160 at 23.  W-E

also states it is "in the process of locating additional responsive communications" with its customers.  Id.  W-E states it "has offered to produce documents found in its search of emails responsive to" subpart (e), but "an independent search for calendar entries (that are not memorialized in emails) is proportionate to this matter."  Id.  The court assumes the last quotation was intended to read "is [not] proportionate to this matter."

In any case, W-E provides no facts or details to support its proportionality argument.  The court notes that W-E is seeking in excess of $100 million in damages from defendants.  It would take a monstrous burden before discovery is deemed to be disproportionate in a case with these high stakes.  W-E has not articulated what the burden might be in terms of cost or manpower to satisfy RFP 8(e).

Defendants have demonstrated the relevance of RFP 8 as a whole. W-E has not demonstrated grounds for resisting the discovery. Accordingly, with the limitations imposed on (a) – (c) as stated above, the court orders W-E to fully comply with RFP 8 and to produce all responsive documents to that request.

**H.    RFP 9**

This request is a straightforward request for an organizational chart for W-E's Agribusiness Division for the last five years that includes names, titles, hire dates, end dates for each employee within the chart. Docket No. 158-3 at 8.

In response to this request, defendants state that W-E provided them with an organizational chart accurate as of February 2023 and limited to South Dakota.  Defendants argue that information prior to February 2023 and after defendants left W-E's employ is relevant to shed light on the extent of internal change within W-E, restructuring, and employee turnover.

The court notes that many of the reasons given by defendants for why they left W-E have to do with top management decisions:  decisions to set the sales goal for 2023 at 130 percent of the goal for 2022, to restrict the marketing/promotional budget, to institute RIFs, to not pay employees what W-E's own market survey indicated should be paid, to deny Wes Hotchkiss access to cost information on branded products, and so on.  Defendants have a right to depose W-E employees who made these decisions.  They are fact witnesses that can shed light on defendants' causation defense.

W-E responds in its brief that it need not provide information about the organization of the Agribusiness Division nationally because "the dates of employment of a summer intern in California in 2020 [does not have] any bearing on the actions of the Individual Defendants." Docket No. 160 at 24.  The court agrees—as to summer interns. However, organizational charts rarely include entry level employees or interns, so the argument is inapposite.

33

Defendants have established the threshold relevance of the discovery sought in RFP 9. W-E has not established grounds for resisting the discovery altogether or for accepting the limitations W-E has itself imposed (February 2023 in South Dakota only). However, the court will limit the request to those employees within W-E in the Agribusiness Division nationally who had a title or rank above that of the individual defendants named in this suit. With that limitation, W-E is ordered to respond fully to RFP 9 immediately.

## I.    Attorney's Fees and Costs

Under Fed. R. Civ. P. 37, the court "shall" award the prevailing party attorney's fees on a motion to compel unless (1) the moving party did not satisfy the meet and confer precondition, (2) the opposing party's nondisclosure was substantially justified, or (3) other circumstances make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A). Here, the court finds that defendants satisfied the meet and confer requirement. Furthermore, although the court did accept some of W-E's suggested limitations on the discovery, there was other discovery—namely that on damages—that W-E clearly had a duty to provide and blatantly refused, both at the initial disclosure stage and later when served with written discovery requests.

The court will award defendants attorneys fees in making this motion to compel, but cautions defendants to excise time from their request on matters that the court modified, either *sua sponte* or at W-E's

34

request.  The sanctions provision under Rule 37 was not intended to be a profit center.

## CONCLUSION

Based on the foregoing facts, law and analysis, it is

ORDERED that defendants' motion to compel [Docket No. 155] is granted in part and denied in part as further detailed in the body of this opinion.  When the court has ordered W-E to "immediately" produce certain discovery, W-E is required to do so within 15 calendar days from the date this order is entered.  It is further

ORDERED that if defendants wish to seek an award of attorney's fees, they must file an application for the same supported by detailed time entries and reference to prevailing hourly rates of attorneys in this locality.  Such application must be filed within 21 days from the date of this order.  Thereafter, W-E shall have 21 days to respond.  A reply, if necessary, may be filed by defendants within 14 days of W-E's response.

## NOTICE OF RIGHT TO APPEAL

Pursuant to 28 U.S.C. § 636(b)(1)(A), any party may seek reconsideration of this order before the district court upon a showing that the order is clearly erroneous or contrary to law.  The parties have fourteen (14) days after service of this order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(A), unless an extension of time for good cause is obtained.  See FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)(1)(A).   Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be

timely and specific in order to require review by the district court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED this 14th day of January, 2025.

BY THE COURT:

VERONICA L. DUFFY

United States Magistrate Judge