UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WILBUR-ELLIS COMPANY LLC,<br><br>                Plaintiff,<br><br>vs.<br><br>BRETT JENS, J.R. SIMPLOT COMPANY, SHANE FASTNACHT, PHYLICIA HOFFMAN, WES HOTCHKISS,<br><br>                Defendants. | 4:23-CV-04104-LLP<br><br><br>ORDER DENYING PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER<br><br>DOCKET NO. 161 |

**INTRODUCTION**

This matter is before the court on plaintiff Wilbur-Ellis Company LLC's ("W-E") amended complaint against former employees defendants Brett Jens, Shane Fastnacht, Phylicia Hoffman, Wes Hotchkiss, and their new employer, defendant J.R. Simplot.[1]  See Docket No. 22.  W-E alleges the individual defendants left their employment with W-E between June 29 and July 10, 2023, to go to work for J.R. Simplot, a competitor of W-E.  Id.  W-E alleges 12

---

[1] W-E is a Delaware corporation with its principal place of business in California.  Docket No. 22 at p. 2.  All of the individual defendants are citizens of South Dakota.  Id.  J.R. Simplot is an Idaho corporation.  Id. at p. 3.  Jurisdiction is premised on the diverse citizenship of the parties.  See 28 U.S.C. § 1332.

separate claims against defendants including breach of contract, tortious interference with contractual relations, breach of duty of loyalty, breach of fiduciary duty, violation of state and federal trade secrets laws, unfair competition, and civil conspiracy.  Id.

Now pending is a motion for a protective order filed by W-E seeking to preclude the deposition of the former president of its Agribusiness Division, Mark Ripato.  Docket No. 161.  Defendants resist the motion.  Docket No. 172.  The motion was referred to this magistrate judge for decision by the district judge.  Docket No. 168.

## FACTS

**A.   Identities of the Parties**

Mr. Jens became an employee of W-E in 2007 under an agreement that, by its terms, ended February 28, 2010, and thereafter reverted to an employment at will relationship.  The district court found (after a two-day evidentiary hearing on W-E's motions for a TRO and for a preliminary injunction) that the restrictive covenants of that employment contract were no longer in effect as of the date that Mr. Jens left W-E's employment on June 30, 2023.  The other three individual defendants were never parties to an employment contract with W-E, but were employees at will at all times. Mr. Fastnacht began employment with W-E in 2010 and left June 29, 2023. Ms. Hoffman began working for W-E in 2016 and left July 10, 2023.  And Mr. Hotchkiss began working for W-E in 2005 and left June 29, 2023.

At the time of his departure from W-E, Mr. Fastnacht was a district sales manager. Docket No. 92 at p. 13:17-21 (October 31, 2023, Hearing Transcript ("HT")). Mr. Jens was one of three sales managers who reported to Mr. Fastnacht. Id. at p. 14:2-21. Mr. Jens was in charge of the areas of Tulare, Huron, and Wessington Springs, South Dakota. Id. at p. 30:25; p. 31:1. Informally, Mr. Jens also had responsibility or influenced the areas of Miller, Highmore, and Blunt, South Dakota. Id. at p. 31:2-6.

Mr. Hotchkiss was the branded manager for South Dakota at W-E. Id. at p. 35:9-12. His duties were to manage the W-E "branded portfolio." Id. at p. 35:25; p. 36:1. He worked closely with the district sales managers and the sales managers as well as with sales agronomists and with customers. Id. at p. 36:1-6. The "branded portfolio" refers to products W-E actually manufactures itself with W-E's name on the box, jug, or bag. Id. at p. 36:9-15.

W-E is an agricultural business that sells seeds, chemicals, fertilizer, and crop scouting to farmers. Docket No. 92 at p. 13:6-7 (Oct. 31, 2023, Hearing Transcript ("HT")). J.R. Simplot competes with W-E in retail agricultural business in South Dakota. Id. at p. 34:9-15.

**B.     Allegations in W-E's Amended Complaint**

W-E alleges in its amended complaint that J.R. Simplot began plotting a raid of W-E's employees, customers, confidential information, and trade secrets in 2021, resulting in the "theft" of 24 employees in South Dakota. Docket No. 22 at p. 3. W-E alleges that in the days leading up to their resignations, defendants Mr. Fastnacht, Ms. Hoffman, and Mr. Hotchkiss inserted external

3

drives or USB devices into their W-E computers and accessed W-E documents, including documents containing confidential and trade secret information. Id. at p. 4. W-E also alleges Ms. Hoffman deleted customer seed orders the day prior to her resignation. Id. W-E alleges on June 20, 2023, Mr. Fastnacht bought 50 GB of iCloud storage and then, on June 27, purchased another 200 GB of iCloud Storage. Id. at p. 23.

W-E alleges that months before the individual defendants terminated their employment with W-E, they began "harassing other Wilbur-Ellis employees to follow their lead" and leave W-E's employment. Id. at p. 26. Other than the four named individual defendants, W-E lists 20 employees who it alleges left its employ between June 29 and July 18, 2023. Id. at pp. 31-32. Some of those employees constituted W-E's entire work force from its office in Tulare, South Dakota.[2] Docket No. 92, Oct. 31. 2023, HT, at p. 39:2-23.

C.   **Testimony from the Hearing on W-E's Request for Injunctive Relief**

At the evidentiary hearing on W-E's request for injunctive relief events other than actions of the defendants were established as contributing to employee dissatisfaction at W-E in the first half of 2023. There was a reduction in force in January 2023 and a second one in February 2023 that

---

[2] The testimony of a W-E witness and employee established the number of ten as the total of the employees at the Tulare office. Another W-E witness and employee said there were 25 such employees. Mr. Jens testified there were 14-15 employees. Docket No. 93 at p. 352:15-17. The court notes that if there were really 25 employees at the Tulare office and all of them walked out on the same date, the amended complaint would probably list more employees than the 20 employees it lists. Resolution of the exact number of employees at W-E's Tulare office is not necessary for purposes of addressing defendants' instant motion.

had negatively impacted morale at W-E.  Mr. Jens testified that two of the employees who were let go, Tait Lacey and Troy Johnson, were very successful at their jobs at W-E and it caused Mr. Jens to fear whether he might be next. Docket No. 93, HT Nov. 1, 2023 at p. 360:8-20.

Mr. Jens made W-E aware in March 2023 that he had received an offer of employment from J.R. Simplot that would pay him 3.8 times his current W-E salary.  Although 2022 had been a record year for sales, Mr. Jens' bonus—paid in March 2023 based on sales for 2022—was lower than in previous years when the sales had not been as high.

Also, W-E increased sales goals for 2023 by 130 percent, a figure the sales employees felt was unrealistic.  And, although W-E had just experienced a record sales year, W-E demanded that discretionary spending for meals, entertainment, travel, and sponsorships—spending used by sales employees to generate sales--be reduced.

In March 2023, the president of W-E's Agribusiness Division, Mark Ripato, along with others, visited Mr. Jens at the Tulare office.  Docket No. 93, HT Nov. 1, 2023 at p. 371:13-19.  During that meeting, Mr. Jens communicated the above and other grievances to Mr. Ripato in a meeting held with all of Mr. Jens' sales persons whom he directly supervised ("direct reports").  Id.  Mr. Jens complained to Mr. Ripato about the corporate micro-management of his job, the fact that corporate forecasts were not reflecting the data he submitted (specifically as to inventory), that the calibration of payments for bonuses needed to be recalculated because it would result in too

5

low of a payment in bad years, that the corporate policies for rewarding sales agronomists needed to be recalibrated, and that the fleet was "a mess." Docket No. 74 at p. 7 (Ex. 104). All of the Tulare employees who met with Mr. Ripato had the opportunity to express their discontent with circumstances at W-E. Docket No. 93, HT Nov. 1, 2023 at p. 371:13-19. This meeting with Mr. Ripato lasted "many hours." Id. At the end of the meeting Mr. Ripato told Mr. Jens and his direct reports that "he was going to go back and make corrections and . . . make changes." Docket No. 164-3 at 6 (depo. transcript at 48). Mr. Ripato followed up after the meeting by sending Mr. Jens a text message. Id. After this meeting with Mr. Ripato, W-E made efforts to improve Mr. Jens' compensation, but otherwise there was "zero response from upper management" to the concerns expressed by Mr. Jens and his direct reports. Docket No. 93 at 374:13-13.

Sarah Hanson, a human resources[3] employee for W-E, confirmed that the above-described meeting took place and that she and Mr. Ripato were the recipients of a subsequent email concerning the meeting. See Docket No. 60-7 at 15 (depo. transcript at 53:16-25; and 54:1-2).

Tracie Gogolin, a Vice President of human resources for W-E confirmed that Mark Ripato was one of several W-E employees who discussed possibly

---

[3] W-E uses the title "People and Culture" to describe the human resources function at its company. Thus, Sarah Hanson is a Business Partner for People and Culture for the Upper Midwest region for W-E and Tracie Gogolin is Vice President of People and Culture for the Agribusiness Division. The court uses the phrase "human resources" because that is a phrase that is recognizable to most readers.

offering retention agreements to key W-E employees or W-E employees at risk of leaving the company. Docket No. 60-6 at 15 (depo. transcript at 50-51). Ms. Gogolin also confirmed the above-described meeting between Mr. Ripato, Mr. Jens, and Mr. Jens' direct reports took place in March 2023. Id. at 19 (depo. transcript at 66-67).

Despite the fact that W-E recognized it would be prudent to offer retention agreements to some employees to ensure they did not leave W-E's employ, W-E never actually offered any retention agreements (other than to offer Mr. Jens increased remuneration) to any employees until after employees left W-E's employ at the end of June and beginning of July in 2023. Docket No. 92 at 126:6-20.

Defendants served W-E with a notice of deposition for Mark Ripato for December 20, 2024. See Docket No. 164-2. One day before the deposition was to take place, W-E filed the instant motion seeking to prevent Mr. Ripato's deposition from being taken. Docket No. 161.

## DISCUSSION

### A.   Good Faith Meet and Confer Requirement

Both the Federal Rules of Civil Procedure and this court's local rules require as a precondition to filing a discovery motion that the parties confer in good faith in an effort to resolve the discovery dispute. See Fed. R. Civ. P. 37(a)(1) and DSD LR 37.1. W-E asserts that it satisfied this requirement. Docket No. 162 at 1. See also Docket No. 164-1 (emails documenting parties' discussion). Defendants do not dispute this.

7

B.   **Standards Applicable**

Federal Rule of Civil Procedure 26(b)(1) sets forth the scope of discovery in civil cases pending in federal court:

> *Scope in General.*  Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable.
>
> See FED. R. CIV. P. 26(b)(1).

Protective orders are governed by Rule 26(c).  That provision provides, in part, that "a party . . . from whom discovery is sought may move for a protective order . . .. The court may, for good cause, issue an order to protect a a party from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).  In ruling on a motion for a protective order, the court may forbid the discovery, specify terms for the discovery, prescribe a different discovery method, forbid inquiry into certain subjects, decide who may be present while the discovery takes place, require sealing of a deposition, require that confidential information not be revealed, or require matters to be filed under seal.  Id.

Under Rule 26(c), a court may grant a protective order only upon a showing of good cause by the moving party.  General Dynamics Corp. v. Selb

Mfg. Co., 481 F.2d 1204, 1212 (8th Cir. 1973). The movant must articulate "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." Id. (additional citation and quotation marks omitted); see also Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994) ("Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking disclosure. The injury must be shown with specificity. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing.") (additional citations and quotation marks omitted). The court must also consider "the relative hardship to the non-moving party should the protective order be granted." General Dynamics Corp., 481 F.2d at 1212 (additional citation omitted).

Rule 26(c) confers " 'broad discretion on the [district] court to decide when a protective order is appropriate and what degree of protection is required.' " Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2, 197 F.3d 922, 925 (8th Cir. 1999) (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984)). In this case, W-E, as the party seeking the protective order, has the burden "to show the necessity of its issuance." See General Dynamics Corp., 481 F.2d at 1212.

## C. Apex-Deposition Doctrine

W-E seeks to prevent Mark Ripato's deposition from being taken pursuant to the apex-deposition doctrine. In support of its motion, W-E asserts that Mr. Ripato was president of its Agribusiness Division, is now fully retired and living in Kentucky, and that Mr. Ripato was not involved in the day-to-day management of employees, but rather made high-level strategic decisions for W-E that are unlikely to shed any light on the issues in this lawsuit. See Docket No. 162; Docket No. 164-2.

The apex deposition doctrine requires a party seeking to depose a high-level corporate executive to demonstrate (1) that the executive has unique or special knowledge of the facts at issue and (2) other less burdensome avenues for obtaining the information have been exhausted. Gladue v. Saint Francis Medical Center, 2014 WL 7205153 *1 (E.D. Mo. Dec. 17, 2014).

A party seeking to prevent a deposition bears a heavy burden to show why discovery should be denied. Wells v. Lamplight Farms, Inc., 2015 WL 225815 *1 (N.D. Iowa Jan. 16, 2015); Bombardier Recreational Products, Inc. v. Arctic Cat, Inc., 2014 WL 5685463 *3 (D. Minn. Sept. 24, 2014). It is unusual for a court to prohibit the taking of a deposition altogether, even when it is a CEO, and a claimed lack of knowledge by itself is insufficient to preclude the deposition. Bombardier, 2014 WL 5685463 *3 (citing Apple Inc. v. Samsung Electronics Co, Ltd., 282 F.R.D. 259, 263 (N.D. Cal. 2012)); Raml v. Creighton Univ., 2009 WL 3335929 *2 (D. Neb. Oct. 15, 2009). The apex doctrine is intended to protect "busy, high-level executives" and "is bottomed

on the apex executive lacking *any* knowledge of relevant facts." Raml, 2009 WL 3335929 at *2 (quoting Minter v. Wells Fargo Bank, N.A., 258 F.R.D. 118, 126 (D. Md. 2009)).  A claim that the witness lacks knowledge of any relevant facts is unavailing "since the party seeking to take the deposition is entitled to test his lack of knowledge."  Minter v. Wells Fargo Bank, N.A., 258 F.R.D. 118, 125 (D. Md. 2009).  As the party seeking the protective order, W-E bears the heavy burden of demonstrating good cause for the order.  Wells, 2015 WL 225815 *1; Bombardier, 2014 WL 5685463 *3; Raml, 2009 WL 3335929 *2; see also FED. R. CIV. P. 26(c).

Here, defendants have shown that Mr. Ripato has special knowledge of facts pertaining to the issues defendant assert were their reasons for leaving W-E's employ.  Mr. Ripato spent the better part of a day at the Tulare, South Dakota, office personally listening to Mr. Jens' concerns and the concerns of his direct reports.  At the end of the meeting, he gave assurances he would take action on those concerns.  He followed up after the meeting by sending Mr. Jens a text about the meeting.  Mr. Ripato took part in discussions via email about W-E's plans to offer retention agreements to key employees.  Defendants wish to depose Mr. Ripato to find out the reasons why W-E never offered any of those retention agreements until after employees left in June and July, 2023.  Defendants also wish to depose Mr. Ripato on the subject of W-E's decision to fire Tait Lacey, why W-E made certain decisions with regard to sales people's compensation and discretionary spending, and W-E's decision not to

11

bind three of the four individual defendants herein to non-compete, non-solicitation agreements.  Docket No. 172 at 7.

In addition, defendants have shown that they have exhausted other less burdensome avenues of discovery.  Defendants previously served written discovery on W-E and received precious little of what it sought.  For example, W-E refused to provide any information as to its calculation of damages.  W-E refused to provide all but one chart showing the organization of the Agribusiness Division.  With few exceptions, W-E refused to provide information about retention agreements offered—specifically why those employees were selected to receive the agreements and why offering of the agreements took place when it did.  W-E provided only very limited documents pertaining to its efforts to retain customers after defendants left.  When asked to provide documents relative to the two RIFs conducted in early 2023, W-E provided only its employee handbook which described the RIF procedure.  See generally Docket No. 174.  Thus, defendants have exhausted other avenues of obtaining this information aside from taking Mr. Ripato's deposition.

As the court noted in a previous opinion, in a slip-and-fall case in front of a Holiday Inn in Sioux Falls, South Dakota, one would not expect the CEO of InterContinental Hotels Group to have personal relevant information about the plaintiff's claim.  Wetch v. Crum & Forster Commercial Ins., 5:17-CV-05033-JLV, Docket No. 105 (D.S.D. Jan. 22, 2019).  The apex deposition doctrine was

designed to protect high-level executives from having their depositions taken in such situations.  Id.

Similarly, in the Gladue case cited by W-E in its brief, the deposition of the defendant's CEO was prohibited where the plaintiff's claim was a garden-variety Title VII employment discrimination claim and there was no evidence the CEO had any knowledge of the reasons for plaintiff's discharge or that he was involved in that discharge in any way.  See Gladue v. Saint Francis Medical Ctr., No. 1:13-CV-00186-CEJ, 2014 WL 7205153 at *1-2 (E.D. Mo. Dec. 17, 2014).  By contrast, where high-level executives had knowledge of negotiation of an agreement with a co-defendant and the production of the product at issue in the lawsuit, the court allowed the depositions to take place over the defendant's assertion of the apex doctrine.  Ribeiro v. Baby Trend, Inc., 8:12-CV-204, 2016 WL 5874967 at *2 (D. Neb. Oct. 7, 2016), overruled on other grounds, Rubeiro v. Baby Trend, Inc., 8:12-CV-204, 2016 WL 11658961 (D. Neb. Nov. 17, 2016).

Other cases cited by W-E stand for the unremarkable proposition that a party may not take the deposition of a CEO when that is the first discovery salvo the party has used and other discovery devices have not yet been explored.  In the Rembrandt Diagnostics, LP case cited by W-E, a protective order was conditionally granted because plaintiff had not exhausted other discovery avenues—namely depositing lower-level officers in the defendant company first.  Rembrandt Diagnostics, LP v. Innovacon, Inc., No. 16-cv-0698

13

CAB (NLS), 2018 WL 692259 at *6-7 (S.D. Cal. Feb. 2, 2018).  The court left open the possibility of the deposition of the President if the depositions of the lower-level officers did not include the issues plaintiff wished to explore.  Id. See also Celerity, Inc. v. Ultra Clean Holding, Inc., No. C 05-4374 MMC (JL), 2007 WL 205067 at *4-5 (N.D. Cal. Jan. 25, 2007) (postponing the immediate taking of deposition of CEO and Chairman of the Board until and unless lower-level employees' depositions were taken and proved to be unsatisfactory, after which depositions of the two executives might be allowed).

Similarly, in the Mulvey case that W-E relies on, the court postponed the deposition of Lee Iacocca, Chairman of Chrysler Corp. because the plaintiff in that product liability lawsuit had not exhausted avenues such as serving written interrogatories and requests for the production of documents.  See Mulvey v. Chrysler Corp., 106 F.R.D. 364, 365-66 (D.R.I. 1985).  The court specifically held that Mr. Iacocca's "prestigious position is an unimpressive paper barrier" and that the court would consider allowing the deposition to go forward if the answers to plaintiff's interrogatories, once served and responded to, warranted.  Id.

The facts here are much different.  Here, Mr. Ripato personally participated in a listening session with Mr. Jens and his direct reports and assured them that W-E would take action.  Presumably, he has some insight as to why no action was subsequently taken.  In addition, it is the kind of high-level decision making defendants as W-E employees were unhappy with that Mr. Ripato likely had input into or knowledge of:  why bonuses were so small

14

after a record sales year, why discretionary spending to generate sales was curtailed, why the fleet wasn't being repaired/maintained, why the aerial business was being terminated, why W-E felt it necessary to conduct two RIFs in early 2023, and other similar issues.  Additionally, defendants have engaged in substantial written discovery and have deposed many lower-level W-E agents and still do not have satisfactory answers to the above issues.

The court in the Dawkins case granted a protection order based on the apex deposition doctrine, but in that case, the executive had no participation in the allegedly wrongful termination of plaintiff's employment; he was merely kept appraised of events.  See Dawkings v. Barnhart Crane & Rigging Co., No. 8:18-CV-534, 2020 WL 1535851 at *2 (D. Neb. Mar. 31, 2020).  Here, Mr. Ripato was not merely kept informed of employee complaints, he inserted himself directly into the situation, spending several hours in person with Mr. Jens and his direct reports, and he left with assurances that the complaints would be acted on.  Additionally, he was party to the decision about the need for retention agreements for key or at-risk employees, the timing of offering such agreements, and the identification of which employees such agreements were offered to.

W-E complains about the expense and time that will be required to prepare Mr. Ripato for a deposition.  But the court points out that W-E is claiming in excess of $100 million in damages in this case.  The cost and time to prepare Mr. Ripato to be deposed is definitely not disproportionate to the needs of the case given W-E's alleged damages.

15

In support of its motion, W-E also points to the fact that Mr. Ripato is now retired and lives in Kentucky. Those facts argue in favor of special conditions attending the deposition, but not, given the facts of this case, prohibiting the deposition altogether. The court will order defendants to take Mr. Ripato's deposition in the town in Kentucky where Mr. Ripato lives (if he is there) and to limit the deposition to no longer than six (6) hours. Alternatively, defendants may take Mr. Ripato's deposition by remote video. The parties are encouraged to come up with a mutually-agreeable location and method of taking this deposition that imposes the least amount of inconvenience on Mr. Ripato. But the court will not prohibit the deposition. Mr. Ripato possesses unique knowledge and facts important to this case. Defendants have attempted to obtain this information through other discovery devices and have been stymied by W-E. Defendants have a right to depose Mr. Ripato.

## CONCLUSION

Based on the foregoing facts, law and analysis, it is

ORDERED that W-E's motion for a protective order [Docket No. 161] is denied. Defendants shall be allowed to depose Mark Ripato in accordance with the limitations noted above.

## NOTICE OF RIGHT TO APPEAL

Pursuant to 28 U.S.C. § 636(b)(1)(A), any party may seek reconsideration of this order before the district court upon a showing that the order is clearly erroneous or contrary to law. The parties have fourteen (14) days after service of this order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(A),

unless an extension of time for good cause is obtained.  See FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)(1)(A).   Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely and specific in order to require review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 23rd day of January, 2025.

BY THE COURT:

*(signature)*

VERONICA L. DUFFY

United States Magistrate Judge